UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Alan PHILIPP,<br> 5 Raeburn Close<br>London NW11 6UG, United Kingdom,<br><br>and<br><br>Gerald G. STIEBEL,<br> 3716 Old Santa Fe Trail<br>Santa Fe, NM 87505,<br><br> Plaintiffs,<br><br> v.<br><br>FEDERAL REPUBLIC OF GERMANY, a foreign state,<br><br>and<br><br>STIFTUNG PREUSSISCHER KULTURBESITZ,<br><br> Von-der-Heydt-Str. 16-18<br>10785 Berlin, Germany,<br><br> Defendants. | Case No. |

## **COMPLAINT**

This is a civil action by plaintiffs Alan Philipp ("Philipp"), and Gerald G. Stiebel ("Stiebel," together with Philipp, the "plaintiffs"), for the restitution of a collection of medieval relics known as the "Welfenschatz" or the "Guelph Treasure" now wrongfully in the possession of the defendant Stiftung Preussischer Kulturbesitz, a/k/a the Prussian Cultural Heritage Foundation (the "SPK"). The SPK is an instrumentality of the defendant Federal Republic of Germany ("Germany," together with the SPK, the "defendants").

## INTRODUCTORY STATEMENT

1.      This is an action to recover the Welfenschatz, a unique collection of medieval relics and devotional art that was sold by victims of persecution of the Nazi regime under duress, and far below actual market value.  Those owners were a consortium of three art dealer firms in Frankfurt: J.&S. Goldschmidt, I. Rosenbaum, and Z.M. Hackenbroch (together, the "Consortium").  Zacharias Max Hackenbroch ("Hackenbroch"), Isaak Rosenbaum ("Rosenbaum"), Saemy Rosenberg ("Rosenberg"), and Julius Falk Goldschmidt ("Goldschmidt") were the owners of those firms, together with plaintiffs' ancestors and/or predecessors-in-interest in this action.

2.      This sale to the Nazi-controlled State of Prussia on June 14, 1935, via a manipulated sham transaction, was spearheaded by the Dresdner Bank, which was acting on behalf and by order of the two most notorious Nazi-leaders and war criminals, Hermann Goering ("Goering") and the German dictator, the "Führer" Adolf Hitler ("Hitler"), themselves.  The transaction relied on the atmosphere of early Nazi terror, in which German Jews could never be arms'-length commercial actors.

3.      This is also an action to address a second victimization suffered by the Plaintiffs. Germany advances the pretense that it has enacted procedures to address Nazi-looted art, but the reality is quite different.  The sham process to which the Plaintiffs were subjected in 2014 provides additional justification for this action.

4.      The coerced sale of the Welfenschatz resulted in payment of barely 35% of its market value to the Consortium—or even as little as 15%, according to contemporary German

state museum professionals.  That money was never fully at the Consortium's disposal even after payment (and consisted partly of other artworks that were worth nothing like their promised value).  The proceeds, such as they were, were then also subjected to confiscatory "flight taxes"—the extortionate payments that Jews had to pay for the privilege of escaping with their lives.

5.      Most critically with respect to the illegitimacy of the 1935 sale, they were Jewish and regarded by the National Socialists as traitors and enemies of the Germanic state, in line with the corrupt ideology of Hitler's racist and inhuman manifesto *Mein Kampf.* These Jewish art dealers were viewed as parasites selling off cultural items at the heart of the Nazi identic for self-gain and for damaging and harming the German identity.

6.      Iconic Germanic art was at the core of the Nazi worldview, and the Welfenschatz was the kind of art in general, and the specific artworks in particular, that the Nazis desperately wanted, and for which they would stop at nothing.  The Consortium's Jewish heritage placed it within the Nazis' grasp after the party's ascension to power in Germany.

7.      The foregoing, without more, is sufficient under longstanding principles of international law to establish that the 1935 transaction was illegitimate.  Any sale of property in Nazi Germany by Jewish owners—let alone to the Nazi-run state itself—was presumptively under duress, illegitimate, and void.  Were Germany to claim otherwise, it would be explicitly endorsing—in 2015—the plunder of Goering (part of whose collection, it should be said, decorated the rooms of the German chancellor's office, the "Bundeskanzleramt," as recently as 2014 until a journalist called attention to it).

8.      There is, however, considerably more.  Specifically, after the Nazi seizure of power in 1933 and the spasmodic violence and intimidation towards Jews, the boycotting of Jewish business, and the eventual elimination of Jews from all aspects of civic life, high ranking Nazis targeted the Welfenschatz, specifically, by virtue of the vulnerability of its Jewish owners, who were publicly accused of selling national treasures and who became public enemies as a result.  The choice they faced was clear: their property or their lives.

9.      Infamous criminals Hitler , Goering, Bernhard Rust ("Rust"), and Hjalmar Schacht ("Schacht") among them, were all involved in explicit correspondence whose intent was to "save the Welfenschatz" for the German *Reich* from these declared enemies of the state.

10.      After the Nazi-takeover of power in Germany, and as a direct and proximate result of the historic persecution that was the official policy of the State of Prussia and the German Reich, the members of the Consortium faced catastrophic economic hardship.  Starting from day one, the Nazi-regime was engaged in spreading fear, panic, and violence in these early days of terror as part of the ongoing so-called "National Socialist revolution" in Germany.  Both the early unlawful laws of the new Germany, the anti-Semitic riots, the nationwide boycotts of Jewish businesses, and the growing permanent, pseudo-legal monitoring of Jews by the "Nazified" administrative bodies, first and foremost by the German tax authorities, directly affected these art dealers' lives and businesses.  Means of systematic disenfranchisement, discrimination, and terror, fomented by the Third Reich's officials, caused also the three art dealers' sale revenues to fall virtually to zero within the shortest period of time and made it impossible thereafter for any of them to earn a living in Germany.  On information and belief,

the Consortium were targeted by the *Geheime Staatspolizei* (Gestapo) and subjected to direct personal threats of violence for being Jews and for trying to sell the Welfenschatz fairly.

11.     The Nazis' crowning touch was to intercede just when a willing fair market buyer for the Welfenschatz appeared, to dictate that any further arms'-length negotiations cease, through which the Consortium could have realized the value of its property.

12.     With the market duly fixed, and their own situation having descended into ahistorical levels of persecution, humiliation, and risk, the Consortium relented in 1935.  From the Consortium's perspective, the "deal"—for 4.25 million RM (barely 35% of its actual value) split and partly paid only into a blocked account—was a predicament and without any alternative.

13.     Soon after Goering, by then hailed as the "savior of the Welfenschatz," had forcefully and punitively "rescued" the collection from the Jews, as highlighted in his biography of 1940, he presented the Welfenschatz as a personal "surprise gift" to Hitler himself at a ceremony in November 1935.

14.     In 2014, the Plaintiffs, as heirs to the Consortium, suffered a parallel victimization.  Despite Germany's international commitments to "fair and just" solutions with respect to Nazi-looted art, it has enacted no meaningful procedures or laws to address victims of art looted and sales under duress.  Worse, it has only appointed an "Advisory Commission" that issues only non-binding recommendations, which are not adjudications of any property rights.

15.     That Advisory Commission, since being established in 2003 as a governmental entity, has shown a disturbing tendency to ignore longstanding principles of international law—chief among them the unassailable principle that a sale by owners like the Consortium in Nazi Germany was by definition coercive and void.

16.     These failures leave the Plaintiffs no choice but to seek the present relief.

## PARTIES

17.     Philipp is an individual, citizen of the United Kingdom, and a resident of London, England, UK. He is the grandson and legal successor to the estate of the late Zacharias Max Hackenbroch, the sole owner of the former Hackenbroch art dealers.

18.     Stiebel is an individual and a United States citizen who resides in Santa Fe, New Mexico.  He is the great-nephew of the late Isaac Rosenbaum, co-owner of I. Rosenbaum art dealers with Saemy Rosenberg, and legal successor to Rosenbaum's estate.

19.     Germany, a/k/a  the *Bundesrepublik Deutschland*, is a sovereign nation comprised of the 16 federal states ("Länder").  Germany is the political—and under international law, the legal—successor to the German *Reich* a/k/a the *Third Reich* a/k/a Nazi Germany.  Germany was established as West Germany in 1949 from the 11 Länder, in the Western-occupied areas of the Third Reich (including West Berlin), and absorbed the remaining 5 Länder as part of reunification in 1990.

20.     The SPK is the successor-in-interest to the Free State of Prussia (the "Freistaat Preussen"), a political subdivision of the German Weimar Republic and later the Third Reich—

with respect to all interests in cultural property and fine art.  The SPK is a foundation under German law, erected by the German parliament in 1957, and an instrumentality of Germany. The SPK operates by and through its President Professor Dr. Hermann Parzinger.  The SPK's board consists of representatives from the German Federal government, and from its political subdivisions, the 16 *Länder*.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over all defendants pursuant to 28 U.S.C. § 1330 and 28 U.S.C. §§ 1605-07 (the Foreign Sovereign Immunities Act).  Process will be served on all defendants pursuant to 28 U.S.C. § 1608.

22.     The defendants are not immune from suit, under either the so-called "expropriation exception" of 28 U.S.C. § 1605(a)(3), or the so-called "commercial activity exception of 28 U.S.C. § 1605(a)(2), all as alleged in further detail herein.

23.     This action concerns rights in property taken by the State of Prussia and/or the German Reich, and/or Goering, in his capacity as Prime Minister of the State of Prussia in 1935, in violation of international law, within the meaning of 28 U.S.C. § 1605(a)(3).  That taking included, *inter alia* and without limitation the following:

i.      The Welfenschatz was acquired by the Nazi State of Prussia to present it as a personal gift to Hitler.  It served no public purpose, but was made for personal gain of the Nazi leaders and their reputation.

ii.       In addition, their takings were discriminatory since the art dealers were Jewish and therefore belonged to a persecuted group, and the collection was wrongfully appropriated not least because they were regarded as state's enemies for holding the iconic Welfenschatz.

iii.      Further, the German Government has not yet returned the collection to the plaintiffs or justly compensated them for the value of the collection.  Without compensation, this taking cannot be valid.

iv.      Dresdner Bank and the Nazi-State of Prussia gained possession of the Welfenschatz in a joint effort by setting up a scheme of manipulation, coercion, and terror.  In violation of international law, they took the collection from plaintiffs' predecessors-in-interest in order to "Aryanize," to "rescue," and to get hold of the collection for *völkisch* reasons in accordance with the National Socialists' policy, which in its entirety was condemned as inhuman and void by the Allies and the United States Government after 1945.

v.       Dr. Robert Schmidt, former director of the Berlin Schlossmuseum and a key actor in the matter at hand, intentionally misled the Allied Forces and the United States Military government for Germany and Bavaria in the postwar-era about the true nature of the acquisition of the collection in order to protect himself and in order to prevent restitution of the collection to the art dealers, based on and granted by Allied Military law.  The current German Government, when it learned of the art dealers' heirs' rights to the collection of the Welfenschatz, adopted Schmidt's

cover-up and deceived the heirs as to the circumstances of its acquisition of the collection.

vi.      The defendants, Germany and the SPK, wrongfully assert ownership over the collection in furtherance of the taking in violation of international law.

vii.     Germany, in its capacity as the political-legal successor of the Nazi Third Reich, is not immune from suit for its complicity in and perpetuation of the discriminatory appropriation of the Welfenschatz collection.  Among other things, violations of Germany's obligations under the 1907 Hague Convention on the Laws and Customs of War on Land, and Germany's official repudiation after 1949 of all Nazi transactions bar any defense that this transaction was legitimate and not coercive.

viii.    The policy of the United States of America since at least 1945 has been to undo the forced transfers and restitute identifiable property to the victims of Nazi persecution wrongfully deprived of such property and, with respect to claims asserted in the United States for restitution of such property, to relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of the Nazi officials.  *See* Press Release No. 296, "Jurisdiction of United States Courts Re Suits for Identifiable Property Involved in Nazi Forced Transfers," reprinted in *Bernstein v. N.V. Nederlandsche-Amerikaansche*, 210 F2d 375, 375-76 (2d Cir. 1954).

24.     Germany and the SPK are engaged in commercial activity within the United States, within the meaning of 28 U.S.C. § 1605(a)(3), including but not limited to the following:

    i.    The SPK engages in regular exhibitions within the United States by loaning objects to museums in the United States from the collections of the museums administered by the SPK.  By way of example but without limitation, the SPK loaned objects to an exhibition entitled "Byzantium and Islam Age of Transition" at the Metropolitan Museum of Art in New York in 2012.  The SPK also licensed photographs of its collection for inclusion in the catalogues of those exhibitions, which are sold and marketed throughout the United States (including in the District of Columbia) by retail and Internet sales.

    ii.    The SPK licenses images of its collection to the general public throughout the United States (including the District of Columbia) on an ongoing basis, including but not limited to licensing relationships with Art Resource in New York, and the United States National Holocaust Memorial Museum in the District of Columbia.

    iii.    The SPK solicits subscriptions to its newsletters, solicitations that reach the District of Columbia, among other parts of the United States.  SPK-administered museums seek to and sell entrance tickets to the Berlin museums to patrons in the United States, including but not limited to patrons in the District of Columbia.

    iv.    The Museum of Decorative Arts ("Kunstgewerbemuseum") in Berlin, administered by the SPK and the current location of the Welfenschatz, publishes and sells a book entitled *Kunstgewerbemuseum Berlin* within the United States of the highlights of its collection, including but not limited to within the District of Columbia.  The Welfenschatz features prominently in this catalogue, in particular the famous *Kuppelreliquiar* (the "Chapel Reliquary")—which is depicted on the very cover of the book.

v.   The Kunstgewerbemuseum in Berlin, administered by the SPK and the location of the bulk of the Welfenschatz, publishes and sells a book entitled *Katalog des Kunstgewerbemuseums* (*Catalogue of the Kunstgewerbemuseum*) within the United States, including but not limited to within the District of Columbia.  The Welfenschatz features prominently in this catalogue, and is referred to as such for any object that is part of the Welfenschatz.

vi.   The Kunstgewerbemuseum in Berlin, administered by the SPK and the location of the bulk of the Welfenschatz, publishes and sells a book entitled *Schätze des Glaubens: Meisterwerke aus dem Dom-Museum Hildesheim und dem Kunstgewerbemuseum Berlin* (*Treasures of Belief: Masterworks from the Hildesheim Cathedral Museum and the Kunstgewerbemuseum Berlin*), within the United States, including but not limited to within the District of Columbia.  The Welfenschatz features prominently in this catalogue as well.

vii.   The SPK has announced plans to publish in 2015 and has arranged for presales of a book entitled *The Neues Museum: Architecture, Collections, History* within the United States, including but not limited the District of Columbia.

viii.   On information and belief, the Bodemuseum in Berlin, administered by the SPK, has a staff exchange program with the Metropolitan Museum of Art in New York.

ix.   The SPK offers research grants to academics within the United States, including within the District of Columbia.

x.   On information and belief, academic conferences organized and administered by the SPK include solicitations to academics in the United States (including the District of Columbia) to contribute and participate.

xi.   The SPK publishes and sells a book entitled *Original und Experiment: Ausstellung der Stiftung Preußischer Kulturbesitz aus der Antikensammlung der Staatlichen Museen zu Berlin* (*Original and Experiment: Exhibition by the Stifttung Preußischer Kulturbesitz from the Antiques Collection of the State*

11

*Museums in Berlin*) within the United States, including but not limited to the District of Columbia.

xii.     The SPK publishes and sells a book entitled *Digital Resources from Cultural Institutions for Use in Teaching and Learning: A Report of the American/German Workshop* within the United States, including but not limited to within the District of Columbia.

xiii.    The SPK publishes and sells a book entitled *Schätze Der Weltkulturen in den Sammlungen Der Stiftung Preussischer Kulturbesitz (Treasures of World Cultures in the Collections of the Stiftung Preussischer Kulturbesitz*) within the United States, including but not limited to within the District of Columbia.

xiv.     The SPK participated in an exhibition National Gallery of Art in the District of Columbia entitled *Dürer And His Time: An Exhibition From The Collection Of The Print Room, State Museum, Berlin Stiftung Preussischer Kulturbesitz*, including the loan of works of art from the SPK.  The SPK contributed further to the catalogue from that exhibition, which is sold in the United States, including but not limited to within the District of Columbia.

xv.      The SPK publishes and sells an annual report entitled *Prussian Cultural Property: 25 Years in Berlin, Collecting, Researching, Educating: from the Work of the SPK 1961-1986 (Annual Report of the SPK)* or *Preussischer Kulturbesitz: 25 Jahre in Berlin, Sammeln, Forschen, Bilden: aus der Arbeit der Stiftung Preussischer Kulturbesitz 1961-1986 (Jahrbuch Preussischer Kulturbesitz)* (as well as other similar editions in other years) within the United States, including but not limited to within the District of Columbia.

xvi.     The SPK publishes and sells a book entitled *Kinderbildnisse aus vier Jahrtausenden: Aus den Sammlungen der Stiftung Preussischer Kulturbesitz Berlin (Children's Pictures from Four Millennia: from the Collections of the*

*Prussian Cultural Heritage Foundation*) within the United States, including but not limited to within the District of Columbia.

xvii.  The SPK publishes and sells copies of the law that gave rise to its creation, the *Gesetz Zur Errichtung Einer Stiftung "Preussischer Kulturbesitz" Und Zur Übertragung Von Vermögenswerten Des Ehemaligen Landes Preussen Auf Die Stiftung* (*Law for the Creation of a Foundation "Prussian Cultural Heritage" and the Transfer of Property from the Former State of Prussia*) within the United States, including but not limited to within the District of Columbia.

25.  On information and belief, Germany engages in a broad range of commercial activity in the United States, including but not limited to the commercial promotion of German companies and industries and the solicitation of American visitors to German museums, including but not limited to those administered by the SPK.

26.  Jurisdiction is also proper in this action pursuant to 28 U.S.C. § 1605(a)(2) because the defendants engage in commercial activity outside the territory of the United States with respect to the Welfenschatz in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.  Specifically, the defendants engage in commercial activity in the United States and derive from the Welfenschatz itself through licensing and other activities, revenue that rightfully could be earned by the plaintiffs absent the defendants' wrongful possession.

27.  Venue is proper in the District of Columbia against Germany pursuant to 28 U.S.C. § 1391(f)(4) as a case brought against a foreign state (Germany), and venue is proper in the District of Columbia against the SPK pursuant to 28 U.S.C. § 1391(f)(3) because the SPK is

an agency or instrumentality of Germany (a foreign state) and the SPK is doing business within the District of Columbia, *inter alia*, as alleged above.

## FACTUAL ALLEGATIONS

### The Welfenschatz and the Consortium

28.     The Welfenschatz consists of several dozen medieval reliquary and devotional objects that were originally housed in the *Braunschweiger Dom* (Brunswick Cathedral) in Germany. Although dating primarily from the 11th to the 15th century, the collection acquired its commonly-known name hundreds of years later when it passed into the hands of the Royal House of Brunswick-Lüneburg, and later acquired the name Welfenschatz because of its association with one of the branches of the "Welfenhaus", or "House of Guelph."

29.     The portion of Welfenschatz that is wrongfully in the possession of the SPK consists of the following objects:

    i.    Guelph Cross (*Welfenkreuz*);

    ii.   Portable Altar With Embossed Silver Figures (*Tragaltar mit Silberfiguren*), 3rd quarter, 13th century;

    iii.  Demetrius Tablet (*Demetrius-Tafel*), 12th century;

    iv.   Tablet Shaped Portable Alter with Agate Slab (*Tafelförmiger Tragaltar mit Achatplatte*), ca. 1200;

    v.    Tablet Shaped Portable Alter with Slab of Rock Crystal (*Tafelförmiger Tragaltar mit Bergkristallplatte*);

    vi.   Rectangular Casket with Painted Ivory Tablets (*Rechteckiger Kasten mit Bemalten Elfenbeinplättchen*);

    vii.  Eight-Cornered Casket with Lid (*Achteckiger Deckelkasten mit Bleibeschlag*);

    viii. Portable Altar of Adelvoldus (*Tragaltar des Adelvoldus*);

    ix.   Portable Altar With Crystal Columns (*Tragaltar mit Kristallsäulchen*);

    x.    Standard Cross Borne by Three Lions (*Standkreuz, von drei Löwen getragen*);

xi.      Portable Altar of Eilbertus (*Tragaltar des Eilbertus*);

xii.     Portable Altar with the Cardinal Virtues (*Tragaltar mit den Kardinaltugenden*);

xiii.    Walpurgis Casket (*Walpurgis-Kasten*);

xiv.     Portable Altar with Abraham and Melchizedek (*Tragaltar mit Abraham und Melchisedek*);

xv.      Chapel Reliquary (*Kuppelreliquiar*);

xvi.     Highly Colored Reliquary Casket (*Der stark-farbige Reliquienkasten*);

xvii.    Small Reliquary Casket with Champlevé Enamel (*Kleiner Reliquienkasten mit Grubenschmelz*);

xviii.   Arm Reliquary of St. Sigismund (*Armreliquiar des Hlg. Sigismund*);

xix.     Arm Reliquary of St. Innocentius (*Armreliquiar des. Hlg. Innocentius*);

xx.      Arm Reliquary of St. Theodorus (*Armreliquiar des. Hlg. Theodorus*);

xxi.     Arm Reliquary of St. Caesarius (*Armreliquiar des. Hlg. Caesarius*);

xxii.    Arm Reliquary of St. Bartholomew (*Armreliquiar des. Hlg. Bartholomaeus*);

xxiii.   Arm Reliquary of St. Lawrence (*Armreliquiar des. Hlg. Laurentius*);

xxiv.    Reliquary in the Form of a Portable Altar in Wood (*Tragaltarförmiges Reliquiar aus Holz mit Steinen besetzt*);

xxv.     Reliquary in the Shape of a Chest, $12^{th}/13^{th}$ Century (*Reliquiar in Truhenform, 12/13. Jhdt.*);

xxvi.    Reliquary in Chest Form (*Reliquiar in Truhenform*);

xxvii.   Portable Altar in Tablet Form (*Tafelförmiger Tragaltar*);

xxviii.  Tablet-Shaped Portable Altar, 12th Century (*Tafelförmiger Tragaltar, 12. Jhdt.*);

xxix.    Head Reliquary of St. Cosmas (*Kopfreliquiar des Hlg. Cosmas*);

xxx.     Head Reliquary of St. Blasius (*Kopfreliquiar des Hlg. Blasius*);

xxxi.    Plenar for Sundays (*Plenar für Sonntage*);

xxxii.   Plenar of Duke Otto the Mild (*Plenar Herzog Otto des Milden*);

xxxiii.  Arm Reliquary of St. George (*Armreliquiar des Hlg. Georg*);

xxxiv.   Wooden Casket with Painted Heraldic Symbols (*Holzkasten mit Wappenmalerei*);

xxxv.    Relic Monstrance with Ivory Reliefs (*Reliquienmonstranz mit Elfenbeinreliefs*);

xxxvi.   Relic Cross on a Gilded Copper Base (*Reliquienkreuz auf Fuss/Kl. Vergoldetes Kupferstandkreuz*);

xxxvii.   Small Folding Altar with Foot (*Klappaltärchen auf Fuss mit Elfenbeinerner Madonnenstatuette*);

xxxviii.   Relic Capsula (*Reliquienkapsel/Agnus Dei) mit Anna Selbdritt*;

xxxix.   Turned Box With Lid (*Gedrehte Deckelbüchse*);

xl.   Arm Reliquary of St. Mary Magdalene (*Armreliquiar der Hlg. Maria Magdalena*);

xli.   Arm Reliquary of One of the Ten Thousand Warriors (*Hölzernes Armreliquiar eines der zehntausend Krieger*);

xlii.   The Large Relic Cross (*Das Grosse Reliquienkreuz*).

30.     The Welfenschatz occupies a unique position in German history and culture, harkening back to the early days of the Holy Roman Empire and conceptions of German national identity and power.

31.     Conservative estimates of the present-day fair market value of the Welfenschatz (including those advanced by the SPK itself) exceed $250,000,000.

32.     In or around 1929, the Consortium was formed.  It consisted of the plaintiffs' ancestors and/or predecessors-in-interest, and on information and belief it received additional funding from third parties in what amounted to a loan.  Only these three art dealer firms—Z.M. Hackenbroch, I. Rosenbaum and J. & S. Goldschmidt—were the signatories to the contracts of 1929 and of 1935.  On information and belief, the Consortium was solely entitled to ownership rights of the collection in the time period of October 5, 1929 to June 14, 1935 when the Welfenschatz had been in their possession.  This ownership was unaffected by certain lenders, banks, and individuals (*e.g.*, a business man called Hermann Netter ("Netter") from Frankfurt, Germany), who acquired no property interest in the collection.

33.     By written agreement between the Consortium and the Duke of Brunswick-Lüneburg, the Consortium acquired the Welfenschatz on October 5, 1929.  A true and accurate copy of that agreement is attached hereto as Exhibit 1, followed by a certified translation.

34.     When the possibility that the Consortium might successfully acquire the Welfenschatz first arose, it was to the particular annoyance of disappointed German museums and states.  As the Hannover High Provincial President Gustav Noske ("Noske"), the former Reich Minister of defense, wrote on November 26, 1929 to the Prussian Minister of Finance and the Prussian Minister for Science, Art and Education, the price for the Welfenschatz would be "a minimum amount of 20 million RM."  Indeed, the famed *Kuppelreliquiar* now wrongfully in the possession of the SPK (and which is shown prominently on the museum guide sold in the United States referred to above) was discussed as having a value of 4 million RM *all by itself* at that time (*i.e.*, a sum consisting of the better part of the amount for which the Consortium was eventually forced to sell the *entire* Welfenschatz).

35.     Concerted efforts by Germany's Reichsregierung (Reich Government), the Prussian State Government and several other entities and museum officials in June of 1930 to "save [the Welfenschatz] for Germany" failed, mainly caused by Otto Braun, the then-Prussian Prime Minister's veto.  While perhaps the House of Welf could not regain the treasure, there was an interest as described by President of the Prussian Staatsrat, Oskar Mulert ("Mulert"), with anti-Semitic foreshadowing to "sell the pieces to Germany, to avoid an accusation of hucksterism abroad."

36.     At the request of the National Socialist faction, the town council of Frankfurt

resolved as follows on August 26, 1930 concerning the "maintenance" of the Welfenschatz:

> A provisional enactment is adopted. . . [] that the most valuable and oldest
> cultural assets of the German people, in particular the Welfenschatz, should not be
> permitted to be sold abroad, so that it can remain in the country.

37.     Even a nationwide lottery was planned to collect money for the "salvation of the

Welfenschatz."

38.     By 1930, the official intention was to buy the Welfenschatz for the Berlin

museums. This failed due to the resistance and vetoes of the then-Prussian Prime Minister Braun.

Braun was particularly passionate about his plans for a democratic land reform, which earned

him the enmity of the large Prussian landowners.  In the final years of the Weimar Republic,

Braun opted for cooperation with the conservative forces to keep the Nazis from power. He

forbade the Rhenish steel helmet ("Stahlhelm"), a World War I community of ultra-conservative

and National Socialist veterans, and enforced the nationwide ban of the Nazis' *Sturmabteilung*

("S.A."), the Nazi Party's paramilitary goon-squad and branch.  In early March 1933, Braun fled

Germany in fear for his life and went into exile in Switzerland.

39.     Nevertheless, in the dying days of the Weimar Republic, the Consortium was able

to bring the Welfenschatz to the United States to offer it for sale to museums.  To some extent,

the Consortium succeeded.  By 1930-31 about half of the collection had been sold to museums

and individuals in Europe and in the United States.  Those 40 pieces (out of 82 overall) which

were sold to the Cleveland Museum of Art and others, however, comprised only about 20

percent of the value of the Welfenschatz acquired in 1929—and did not include the most valuable pieces such as the iconic *Kuppelreliquiar*.

40.     After the dramatic events and reactions of 1930, matters settled down briefly with respect to the Welfenschatz.  The Consortium, while not unaffected by the growing world economic depression, was able to safeguard the core income of its members and stay in business. None of the three companies filed for bankruptcy.

41.     This period of relative calm, however, was not to last.

**The Nazi Rise to Power**

42.     Founded in 1923, the National Socialist German Workers Party (*National Sozialistische Deutsche Arbeiterpartei*, or "NSDAP"), grew out of various nationalist movements in the wake of World War I.  Originally called the DAP, (*Deutsche Arbeiterpartei*), Hitler was member No. 55.  He soon took control of the movement, and his message from the start was the unmistakable intent to marginalize and eliminate European Jews.

43.     Throughout the 1920s, the NSDAP struggled for relevance in the economic chaos of the fledgling Weimar Republic.  A failed coup d'état in 1923 that came to be known as the "Beer Hall Putsch" was derided as amateurish, and Hitler and other Nazi leaders were imprisoned.  While incarcerated at Landsberg Prison, Hitler penned the foundational document of what would become the Nazi movement: *Mein Kampf*.  The book left no doubt as to Hitler's worldview, and his views on where Jews fit into it, *i.e.*, they did not.  For anyone seeking to rise

within the NSDAP, or later the government that it took over, it left no secret about how to please Hitler.

44.     With the onset of the Great Depression, the electoral fortunes of the NSDAP improved.  Still unable to break through into a position of parliamentary control, they nonetheless achieved substantial enough minorities to be reckoned with, and made a name for themselves with threatening behavior in the legislatures they joined.

45.     That threatening behavior took its worst form outside the halls of town halls, "Landtage," the German states' parliaments, and the Reichstag, however.  The Nazis and their "brownshirts," the S.A., became known for politically-motivated violence and attacks on political opponents, communists, socialists, and Jews.

46.     The Nazis also now found resonance in the electorate with their scapegoating of Jews.  Jews had long been stereotyped in association with commerce, as part of the alleged "Global Jewish Conspiracy."  The NSDAP played off this, and blamed Jews for any and all economic setbacks: the hyperinflation of the Weimar Republic, the collapse of the stock market, bank closings, and the Great Depression.  In a frightening time, the Jews of Germany felt the scorn of their neighbors as never before.

47.     In the parliamentary elections of 1932, the NSDAP won a plurality of the popular vote for the first time.  This gave the NSDAP the largest faction within the Reichstag, though not yet a majority.  It was to be the last even arguably democratic election in Germany until after 1945.

48.     On January 30, 1933, Adolf Hitler was appointed Chancellor by aging Reich President Paul von Hindenburg.  What was initially perceived as a stabilizing nod to conservatism, quickly descended into an onslaught of repression.  All the designs of the Nazi Party program of 1920, the failed "putsch" of 1923, and *Mein Kampf* had now assumed the authority of the state.

49.     On February 27, 1933, a fire broke out in the Reichstag, the imperial parliament building that housed the legislature of the Weimar Republic.

50.     This provided the Nazis with the entire pretext they needed.  Cited as proof that German communists were plotting against the government, despite flimsy evidence and the likelihood that it was orchestrated by the Nazis themselves as an excuse to act, it was to become the precipitating event for Nazi Germany.

51.     With the "Decree of the Reich President for the Protection of People and State" of 28 February 1933, better known as the Reichstag Decree, Hitler was given far-reaching, violent means of power.  Articles 114, 115, 117, 118, 123, 124, and 153 of the German Constitution, which affected the fundamental rights of citizens, were overridden.  Henceforth, the restriction of personal freedom, freedom of expression and of personal property were expressly sanctioned by the state.  Infringements of the Regulation were punished with confiscation, prison, penitentiary, and death.

52.     With free exercise curtailed and violent enforcers unleashed on the streets, victory in the election of March 5, 1933 was ensured.  The Nazis emerged with a majority of the seats in the Reichstag, and carte blanche was delivered to Hitler and his anti-Semitic program.

53.     Hitler and his regime wasted no time whatsoever.  The Enabling Act of 1933 (*Gesetz zur Behebung der Not von Volk und Reich*, or Law for the Remedy of the Emergency of the People and the Reich) amended the Weimar Constitution further, giving the Chancellor—*i.e.*, Hitler—the power to enact laws without the legislature.

54.     Other laws followed in this vein: the Restoration of the Civil Service Law of July 4, 1933, the destruction of public unions and democratic trade associations in April and May, 1933, the institutionalization of the one-party state and expulsion of non-National Socialists (July 14, 1933), and the repeal of the fundamental constitutional rights of the Weimar Republic all followed.

55.     These laws and regulations, while draconian, barely approach the repression that was unleashed on Germany's Jews.  Through the collective humiliation, deprivation of rights, robbery, and murder of the Jews as a population, they were officially no longer considered German.

56.     Boycotts of Jewish businesses spread in March and April 1933, just weeks after Hitler's ascension, with the encouragement of the state itself.

57.     By the spring 1933, the concentration camp at Dachau had opened, and the murder of Jews detained there went unprosecuted.  This may seem unsurprising with the benefit of hindsight, but Germany had descended in a matter of weeks to a place where Jews could be plucked off the streets, imprisoned, and murdered just yards away from their neighbors, all without consequence.  Closer to the Consortium, the Osthofen concentration camp outside of Frankfurt opened in May, 1933.

58.     It was not merely that such violence could happen with impunity, but also that it was now officially encouraged.

59.     The boycott of Jewish-owned businesses is hard to imagine now.  Judges, lawyers, doctors, retailers, art dealers—the bedrock of the German middle class—were targeted and driven out of their ability to make a living.

60.     Propaganda was soon in full swing.  The *Völkischer Beobachter* was the notorious official Nazi Party paper.  In an edition dated March 31, 1933, Julius Streicher (who published his own militant and racist newspaper *Der Stürmer*) called on the populace to boycott Jews as "profiteers, war slide, convicts, deserters and Marxist traitors."  He concluded:

> All Jews will have to fight so long, until victory is ours! Nazis! Defeat the enemy of the world! And if the world would be full of the devil, we must succeed yet!

61.     S.A. men, the by-now-ubiquitous brownshirt thugs, fanned out to express "public opinion," as the police and ordinary citizens looked on.  Jewish shops were smashed, stores and apartments were looted, and Jewish lawyers were beaten on their way to court.

62.     The latent danger for Jews to lose their lives and their property was not dependent on the new laws noted above, though they hastened the threat.  More laws restricted the ability of Jews to transfer assets—punishable by death—as Jews were tortured in Gestapo, S.A. and S.S. cellars or simply beaten to death in broad daylight.

63.     For example, on April 1, 1933, furrier Hirsch Ber Gottfried was beaten through the streets of Leipzig, and had a sign hung around his neck that read "I am a dirty Jew."

**Prussia and the Nazis Train Their Sights on the Welfenschatz**

64.     No Jews could remain unaffected by the foregoing, and the members of the Consortium were no different.  The members of the Consortium were soon completely cut out of economic life in Germany, and on information and belief, were themselves threatened with violence.

65.     On information and belief, the *Geheime Staatspolizei*—the Gestapo—opened files on the members of the Consortium because of their ownership of the Welfenschatz and their prominence and success.

66.     Not surprisingly, Prussian interest in the Welfenschatz was soon revived now that the Consortium was so vulnerable.

67.     Former District and Local Leader of the *Kamfbund für deutsche Kultur*—the League of Struggle for German Culture—and new Mayor of Frankfurt Friedrich Krebs ("Krebs") quickly wrote to Hitler himself (emphasis added):

Upon coming to power, National Socialism in Frankfurt a.M. also found extraordinarily unclear relationships in the area of art. Since then, the coarsest grievances have been resolved and in the course of reconstructing the artistic life of the old imperial city, I have come to the question of how one of the greatest artistic and cultural properties of the German people, the [Welfenschatz], which was last exhibited in Frankfurt a.M. in 1930 and then transported to America, can be won back for the German people. . . .

[]

The Gospels of Henry the Lion must be regarded as a key piece of the Guelph Treasure that is located in Gmunden. This work of German book illumination is the greatest of all time and is not included (in the inventory) in the Guelph Treasure and has also therefore not been moved to America; however, it belongs integrally and, indeed, as a key piece.

The securing of the Gospel of Henry the Lion would be the most important act in a systematic cultivation of historical artifacts for Germany and would attract even more attention because the work is hardly known in wide sections of the population and has never been shown to the public.

Under your leadership, the new Germany has broken with the materialism of the past. It considers the honor of the German people as its most valuable asset. In order to reclaim this honor on an artistic level, I believe the recovery and the ultimate acquisition of any irreplaceable treasures from German's middle ages, such as they are organically combined in the [Welfenschatz], would be a decisive step. According to expert judgment, the purchase is possible **at around 1/3 of its earlier value**. It therefore relates to an amount that will be proportionally easy to raise. I therefore request that you, as Führer of the German people, create the legal and financial preconditions for the return of the [Welfenschatz].

68.    A true and accurate copy of this letter is attached hereto as Exhibit 2, followed by a certified translation.

69.    Ostensibly Krebs sought the acquisition of the Gospels of Henry the Lion, but his real intention was to save the honor of the German people, to snatch the Welfenschatz from the Jewish merchants, and bring it "home to the Reich," and asks *Hitler himself* to lay the groundwork for obtaining the Welfenschatz at only 1/3 of its value.

70.     To place Krebs in context among Nazi zealots, he distinguished himself as mayor by firing all Jewish civil service employees ten days *before* the Law for the Restoration of the Civil Service was enacted.

71.     Standing behind all of this was Goering himself, Hitler's highly decorated deputy—Prime Minister of Prussia at that time—aided by the desire and expediency by his underlings to demonstrate their anti-Semitic credentials to him and to Hitler.

72.     Goering was a notorious racist and anti-Semite who, in view of the massive destruction of infrastructure and buildings, mostly synagogues, caused by the Nazi-mob on occasion of the Reich's Pogrom Night, or "Night of Broken Glass" ("Kristallnacht") in November 1938, is quoted saying that he would have "preferred if you would have slain two hundred Jews rather than destroying such values. . . ."

73.     Goering's appetites were as prodigious as they were legendary, particularly with respect to art.  He cultivated for himself an image of culture and refinement that was belied by his rapacious greed for plundered art.  Throughout his period of influence in the Third Reich, Goering targeted art that he wanted, but seldom if ever did he simply seize property.  Instead, he routinely went through the bizarre pretense of "negotiations" with and "purchase" from counterparties with little or no ability to push back without risking their property or their lives.

74.     Adolf Feulner ("Feulner") had a career beginning in 1930 as director of the Museum of Decorative Arts and History Museum in Frankfurt, and from 1938 to his death as head of the *Kunstgewerbe* (arts and crafts collection) of Cologne.

75.     In a letter dated November 1, 1933, Feulner wrote to the President of the German

Association for the Preservation and Promotion of Research (*Deutsche Gemeinschaft zur*

*Erhaltung und Förderung der Forschung*, or the "DFG"), Friedrich Schmidt-Ott ("Schmidt-Ott")

about the Welfenschatz.  This letter makes clear that it was Feulner who approached the

Consortium, and not the other way around, and at the instigation of Krebs or at the very least in

consultation with him.  Feulner wrote: "After consultation with Mr. Hackenbroch /. . . / the

owners are very willing . . . to enter into negotiations with the Reich."


76.     Although the Welfenschatz was physically stored in Amsterdam, the Netherlands

by this time, there is no question that the peril faced by the Consortium as Jews, still living in

Germany and vulnerable to Nazi attacks at any time, placed it well within the Nazis' grasp.  Any

resistance posed grave risks to the Consortium and their families.


77.     On January 1, 1934 the museum directors Dr. Otto Kümmel ("Kümmel," of the

State Museums), Dr. Robert Schmidt ("Schmidt" of the Schloss Museum, the predecessor of the

Kunstgewerbemuseum where the Welfenschatz is today), Dr. Karl Koetschau ("Koetschau" at

the Kaiser-Friedrich-Museum), and Dr. Demmler (at the German Museum), together with Dr.

Hans-Werner von Oppen ("von Oppen," Speaker in the Ministry of Education and Board

member of the Dresdner Bank) visited the collections stored at the bank whose possession had

been taken by Prussian intervention.  The Welfenschatz was discussed at this meeting, and

clearly not for the first time.  As the minutes of the meeting composed by a Mr. Stern of the

Dresdner Bank noted:

> On previous visits the museum directors, and in particular Prof. Koetschau, had
> noted that it was of considerable interest to establish the ways in which to
> incorporate the Welfenschatz.  When Prof. Koetschau returned to this issue again

and Dr. von Oppen was informed about the possibilities on the matter, I told him
that the Welfenschatz was with an art dealer consortium, that would be happy to
liquidate their failing business, and that I would be able to commence negotiations
with the appropriate person, if this were desired.

78.     Von Oppen directed Stern to lead the effort "in all respects."

79.     Later, in December, 1946, Schlossmuseum director Schmidt misled the Allied

forces in securing himself a role at the Central Collecting Point at Wiesbaden, from which he

found himself a prosperous post-war career.  Despite direct firsthand knowledge of the

transaction, he described the purchase price of Prussia's 1935 acquisition of the Welfenschatz as

7 million RM, plus a number of valuable works of art.  While still below market, this was a

complete fabrication that allowed Schmidt to shift blame to others, a regrettably recurring theme

among those like Schmidt who acquiesced in this kind of illicit behavior.

80.     Stern notes in the minutes menacingly that although the Welfenschatz had been

purchased in 1929 for 7.5 million RM, that the Consortium might be willing to accept a lower

price "to liquidate the business so as not to suffer even more loss of interest. . . ."

81.     Just days before Stern had told Alfons Heilbronner, owner of the art dealer Max

Heilbronner in Berlin, a Jewish debtor to Dresdner Bank and since that time the messenger

between the bank and the consortium, to "determine whether a price substantially below the

price that it cost, would have appeared promising."

82.     Stern then told Heilbronner that he did not want to approach the Consortium, but

that if Heilbronner did he could be assured a commission.

83.     Heilbronner became suspicious. He had heard that "negotiations with the Reich were in progress," but he dismissed Stern because he was concerned that if an interested buyer appeared, he could not be sure if they were acting for themselves or for a third party.  In any event, it was agreed that Heilbronner would "initiate his efforts immediately."

84.     It was clear from the words of the representatives of the Dresdner Bank that it intended to pursue the Welfenschatz with the German Reich to obscure Prussia's role in transacting business with Jews.

85.     On January 23, 1934, Stern reported to the Reichsbank directorate that Heilbronner had not succeeded with the spokesman of the Consortium.  He was told that the Consortium "will not go down under 6.5 million RM, perhaps 6 million RM in extreme circumstances."

86.     Heilbronner quickly traveled to Paris under pressure from the bank syndicate to tell Saemy Rosenberg that the price could not exceed 3.5 million RM.

87.     Stern memorialized another meeting on May 11, 1934:  Mulert had called, and wanted to know if it was going to be possible to "secure the Welfenschatz for German museums."  Stern had informed Mulert that the Consortium had advised that they had an offer in hand for 7 million RM, probably from a Berlin private banker.

88.     It was hardly unexpected that such an offer would have come in, nor that the Consortium would have wanted to wait out for bidders to compete against each other.  Anyone

listening to Hitler's speeches and official propaganda about art knew how Nazi art tastes ran: they detested modern art that they deemed "degenerate," and they exalted traditional, historical German art and motifs.  The Welfenschatz was, literally, the highest example of what the Nazis sought.  It combined both impeccable "German" credentials, but was also of unquestioned quality apart from the state sponsored works being churned out by the likes of Josef Thorak and Arno Breker.

89.    But the Consortium did not have time to wait for the fair market value of the Welfenschatz.  Legion examples of Jewish collectors and professionals exist who waited too long and lost everything.

90.    Koetschau then asked Stern when the negotiations over the Welfenschatz would begin.  Stern reported that he expected a firm offer from the Consortium, and that the price of 3.5 million RM being pursued would be a "very low" price constituting 15% of the Welfenschatz's value.

91.    To put it in context, if 3.5 million RM were 15% of the value of the Welfenschatz, then the Welfenschatz's full value would have been ___*23.33 million RM*___, or nearly six times what the Consortium was paid.

92.    A month later, Stern advised the director of the Schloss Museum that negotiations had stalled because the Consortium continued to insist on a price over 7 million RM.

93.     Starting in the summer of 1934, two people in particular took up the mantle of "saving" the Welfenschatz for Germany: Paul Körner ("Körner") and Wilhelm Stuckart ("Stuckart").  It was this effort that led to the eventual sale under duress of for dramatically below market value.

94.     The Consortium could scarcely have expected fair treatment from them.

95.     Körner already had a successful Nazi career behind him by 1934.  Since 1926 he had been adjutant for Goering.  Körner was an NSDAP Party member starting in 1931 (long before even a cynic could argue it was advantageous or necessary for status in Nazi-run Germany), as well as the *Schutzstaffel* (the "S.S.")—an organization later declared by the International Military Tribunal at Nuremberg to be a criminal enterprise, and about which its elite members cannot ever have had any illusions.  He rose to an S.S. Group Leader (*Gruppenführer*)—an "achievement" that speaks for itself—and was appointed as personal assistant to Goering in the Prussian Ministry of the Interior.

96.     After Goering became Prussian Prime Minister in April 1933, Körner was appointed Secretary of the Prussian State Ministry.  On the occasion of the opening of the Prussian State Council (Staatsrat) described above, Körner wrote a foreword in the *Völkischer Beobachter*, in which he took aim at "all liberal and democratic sentiments," and described the task of the new Staatsrat as, "to be National Socialist in its operation."

97.     Goering transferred authority to Körner on April 10, 1933 over the "Research Office," the notorious institution that took over all telephone, telegram, radio, and mail monitoring in the Third Reich.

98.     Goering also approved Körner for the post of Secretary of State in the Four-Year Plan.  In this role, Körner was to be instrumental in helping to make the German economy "ready for war."  Finally, and most tellingly, Körner later attended the Wannsee Conference in suburban Berlin in 1941, at which Reinhard Heydrich, Adolf Eichmann, and other high ranking war criminals decided upon the implementation of the "final solution of the Jewish question"—the plan to exterminate the entire Jewish population of Europe.

99.     Stuckart first came into contact with the Nazi Party in 1922 while a law student, and enrolled in the Party at a time when it was barely on the fringe of mainstream German politics.  By 1926, he was the legal adviser of the NSDAP in Wiesbaden.  Starting in 1930, he was also a member of the *Kampfbund fur Deutsche Kultur*.  He applied to the civil service in 1930, but was dismissed in 1932 because of his political (*i.e.*, Nazi) convictions.  Stuckart also joined the S.A. in 1932 and ascended to be the legal secretary to the S.S. and S.A. in Pomerania.

100.     On May 15, 1933 Stuckart was appointed as Acting Assistant Secretary of State in the Prussian Ministry of Science, Culture and Public Education.  Just a few weeks later, he was appointed Secretary of the Ministry of Science and entrusted with the representation of Minister Rust.

101.    Rust had been a member of the NSDAP since 1922.  He was a "Gauleiter" (an honorific given to regional leaders within the party) after 1928 of the nationalist/anti-Semitic National Socialist Society for German Culture.   After the seizure of power, he founded in 1935 the racial ideology Reich Institute for the History of the New Germany.  Rust committed suicide on the day of German surrender on May 8, 1945.

102.    Stuckart's area of professional responsibility by then included primarily "Jewish Affairs," and he was to become the architect of the development of the anti-Jewish law. Notably, he was instrumental in the drafting of the "Nuremberg Laws" that codified the exclusion of Jews from all aspects of society.  In 1936 he became Chairman of the Reich Committee for the Protection of German Blood.

103.    This, then, was the first of the characters with which the Consortium was confronted in seeking to recoup the fair market value of their property.

104.    Still in his capacity as Deputy Minister of the Ministry of Science, Stuckart answered on July 14, 1934 a June 26, 1934 letter from Körner.  Körner had submitted to Stuckart a draft of a letter to be sent to Hitler, to which Stuckart offered his opinion as follows:

> I note that in the opinion of the Prussian Minister of Finance, an acquisition by the Prussian State would be within the range of possibilities, providing that the President of the Reichsbank (in parallel the negotiations that were recently held between him and myself in relation to the question of purchasing the art collections that are situated at Dresdner Bank, about which I have notified the Prime Minister through official channels) declares himself to be in agreement that the payment would not take place in cash, but by issuing Prussian treasury bonds. Reichsbank President Schacht held out the prospect of the same kind of financing for the acquisition of the Guelph Treasure by the Prussian State. This means that Prussia does not need to raise any funds now, but solely takes on a less onerous indebtedness. In this way, Prussia would be put in a position where it was able to

subsequently bring the historically, artistically and national-politically valuable
Guelph Treasure to the Reich in addition to many other valuable cultural
treasures.

105.    A true and accurate copy of this letter is attached as Exhibit 3 hereto, followed by

a certified translation.

106.    The cast of notorious National Socialists identified in the paragraphs above and

arrayed against the Consortium is sobering.  First, of course, the draft letter is intended for Hitler

himself.  Currying favor with the Führer through acquiring the Welfenschatz was the overriding

goal.  Second, Stuckart had already vetted the plan with the Prime Minster of Prussia—*i.e.*,

Goering.  Lastly, the financing that had been considered, approved, and planned, came from

Schacht, the President of the Reichsbank.

107.    For his part, Schacht was no lightweight in the Nazi Party; in addition to his duties

as President of the Reichsbank from 1933 to 1939, he was the Reich's Economic Minister from

1934 to 1937, as Germany flouted the Versailles treaty, targeted resources in the Saarland that

were supposed to remain neutral, and made every preparation to plunge Europe—and with it the

whole world—into war.

108.    The letter went on to describe how Stern, and a "Mr. Pilster" would soon appear

as "interested parties," offering intentionally lowball offers of 3 million and 4 million RM—a

scheme orchestrated by the "M.P.", *i.e.* by Prime Minister Goering, quite literally for Hitler.  It

went on to recommend that the city of Hannover be discouraged from entering into the

negotiating picture.

109.    The letter closes, "With German greetings and Heil Hitler!"

110.    Stuckart thus describes the motive for the acquisition of Welfenschatz: to impress Hitler and his circle, and to do so for a less than market price.  The pressure that would allow this to happen is so axiomatic as to be a basic aspect of Nazi Germany: the life and liberty of the Consortium were at stake.

111.    For Stuckart himself, he is even more frank.  The Welfenschatz is "obviously politically" valuable for Prussia "in its later rise in the Reich."  The stage was thus set, to take advantage of the weakened position of the Consortium by virtue of their persecuted status, to acquire the Welfenschatz for far-below-market price.

112.    That process only accelerated as 1934 went on.  The National Socialist regime was not content to enact legislation targeting specific policy aims.  The Nazis were clear that the real goal was *Gleichschaltung*-the transformation of society itself.  Art was at the center of this plan.

113.    In 1933, Minister for Propaganda and Education Joseph Goebbels founded the Reich Chamber of Culture (*Reichskulturkammer*)—after first organizing the April 1, 1933 Jewish boycotts.  The *Reichskulturkammer* assumed total control over cultural trade, and membership was required to conduct business.  Needless to say, Jews were excluded, effectively ending the means of work for any Jewish art dealer in one stroke.  Major dealers' collections were liquidated because they could not legally be sold.

114.     Ideologue and "Reichsleiter" Alfred Rosenberg soon got involved as well.  Alfred Rosenberg played many roles.  He was the editor of the *Völkischer Beobachter,* and he was also the author of the polemical screed *The Myth of the 20th Century* (*Der Mythos des 20. Jahrhunderts*)—second only to Hitler's *Mein Kampf* in its influence on Nazi racist ideology.  Later, he gave his name and direction to the notorious *Einsatzstab Reichsleiter Rosenberg* (ERR) that coordinated the systematic looting of occupied countries, particularly the collections of French Jews (those Jews, of course, were frequently then murdered).

115.     Not surprisingly, Alfred Rosenberg was tried as a war criminal at Nuremberg after the war, convicted, and hanged.

116.     Alfred Rosenberg's *Kampfbund für Deutsche Kultur* disrupted auctions at Jewish establishments and drove some to ruin.

117.     In an added and ironic tragedy, Jewish art dealers also lost their Jewish customers, whose economic means were being destroyed systematically and comprehensively; there was no money left to buy art.

118.     The impact of the Jewish exodus from German economic and cultural life by this time was made clear in a Municipal Memorandum Concerning the Departure from Culture Associations by Jewish Members," dated February 16, 1934.  Rental revenue from Jewish tenants plummeted; the Municipal Theatre in Frankfurt, for example, saw its revenue fall by 100,000 RM; the Museum Society lost 40% of its revenue, the Frankfurt Art Association lost 270 Jewish and 50 non-Jewish members, nearly half of all members together; and the

Staedelsches Kunstinstitut likewise saw its membership drop from 120 to 70.  Investment in art fell too.

119.    To sum it all up, on December 1933, the Frankfurt city treasurer wrote to Krebs with regard to the current climate:

> In the period from 1 March to 31 October 1932, 372 Jewish firms were closed.  In the same period of the year 1933, 536 Jewish firms were closed.  It is not only the increasing the number closures from 1932 to 1933 that shows the severe economic damage that the city has seen. Rather, it has to be noted that while the earlier closures were also followed by corresponding new applications, there can of course be no question of any significant new registrations in 1933.

120.    The local museums, who were mainstay customers of the dealers in the Consortium, fell away too but not for reasons of economic difficulty.  Rather, they were subject to new stringent nationalist regulations, characterized by the infamous signs *Kauft nicht beim Juden!*—"Don't buy from Jews!"

121.    Because of the anti-Semitic climate, Isaak Rosenbaum and his nephew Saemy Rosenberg, the two co-owners of I. Rosenbaum, gave up, when Saemy Rosenberg had received a warning from a trusted friend and World War I comrade, that he should better "go on a long vacation abroad."  They left Germany, and emigrated to Holland.  Both were liable for the payment of flight tax in the amount of 25 percent of their total (movable and immovable) assets.  A true and accurate copy of the Gestapo memo that memorialized this extortion is attached hereto as Exhibit 4, followed by a certified translation.

122.    The owners of the art dealer J. & S. Goldschmidt (also part of the Consortium) were forced by the Reich Chamber of Culture to vacate its premises at Berlin in 1934, where it

had been since 1923 in the Palais Rathenau.  J. & S. Goldschmidt had no choice but to move to the back room of the antiques firm of Paul Graupe auction house, as subtenants.  Naturally, sales continued to decline precipitously, and the business was de facto closed by 1936, when Julius Falk Goldschmidt and his cousin Arthur fled Germany in July and in November the same year, leaving behind all of their assets.

123.     The nephew and designated successor of Z.M. Hackenbroch, Herbert Bier, later described the cataclysm that befell his uncle: "The depression of 1930 and what followed was naturally notable, but the real decline began with the boycott in 1933." And the lawyer for Hackenbroch's widow Clementine later added poignantly:

> Although, according to a letter from the President of Fine Arts, the deceased husband was allowed to exercise his profession / ... / until 7/31/37, such an exercise of his business amounted to little or nothing in view of the economic damage caused by the general Boycott.  Like a still-licensed attorney, a doctor was allowed to operate, but it was known that the Jew was boycotted and was shunned despite official permission from Christians.  I was also a "Front Combatant" with an Iron Cross 1st Class, and thus allowed my activity by law. But I had nothing more to do.

124.     While "Aryan" companies had suffered just as Jewish businesses had under the global economic crisis, starting in 1933 the former soon got back on its legs thanks to the Nazi regime and, relevantly, prospered from the repression of their Jewish competitors.

**Dresdner Bank**

125.     Dresdner Bank, which became notorious as the "S.S.-bank", was frequently complicit in one-sided and manipulative taking advantage of other Jewish business owners.

126.    On February 9, 1935 Dresdner Bank Director Samuel Ritscher wrote in a file note that Prussian Finance Minister Johannes Popitz ("Popitz") had asked him to care for the matter of the Welfenschatz.  It would fall to him to carry out this transaction together with the art collection of Dresdner Bank, "so the whole thing appears to be together."

127.    The magnitude of this opportunity was apparent to Popitz, who saw the possibility of taking advantage of the Consortium's condition to acquire the Welfenschatz.

128.    Stern described a meeting of the Director of the Schloss Museum with Director Nollstadt ("Nollstadt") of Dresdner Bank of February 12, 1935: Heilbronner remained in "continuous negotiations" with the Consortium.  Nollstadt discussed the importance of conveying the impression to the Consortium that the buyer whom Dresdner Bank represented intended to gift it to the state museums, such that the Consortium would conclude there were no other potential buyers (those very museums being the most obvious candidates otherwise).

129.    At the beginning of April, 1935, Otto von Falke, one of the leading and well-known German art experts and co-author to a rare catalog compiled on the Welfenschatz by 1930, viewed the remaining parts of the Welfenschatz.  He reported, "that the most beautiful and historically the most outstanding works of art, on which the fame of the Welfenschatz is based, still exist."

130.    On April 6, 1935 Heilbronner reported directly to Director Ritscher that he had been "intensely preoccupied with the matter" for a year and a half.  The problem according to Heilbronner, was that Rosenberg and the other members of the Consortium were confident in the

rectitude of the asking price.  Heilbronner resolved to convince the Consortium of the fleeting

nature of the opportunity—fleeting of course because of the grave peril that the Consortium now

faced in the Nazi regime.

131.    By the spring of 1935, the exclusion of Jews from the German life had assumed

more threatening forms, and had become nearly total.  The means by which German art could be

sold by Jewish dealers had effectively been eliminated.

132.    It is hardly a surprise then, that after two and a half years of pronounced

repression and the very real risk that they would lose the entire Welfenschatz, if not more, the

Consortium sent word that it might be "willing" to relent from the fair market value of the

collection and sell it for 5 million RM—already far below what all involved had acknowledged

was its real value.  These "deliberations" were, of necessity, coerced and under duress by virtue

of the circumstances.

133.    On April 10, 1935, Heilbronner spoke again with Ritscher, who told him that

Dresdner Bank "in the name of its client," was authorized to submit a bid of 3.7 million RM for

the Welfenschatz.

134.    Then, a new issue arose that threatened the intended acquisition of the

Welfenschatz, the "solution" to which only underscores the coercive context of the pending

transaction.

135.    In Herrenhausen bei Hannover (near the City of Hannover, capital of the German federal state Lower-Saxony), a new museum had been planned, and it intended to seek to acquire the Welfenschatz.  The basic economics of the effect that this could have had on the negotiations is clear: it presented the possibility that a new, motivated bidder would enter the discussion willing to pay the fair market value, against which Prussia's lowballing would stand no chance in a real negotiation.

136.    Dresdner Bank, which was acting on behalf of Prussia and which had also indemnified Heilbronner for his commissions, assured that it would take appropriate action: The "authoritative entities" were to be invited to review the plans at Herrenhausen to ensure that there was no "conflict."  In other words, the Nazis made it clear to the museum in Herrenhausen to cease its interest in buying the Welfenschatz fairly.

137.    Thus, in one final stroke the Nazi state and its agents stripped away the last chance that the Consortium had to recover the value of its property.

138.    After two years of direct persecution, of physical peril to themselves and their family members, and, on information and belief, secure in the knowledge that any effort to escape would result in the certain seizure outright of the Welfenschatz, the Consortium had literally only one option left.

139.    Rosenberg submitted an offer valid until May 4, 1935 under the most extreme duress: a sale price of 4.35 million RM.

140.     Dresdner Bank, still in its role as the "purchaser," would not drop the ruse.  It claimed that its "client" (*i.e.*, the Nazi state itself) was "traveling" and could not yet respond to the offer, asking for another 16 days to respond.  "However," said the bank, "we believe it should be noted that the margin between the price 3.7 million RM that you rejected, and your current demand, is so great that we fear that our client will not increase his offer."

141.     Additional discussions ensued about the proportion of the sales price that would be paid in cash, and whether in local or foreign currency, and whether in Germany, or elsewhere.

142.     On May 17, 1935, Rosenberg made a final offer on behalf of the Consortium.  By early June, the negotiations had progressed to the point that the acquisition of the Welfenschatz was considered all but certain, such that Rust, as Reich Minister for Science, Education and Culture, wrote to the Minister of Finance:

> It is with great satisfaction that I welcome the repurchase of the Welfenschatz, in connection with the proposed acquisition of the art holdings of the Dresdner Bank.  Its recovery for Germany gives the entire action its historic value.

143.     During the negotiations, Saemy Rosenberg was staying at the Hotel "Fürstenhof" at Potsdamer Platz in Berlin.  At this same time, S.A., Hitler Youth, and non-party members were demonstrating against Jewish shops daily, chanting, "do not buy from Jews!"

144.     The same day—Friday, June 14, 1935—when Saemy Rosenberg signed the sales contract in Berlin, apparently in great haste and pushed by his counterparts from Dresdner Bank—he sent a letter to Dresdner Bank when he returned to the hotel, stating that the contract should be regarded as legally valid, even without the other owners having signed it at this point.

Furthermore, he promised to get all of the owners of the Welfenschatz to sign it properly by return.

145.    On July 1, 1935, Saemy Rosenberg went to the Kaiser Friedrich Museum in Berlin to view the works of art in the collection, as the incorporation of some existing works had come into the discussion for the Welfenschatz negotiation.

146.    A true and accurate copy of both the contract of June 14, 1935, and the letter of Saemy Rosenberg of June 14, 1935, are attached hereto as Exhibit 5 and Exhibit 6, respectively, followed by certified translations.

147.    The surviving copy of the contract bears four signatures only: of Saemy Rosenberg, Isaak Rosenbaum, Zacharias Max Hackenbroch and Julius Falk Goldschmidt—the sole owners of the collection.

148.    The tactics of the Nazi-Prussian state and of Goering to get possession of the Welfenschatz under "favorable conditions" thus proved successful, accomplished by means of terror and threat, relying on the great imbalance of power of the contracting parties and by pursuing a scheme of grave manipulative negotiation and a cover-up.

149.    In mid-July, as the "deal" was being concluded, there were riots on Berlin's Kurfürstendamm.

150.    On July 18, 1935, the Welfenschatz, supervised by director Dr. Schmidt, was carefully packed in Amsterdam for delivery to the Schlossmuseum in Berlin.

151.    On July 19, 1935, Dresdner Bank made the requisite payments pursuant to this document.

152.    The agreed upon terms and conditions of the contract of June 14, 1935 were to the unique benefit of the buyer, the Nazi state.  Moreover, the Consortium was obligated to pay a commission of 100,000 RM to Alfons Heilbronner out of their pockets (which enabled Heilbronner to pay back his debts he had with Dresdner Bank to some extent). After the deduction of that commission, the remaining purchase price of 4.15 million RM was split: 778,125 RM were paid to a "Sperrmark account," a blocked account with Dresdner Bank. To be offset against the credited money, the art dealers had to accept art objects from the Berlin Museums instead of having access to freely dispose of that money.  The received works of art eventually were sold in order to repay the Consortium's foreign loans.  According to Hackenbroch, the selection of the pieces from the museums to be delivered to them, and contrary to prior mutual agreement, was not made by the art dealers, but ultimately by museums' officials. They were thus forced to accept other items in lieu of payment—not by choice—but at their risk of selling them at appropriate prices (which was of course impossible because of their persecution as Jews).

153.    The balance, the amount of 3,371,875 RM, was credited to three different bank accounts of Hackenbroch in Germany.

154.    The Consortium used that money to repay the investors, the money lenders from 1929 in full, the receipt of which is confirmed by German tax records.  This only diminished further the diluted value for their property that the Consortium realized in this coercive transaction. Thus, the Consortium disposed of the Welfenschatz at a significant loss relative to its market value, when they had no longer had any alternative in Germany to earn a living.

155.    By this time, Jews were denied not only to transfer cash abroad legally, but any other receivables of more than 50,000 RM.  One of the massive obstacles to emigration was the so-called flight tax on all emigrating nationals who had assets of more than 200,000 RM.  While originally intended to discourage emigration in the Great Depression, it was used by the Nazi regime as a means simply to steal what Jews had left as they fled for their lives.

156.    Hackenbroch died on August 9, 1937, officially because of cardiac insufficiency.

157.    Cleveland Museum of Art director William M. Milliken ("Milliken") traveled to Germany before the war on a regular basis and had been well acquainted with the art dealers.  In his autobiography, he discussed the Consortium and the Welfenschatz.

158.    Milliken left no doubt that the very possession of the Welfenschatz by the Consortium, and in particular the decision to sell portions of the collection in America, subjected the Consortium to specific anti-Semitic vitriol.

159.    Milliken also relates rumors he had heard about Hackenbroch being "dragged to his death through the streets of Frankfurt by a Nazi mob."

160.    In either event, Hackenbroch's widow was evicted from their house—on what had then been renamed, in the bitterest of ironies, "Hermann Goering Ufer"—two months later so that the Hitler Youth could use it.  The last remnants of his gallery inventory came to auction in December, and on December 30, 1937 the firm was deleted from the commercial register and simply ceased to be.

161.    Clementine Hackenbroch, the widow of Zacharias, emigrated in the summer of 1938 with her daughter Irene to England.  After 52,808 RM for flight tax was extorted from her, and their accounts blocked at Deutsche Securities, and Exchange Bank, she had no other property.

162.    Lucie Ruth Hackenbroch (Philipp's mother) came under surveillance of the Gestapo and was herself stripped of her citizenship in humiliating fashion: published under the swastika of the German Reichs Gazette and Prussian Gazette.  Almost as an afterthought, it is noted that all those on the list who have been expelled have also had their property seized.

163.    Julius Falk Goldschmidt and the other members of that firm tried to continue the company in Berlin, Frankfurt and Amsterdam.  He emigrated to London in summer of 1936.  His cousin Arthur Goldschmidt was later arrested in Paris, imprisoned in several camps, and emigrated in 1941 to Cuba, and then in 1946 to the United States.

164.    Saemy Rosenberg and Isaak Rosenbaum had emigrated by 1935 from Germany.  In Amsterdam, the two founded the company Rosenbaum NV, which was "Aryanized" by a German "manager" after the occupation of the Netherlands by Hitler's army in 1940.  Saemy

Rosenberg's brother, Siegfried Rosenberg, ran operations in Frankfurt as best he could until 1937, when the company was liquidated and closed.  After a further reduction in the Rossmarkt where it had traditionally stood, it moved to a warehouse.  On July 11, 1938, this firm too—based in Frankfurt since the mid-19th century—was deleted from the commercial register.

165.    Saemy Rosenberg had to pay 47,815 RM in Reich Flight Tax.  Isaak Rosenbaum was expelled from Germany and paid 60,000 RM, plus 591.67 RM in interest, to the tax office Frankfurt-Ost.

166.    In an indication of what would have befallen Saemy Rosenberg had he and the Consortium failed to capitulate, the coda to his Gestapo file was written on May 2, 1941.  In this confidential file memo, Rosenberg, his wife, and his daughter are officially stripped of their citizenship and their property officially seized outright.  *See* Exhibit 4.  To add insult to injury, Rosenberg is identified on the latter part of the form with "Israel" included in his name, an appellation that the Nazi government compelled all Jewish men to add to their names.  *Id.*

167.    Isaak Rosenbaum died on October 28, 1936 in Amsterdam.

168.    Overall, the firm of I. Rosenberg and/or its owners taxed in the amount of at least 219,497.57 RM, for the sole and exclusive reason that they were Jews.

169.    In August 1939 Saemy Rosenberg fled with his wife and child from Amsterdam, the Netherlands, via Mexico to the United States.

**The Aftermath**

170.     In the introduction to the new guide for the Welfenschatz by Otto Kümmel,

housed at the Berlin Schlossmuseum in 1936, the matter is put bluntly: "The Welfenschatz was

recovered for Germany in the summer of 1935 by the Prussian state government."  The guide

thanks Popitz, Rust, and Goering for their particular efforts in "rescuing" the Welfenschatz.  The

Consortium goes unmentioned.


171.     Propaganda films were commissioned to celebrate the acquisition.


172.     On October 31, 1935, the *Baltimore Sun* reported that the Welfenschatz was to be

given as a "surprise gift" for Hitler (emphasis added):

> The bulk of the so-called Guelph Treasure, ***which was purchased by the Prussian
> Government for $2,500,000***, will be presented to Adolf Hitler as a "surprise gift,"
> it was disclosed here tonight.

> The treasure includes an important collection of church vessels and sacred relics,
> richly studded with precious stones.  Long owned by the Dukes of Brunswick, the
> treasure was purchased by a consortium of art dealers and sold to the Prussian
> government.  Gen. Hermann Wilhelm Goering, Premier of Prussia, will preside at
> the ceremony at which the gift to Hitler will be made.

173.     A true and accurate copy of this article is attached hereto as Exhibit 7.  At the

exchange rate of the day, the reported purchase price of $2,500,000, apparently being revealed to

journalists at that time by Nazi propaganda, would have been worth approximately 6-7 million

RM—far more than what the Consortium actually was paid (before being further extorted for

those proceeds).

174.    During the Second World War, the Welfenschatz was housed in the Berlin museums, and later shipped out of the city to be saved from destruction and robbery as the war turned against Germany. After the war, it was seized by U.S. troops, then handed over in trust to the State of Hesse.

175.    The end of the war brought important changes for Prussian institutions like the Berlin museums.  Prussia had been long blamed for Germany's militarism in connection with two world wars.

176.    After the war, the Allies had seen enough.  By joint act in 1945, the *Freistaat Preussen* was officially dissolved.

177.    The SPK was created for the purpose, *inter alia*, of succeeding to all of Prussia's rights in cultural property—including Prussia's wrongfully acquired possession of the Welfenschatz.

178.    It is noteworthy that even the previous owner of the Welfenschatz up to 1929, the Duke of Brunswick-Lüneburg, later on, in the 1960s, claimed that the SPK, because of the tainted sale of 1935, was not to be legally entitled to the collection, but the art dealers were.

**The Sale of the Welfenschatz Under Duress in 1935 was a Taking of Property in Violation of International Law**

179.    Since World War II, a presumption of international law has been that any sale of property by a Jew in Nazi Germany or any country occupied by Nazi Germany carries a presumption of duress and thus entitled to restitution.

180.    This is for the basic reason, as demonstrated by the foregoing, that no Jewish citizen or resident of Germany could possibly have entered into an arms'-length transaction with the Nazi state itself.

181.    In addition, the Consortium faced specific threats of violence and, on information and belief, surveillance and intimidation by the Gestapo.

182.    Altogether, the economic and physical threats faced by the members of the Consortium made the 1935 sale a transaction under duress, and thus void.  Viewed conversely, the 1935 transaction would be valid only if Jews in 1935, in Germany, under economic and physical peril, were free to make an arms'-length bargain with the Nazi state itself.  Only to state the premise is to reveal its absurdity, and the invalidity of the 1935 transaction.

183.    According to international principles of law, German law—German Civil Code ("BGB") included—the tainted and voidable acquisition of the Welfenschatz by the Nazi Prussian State in 1935 did not convey good title to Germany and SPK.

184.    A bona fide acquisition of unlawfully expropriated or otherwise lost cultural goods according to § 935 BGB is prohibited within the Common law legal system—according to the *nemo dat quod non habet* principle as well as with the codified German Civil Law, according to § 935 BGB.

185.    If the res in question has been stolen or lost, then bona fide acquisition according to § 932 BGB et seq. is not available (§ 935 BGB).  The idea behind this limitation is that the

owner has not parted with his direct possession deliberately, so that a third person shall not have the benefit of the appearance of entitlement through possession under such circumstances.

186.    Any sale by the victims of the Nazi regime after January 30, 1933 that were under duress are void, with effect *ex tunc* within the meaning of § 138 BGB.  This is because, *inter alia*, the transaction would not have been conducted absent the coercive rule of National Socialism.  Any acquisition of such cultural objects cannot be considered a bona fide purchase in accordance with § 935 BGB.

187.    Such objects whose sale is to be regarded as void under § 138 BGB, fall under the category of § 935 para. 1 BGB and apply as "lost" under German law.

188.    As a result, any claimant, whose claim meets the aforementioned requirements, generally speaking, has a claim for restitution, according to § 985 BGB.

**The Sham Process by the Limbach Commission, and Germany's Refusal to Honor its International Commitments to Victims of Nazi Looting Constitutes a Second Taking in Violation of International Law**

189.    In 1998, the United States Department of State organized and hosted the Washington Conference on Holocaust Era-Assets (the "Washington Conference").

190.    The Washington Conference resulted in what have become known as the Washington Conference Principles on Nazi-Confiscated Art.  Germany was a key participant, along with Austria, France, the United States, and dozens of other nations. The Washington Principles state:

In developing a consensus on non-binding principles to assist in resolving issues relating to Nazi-confiscated art, the Conference recognizes that among participating nations there are differing legal systems and that countries act within the context of their own laws.

1)      Art that had been confiscated by the Nazis and not subsequently restituted should be identified.

2)      Relevant records and archives should be open and accessible to researchers, in accordance with the guidelines of the International Council on Archives.

3)      Resources and personnel should be made available to facilitate the identification of all art that had been confiscated by the Nazis and not subsequently restituted.

4)      In establishing that a work of art had been confiscated by the Nazis and not subsequently restituted, consideration should be given to unavoidable gaps or ambiguities in the provenance in light of the passage of time and the circumstances of the Holocaust era.

5)      Every effort should be made to publicize art that is found to have been confiscated by the Nazis and not subsequently restituted in order to locate its pre-War owners or their heirs.

6)      Efforts should be made to establish a central registry of such information.

7)      Pre-War owners and their heirs should be encouraged to come forward and make known their claims to art that was confiscated by the Nazis and not subsequently restituted.

8)      If the pre-War owners of art that is found to have been confiscated by the Nazis and not subsequently restituted, or their heirs, can be identified, steps should be taken expeditiously to achieve a just and fair solution, recognizing this may vary according to the facts and circumstances surrounding a specific case.

9)      If the pre-War owners of art that is found to have been confiscated by the Nazis, or their heirs, can not be identified, steps should be taken expeditiously to achieve a just and fair solution.

10)     Commissions or other bodies established to identify art that was confiscated by the Nazis and to assist in addressing ownership issues should have a balanced membership.

11)     Nations are encouraged to develop national processes to implement these principles, particularly as they relate to alternative dispute resolution mechanisms for resolving ownership issues.

191.    The restitution encouraged by the Washington Principles is, and has been for more than 15 years, the foreign policy of the United States.  The United States Supreme Court, as well as the Courts of Appeal of the United States, have recognized that proceedings in furtherance of that goal such as this one are entirely consistent with that policy.

192.    In addition, Germany is a signatory to the Washington Principles.  On December 9, 1999, the Federal Republic itself, the 16 *Länder*, and the association of local authorities issued a declaration of adherence to the Washington Principles, entitled the "*Erklärung der Bundesregierung, der Länder und der kommunalen Spitzenverbände zur Auffindung und zur Rückgabe NS-verfolgungsbedingt entzogenen Kulturgutes, insbesondere aus jüdischem Besitz*" *vom 9. Dezember 1999* (the "Collective Declaration").

193.    The Collective Declaration commits to the restitution of Nazi-looted artworks, notwithstanding any other wartime claims compensation or restitution by Germany or the Allies and, consistent with postwar Allied Military Government law, without distinguishing according to whether or not Nazi-looted assets had been robbed, stolen, confiscated, or had been sold under duress or by pseudo-legal transaction.

194.    In 2009, the Czech Republic hosted a follow-up to the Washington Conference (the "Prague Conference").  Representatives of some 49 countries, most of which were affected by Nazi crimes during World War II, and nearly two dozen NGOs were invited to attend. The Conference focused on immovable (real) property, Nazi-looted art, Holocaust education and remembrance, archival access, and the recovery of Judaica. In addition, there was a session on

the social welfare needs of survivors of Nazi persecution, an issue of great importance to the

United States.

195.    The Prague Conference resulted in the Terezin Declaration, which states, with

respect to Nazi-stolen art:

> Recognizing that art and cultural property of victims of the Holocaust (Shoah) and
> other victims of Nazi persecution was confiscated, sequestered and spoliated, by
> the Nazis, the Fascists and their collaborators through various means including
> theft, coercion and confiscation, and on grounds of relinquishment as well as
> forced sales and sales under duress, during the Holocaust era between 1933-45
> and as an immediate consequence, and
>
> Recalling the Washington Conference Principles on Nazi-Confiscated Art as
> endorsed at the Washington Conference of 1998, which enumerated a set of
> voluntary commitments for governments that were based upon the moral principle
> that art and cultural property confiscated by the Nazis from Holocaust (Shoah)
> victims should be returned to them or their heirs, in a manner consistent with
> national laws and regulations as well as international obligations, in order to
> achieve just and fair solutions,
>
> 1)      We reaffirm our support of the Washington Conference Principles on
> Nazi-Confiscated Art and we encourage all parties including public and private
> institutions and individuals to apply them as well,
>
> 2)      In particular, recognizing that restitution cannot be accomplished without
> knowledge of potentially looted art and cultural property, we stress the
> importance for all stakeholders to continue and support intensified systematic
> provenance research, with due regard to legislation, in both public and private
> archives, and where relevant to make the results of this research, including
> ongoing updates, available via the internet, with due regard to privacy rules and
> regulations. Where it has not already been done, we also recommend the
> establishment of mechanisms to assist claimants and others in their efforts,
>
> 3)       Keeping in mind the Washington Conference Principles on Nazi-
> Confiscated Art, and considering the experience acquired since the Washington
> Conference, we urge all stakeholders to ensure that their legal systems or
> alternative processes, while taking into account the different legal traditions,
> facilitate just and fair solutions with regard to Nazi-confiscated and looted art, and
> to make certain that claims to recover such art are resolved expeditiously and
> based on the facts and merits of the claims and all the relevant documents
> submitted by all parties. Governments should consider all relevant issues when
> applying various legal provisions that may impede the restitution of art and

cultural property, in order to achieve just and fair solutions, as well as alternative dispute resolution, where appropriate under law.

196.    Pursuant to the Washington Principles, the Terezin Declaration, United States law, German law, and international law, the 1935 sale of the Welfenschatz was not an arms'-length transaction and must be considered a transfer of property under duress, a transfer that could not have passed, and that did not pass legitimate title to the SPK.

197.    Pursuant to the Washington Principles, the Terezin Declaration, United States law, German law, and international law, Germany has committed to address victims of art looting in a fair and equitable manner.

198.    Germany itself has acknowledged these principles—but only when it suits.  In 2003, Germany created the "German Advisory Commission for the Return of Cultural Property Seized as a Result of Nazi Persecution, Especially Jewish Property," (*Die Beratende Kommission für die Rückgabe NS-verfolgungsbedingt entzogener Kulturgüter, insbesondere aus jüdischem Besitz*) better known as the "Limbach Commission" for its presiding member, former German Supreme Constitutional Court judge Jutta Limbach ("Limbach" or the "Advisory Commission"). The Advisory Commission is a non-binding mediation that issues recommendations to German state museums, but its decisions have no preclusive effect.

199.    In one of its first decisions, Limbach considered a claim for restitution from the collection of Julius and Clara Freund, German Jews who were persecuted as such.  After Julius died in his British exile in 1941, Clara sold their collection in desperation in Switzerland.  Both the owner and the artwork were outside of Nazi Germany (United Kingdom and Switzerland), a

far more secure place than Amsterdam in 1935, and they were paid a near-market price.  Yet the larger picture was clear, and the Limbach Commission recommended restitution for a collection that was clearly sold under duress.

200.    Austria also has a commission for the restitution of Nazi-looted art, and is bound by the same principles.  By way of example, Austria restituted 177 botanical drawings and prints to the heirs of Dr. Ernst Moritz Kronfeld in 2014.  Even though the commission could not determine with certainty how the prints had passed from Kronfeld to Baldur von Schirach, another high-level Nazi and Gauleiter of Vienna, the point was that in such a case it does not really matter:

> These questions can be left open, because the sale by either Dr. Kronfeld or his widow would have been sales by persons in a persecuted group, and would also be void as an appropriation. . . .

201.    Germany has a unique historical responsibility to victims of the Holocaust, which it has gone to great lengths to accept in other contexts.

202.    The attitude towards looted artworks in German museums remains, regrettably, an exception to Germany's otherwise laudable approach to confronting history.

203.    Despite the creation of the Advisory Commission, despite the Collective Declaration and other measures ostensibly pursuant to the Washington Principles, Germany today still has no coherent policy towards victims of Nazi-looted art.

204.     The World Jewish Congress and other victims' representatives, groups and non-governmental organizations ("NGOs"), share this view and have repeatedly expressed their concern about it.

205.     At best, the Advisory Commission serves as a non-binding mediation process. German museums are not obliged to accept its recommendations, and the Advisory Commission itself is not actually independent.  It is not an arbitration, and it does not adjudicate rights in property.

206.     At worst, Germany portrays the Advisory Commission as a *solution* to this inadequacy, to give cover to the idea that Germany is in compliance with the Washington Principles.

207.     The international scandal of the Cornelius Gurlitt ("Gurlitt") affair beginning in 2013 has given the lie to this notion.  Gurlitt's father Hildebrand was an art dealer authorized in the Nazi state to buy and sell so called "degenerate art," which was considered contraband in the hands of anyone else.

208.     In 2013 it was revealed that Germany had seized approximately 1,280 works of art from Cornelius Gurlitt as part of a tax investigation on suspicion that it was looted.

209.     Since that time (the revelation itself by a newspaper was nearly two years after the artwork was found and held in secret), Germany has failed to adopt any new policies or laws.

The State of Bavaria reached a private agreement with Cornelius Gurlitt shortly before he died in May, 2014, an agreement whose terms have still never been revealed.

210.    That agreement appointed a Task Force to examine the Gurlitt collection, but Germany has not even followed the public recommendations of that Task Force.  Instead, it has continued to resist restitution even of artworks that the Task Force recommended be restituted.

211.    A November, 2014  agreement with the named heir of Gurlitt, the Kunstmuseum Bern in Switzerland, has provided the public with some information, but the process remains opaque notwithstanding the self-congratulatory publicity that surrounded it.  To this day, only a handful of objects have been identified to be restituted, and on information and belief, none have been.

212.    Worse, the chairwoman of the Advisory Commission herself took the occasion to argue that *German museums* are the victims in the whole affair.  This episode is telling on the perspective of German authorities to looted art: Jewish victims can wait, but German museums should be made whole.

213.    In the absence of meaningful recourse, but in an interest to reach agreement on the Welfenschatz, the plaintiffs submitted their claim to the Advisory Commission and presented conclusive evidence of the foregoing aspects of early Nazi terror and duress.

214.    Despite these internationally accepted principles and precedents (among many others), the Advisory Commission failed to recommend the restitution of the Welfenschatz.

215.    In what was, on information and belief, a politically-motivated decision—ironically a desire to "save the Welfenschatz" that mirrors the one that animated its plunder 70 years ago—the Advisory Commission turned a blind eye to the desperate circumstances of the Consortium, and to the active manipulation and interference by the highest levels of the Prussian-Nazi state.

216.    Most importantly, the Advisory Commission accepted the persecution of the Consortium as fact, but ignored the governing presumption of law—that as Jews, any sale was under duress. The SPK presented *no evidence to the contrary* to rebut the internationally—recognized presumption of duress.

217.    The Advisory Commission acknowledged that the art dealers were persecutees, and as such, were subject to a hostile market environment that pervaded the Reich at that time. More particularly, the Advisory Commission heard from five experts who established the context surrounding the sale at issue by showing (i) the actual market value of the collection in 1935; 11.6 Million RM; (ii) the law applicable to the sale; (iii) the historical background which supports the claim that the sale in issue was coercive and made under duress—and certainly cannot be characterized as one governed by free will and free choice in an open market; and (iv) the art dealers were the sole owners of the collection.

218.    Neither the qualifications nor credibility of these experts were challenged.  As such, the SPK did not carry its burden of showing why these experts should not be accepted nor rebuts their conclusions.

219.    The experts in the Welfenschatz case have devoted their academic careers to studying and understanding this period and have gained an insight that is unchallenged.

220.    Nonetheless, the Advisory Commission did not incorporate the uncontested findings of these experts into the recommendation, issued on March 20, 2014. This challenges the important role and assistance they contributed to the process, a role that should be encouraged.  Ignoring the experts entirely in an otherwise detailed opinion undermines the credibility of the report by the Advisory Commission.  It also leaves future claimants to wonder how claims are to be supported so that the Advisory Commission can reach reasoned and non-arbitrary results.

221.    It also is telling that, having had ample time to gather its own evidence to rebut this expert testimony, the SPK before the Advisory Commission neither challenged these experts nor offered their own expert testimony.  Put another way, *the SPK could not produce anyone who could testify to the fairness of this transaction*. Indeed, to the contrary, the SPK accepted the qualifications and testimony of the plaintiffs' experts.

222.    Moreover, the defendants are likely the custodians of additional relevant documents, but failed to produce them in the course of the Advisory Commission's work.  These documents likely include further correspondence among Nazi functionaries, Gestapo files, and photographic evidence.  These have been concealed from the plaintiffs.

223.    Under these circumstances, this testimony must be given some weight which must form part of its decision if that decision is to be seen as reasoned and consistent with established principles of law, *e.g.*, § 286 Abs. 1 ZPO (German Civil Code of Procedure).

224.    The recommendation against restitution of the Welfenschatz was also inconsistent with other prior decisions of the Advisory Commission.

225.    As referenced above, in the Freund case the Advisory Commission held that victims of Nazi persecution, financially strained, who had long since fled Nazi Germany with their art collection and sold it in Switzerland, should nevertheless recover their paintings, even though both the paintings and the people were abroad and a fair price was paid.

226.    By contrast, in the Welfenschatz case, the victims of Nazi persecution were still in Germany at the time of the coerced sale. They were Jews living under dire conditions under the swastika. They were forced to experience the destruction of their livelihoods through sanctions by the Nazi state, which was engineering a retaking of the Welfenschatz.  The expert opinions overwhelmingly support this conclusion.

227.    The recommendation by the Advisory Commission lacks any explanation as to why the Panel—consistent with their previous assumptions and approved standards of review— excludes and denies a fair and just resolution in the Welfenschatz case, in accordance with their own established standards.

228.    The SPK and Germany refuse to provide justice to the plaintiffs, based on what must be seen as questionable findings by the Advisory Commission, obtained in a questionable, non-binding proceeding, using questionable standards.

229.    On information and belief, the answer is in fact very simple: the German government simply does not wish to relinquish the Welfenschatz, no matter how ill-gotten it is.

230.    In so doing, Germany has turned its back on its historic responsibility.  This is particularly disappointing given Germany's decades-long and admirable confrontation with its wartime past.  Sadly, Nazi-looted art in German state institutions remains a blind spot and justice is not served.

## CAUSES OF ACTION

### Count I—Declaratory Relief

231.    The Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-230 as though fully set forth herein.

232.    An actual case or controversy has arisen between and among the Plaintiffs, the SPK, and Germany, as to the ownership of the Welfenschatz.

233.    The Defendants have wrongfully detained the Welfenschatz and have refused to provide restitution to the Plaintiffs.

234.     Plaintiffs are entitled to a declaratory judgment decreeing that they are the owners of the Welfenschatz and directing the Defendants to return the Welfenschatz to the Plaintiffs.

235.     Plaintiffs are further entitled to a declaratory judgment decreeing that their right, title, and ownership in the Welfenschatz is superior to any held by either the SPK, Germany, or both.

## Count II—Replevin

236.     The Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-235 as though fully set forth herein.

237.     The defendants have deprived the plaintiffs of their rightful property, the Welfenschatz.

238.     The plaintiffs are entitled to the replevin of the Welfenschatz in the possession of the SPK.

## Count III—Conversion

239.     The Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-238 as though fully set forth herein.

240.     The Welfenschatz is the rightful property of the plaintiffs, as heirs and/or successors in interest of the Consortium.

241.    The SPK and Germany exercise unlawful control and dominion over the plaintiffs' property: the Welfenschatz.

242.    Despite lawful demand for the return of the Welfenschatz, defendants SPK and Germany have refused to return the plaintiffs' property.

243.    Plaintiffs have been damaged by the defendants' conversion in an amount to be determined at trial, but in any event not less than the value of the Welfenschatz, which by conservative estimates exceeds $250,000,000.

### Count IV—Unjust Enrichment

244.    The Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-243 as though fully set forth herein.

245.    The SPK has wrongfully possessed the Welfenschatz for decades.

246.    The SPK has used the Welfenschatz in commerce as a significant attraction and source of revenue.

247.    The SPK's use of the Welfenschatz in this manner has unjustly enriched the SPK and Germany.

248.    The SPK should disgorge to the plaintiffs the amounts by which it has been unjustly enriched, in an amount to be determined at trial.

## Count V—Fraud in the Inducement

249.    The Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-248 as though fully set forth herein.

250.    The negotiations leading to the "sale" of the Welfenschatz were a sham orchestrated by the Prussian government and high-ranking Nazis through the Dresdner Bank.

251.    The representations that led to the execution of the 1935 contract, including but not limited to the existence of other interested buyers and the true identity of the party in interest—the Nazi state—were knowingly false when made.

252.    The Consortium reasonably relied on those false statements to their detriment.

253.    As a result of the fraud perpetrated by the Prussian government and the Dresdner Bank, the Consortium was damaged.

254.    As a remedy for the fraud in the inducement, the plaintiffs, as successors in interest to the Consortium, are entitled to rescission of the 1935 contract and to the return of the Welfenschatz in its entirety from the defendants, the successors in interest to Prussia and the German Reich.

## Count VI—Breach of Fiduciary Duty

255.    The Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-254 as though fully set forth herein.

256.    As a result of the inequitable and genocidal conduct of the defendants' predecessors-in-interest, the Consortium was deprived of its property.

257.    When Nazi Germany was defeated, the defendants succeeded to the interests of Prussia and Nazi Germany.

258.    By virtue of the political reorganization of Germany, Germany's international committments, the Washington Principles, the Terezin Declaration, and/or the Collective Declaration, a trust—express, implied, or constructive—arose for the benefit of the Consortium and its heirs and/or successors in interest: the plaintiffs.

259.    As trustees of that trust, the defendants owe the plaintiffs a duty of absolute good faith and against self-dealing,

260.    The defendants have breached that fiduciary duty by refusing to restitute the Welfenschatz to the plaintiffs and by otherwise enriching themselves at the plaintiffs' expense through the use of trust property.

261.    The plaintiffs have been damaged by the defendants' breach of fiduciary duty in an amount to be determined at trial, but in any event not less than the value of the Welfenschatz, which by conservative estimates exceeds $250,000,000.

## Count VII—Breach of the Covenant of Good Faith and Fair Dealing

262.    The Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-261 as though fully set forth herein.

263.    The 1935 agreement constituted an enforceable contract.

264.    Every contract has an implied term of good faith and fair dealing.

265.    Throughout the negotiations leading to the "sale," the state of Prussia—of which the SPK is the direct successor—and the German Reich—of which Germany is the successor—were engaged in coercive efforts to eliminate competition and any possibility of an arms'-length transaction.

266.    These actions, combined with the pretense of a straw man through the Dresdner Bank, violate the covenant of good faith and fair dealing.

267.    As a result of this violation of the good faith and fair dealing by the defendants' predecessors-in-interest, the Consortium was damaged.  By extension, the plaintiffs, as the Consortium's successors in interest, have been damaged in an amount to be determined at trial, but in any event not less than the value of the Welfenschatz, which by conservative estimates exceeds $250,000,000.

### Count VIII—Civil Conspiracy

268.   The Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-267 as though fully set forth herein.

269.   Prussia and Germany conspired to deprive the Consortium of the benefits and protections of the Welfenschatz in and before 1935.

270.   Since 1935, the SPK and Germany have, at various times, conspired to deprive the plaintiffs of the benefits and protections of the Welfenschatz.

271.   This conspiracy was conducted for an illegal purpose—including but not limited to the concealment of the real facts surrounding the acquisition of the Welfenschatz and through illegal means—the indisputable horrors of Nazi Germany.

272.   The defendants, as the legal successors to the original conspirators, have continued that conspiracy to this day.

273.   By virtue of this conspiracy, the plaintiffs have been damaged in an amount to be determined at trial, but in any event not less than the value of the Welfenschatz, which by conservative estimates exceeds $250,000,000.

### Count IX—Bailment

274.   The Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-273 as though fully set forth herein.

275.    For decades after the war, the true facts of the conspiracy behind the plot to acquire the Welfenschatz for Hitler were unknowable.

276.    Since the revelation of long secret documents, the plaintiffs have been engaged in negotiations with the SPK concerning the restitution of the Welfenschatz.

277.    As a result of those negotiations, an implied bailment arose pending resolution of the dispute over title to the Welfenschatz.

278.    After negotiations failed, the plaintiffs demanded the return of the Welfenschatz in 2014 and the SPK refused.

279.    As a result of the defendants' breach of this implied bailment, the plaintiffs have been damaged in an amount to be determined at trial, but in any event not less than the value of the Welfenschatz, which by conservative estimates exceeds $250,000,000.

## Count X—Tortious Interference

280.    The Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-279 as though fully set forth herein.

281.    The Consortium had prospective contracts for the sale of the Welfenschatz with private buyers in Berlin and Hannover, among others.

282.    The State of Prussia and Germany know of those prospective contracts.

283.    The State of Prussia and Germany interfered with those prospective relationships for wrongful motives—anti-Semitism—and through wrongful means—the violent and dangerous treatment of Jews in Nazi Germany.

284.    The current defendants are the successors in interest to the State of Prussia and Nazi Germany with regard to the foregoing.

285.    As a result of the foregoing tortious interference, the plaintiffs have been damaged in an amount to be determined at trial, but in any event not less than the value of the Welfenschatz, which by conservative estimates exceeds $250,000,000.

## PRAYERS FOR RELIEF

**WHEREFORE**, the plaintiffs respectfully request that the Court:

A) Enter judgment on all counts in favor of the plaintiffs; and

B) Order the defendants to return the objects known as the Welfenschatz to the plaintiffs forthwith; and/or

C) Order the defendants to pay the plaintiffs a sum of $250,000,000 or such higher amount as the Court deems just; and

D) Order the defendants to pay the plaintiffs their reasonable attorneys' fees; and

E) Enter such other and further relief as is just and proper under the circumstances.

February 23, 2015                         SULLIVAN & WORCESTER LLP


/s/ Nicholas M. O'Donnell
Nicholas M. O'Donnell (DC Bar No. 1011832)
One Post Office Square
Boston, Massachusetts 02109
Telephone: (617) 338-2800
Facsimile:  (617) 338-2880
Email: nodonnell@sandw.com

*Attorneys of record for plaintiffs Alan Philipp and
Gerald G. Stiebel*

and

Melvyn Urbach (New Jersey Bar No. 013491996)
*Pro hac vice motion forthcoming*
275 Madison Ave, Suite 1105
New York, New York 10016
Telephone: (212) 661 9400
Facsimile:  (212) 661 6606
Email: MelUrbach@Me.Com

Markus H. Stötzel, Rechtsanwalt
*Admitted to practice in Germany only, not a signing
attorney for the purposes of this pleading*
Uferstrasse 11
35037 Marburg, Germany
T: +49-6421-794560
F: +49-6421-794561
E: rastoetzel@aol.com

*Of counsel for plaintiffs*