# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Alan PHILIPP and Gerald G. STIEBEL, | ) | |
| | ) | Civ. Action No.: 1:15-cv-00266-CKK |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | October 29, 2015 |
| FEDERAL REPUBLIC OF GERMANY, | ) | |
| a foreign state, and STIFTUNG | ) | |
| PREUSSISCHER KULTURBESITZ, | ) | **Oral Argument Requested** |
| | ) | |
| Defendants. | ) | |

# DEFENDANTS' MOTION TO DISMISS
# AND INCORPORATED MEMORANDUM OF LAW

## Table of Contents

Table of Authorities ................................................................................................. iii

Introduction ........................................................................................................... 1

Statement of Facts ................................................................................................. 5

Discussion ............................................................................................................ 10

I.   Sovereign immunity requires dismissing all of the claims. ................................ 10

    A.  The Foreign Sovereign Immunities Act is the only possible basis for
        jurisdiction. ............................................................................................ 10

    B.  The commercial activity exception does not apply........................................ 11

        1.  The claims are "based upon" the alleged expropriation of the
            Welfenschatz in 1935, not on alleged licensing, exhibitions, and
            publication sales of the Welfenschatz decades later in the U.S. ............. 12

        2.  The claims are based on sovereign activity, not commercial activity. .... 13

        3.  The acts on which the claims are based did not cause any direct
            effect in the U.S. .......................................................................... 14

    C.  The expropriation exception does not apply. ................................................. 16

        1.  A state's expropriation from its own nationals does not violate
            international law. .......................................................................... 17

            a.  International law does not prohibit a sovereign taking from its own
                nationals. ............................................................................. 17

            b.  The domestic takings rule bars the plaintiffs' claims. ...................... 21

            c.  No exception to the domestic takings rule applies in this case......... 23

        2.  The plaintiffs cannot invoke the expropriation exception because
            they have not exhausted their remedies in Germany. ........................... 25

II.  The plaintiffs lack standing to assert their claims. ............................................. 29

    A.  Both the prudential standing rule and Rule 17(a) require that claims
        on behalf of an entity be brought by authorized individuals. ........................ 29

i

B.  Under German law, the claims belong to the Consortium, not
the plaintiffs. ................................................................ 30

C.  The plaintiffs lack authority to assert claims on behalf of the
Consortium................................................................... 33

D.  *Helmerich* does not change this analysis. ..................................... 34

III. The plaintiffs' claims are preempted and otherwise non-justiciable because
they conflict with U.S. foreign policy. ................................................. 36

A.  U.S. foreign policy promotes alternative dispute resolution mechanisms,
in the relevant nation, for claims of Nazi-looted art. ..................................... 37

B.  Germany provided the plaintiffs with an opportunity to make their claims.. 41

C.  The plaintiffs' claims are preempted because they conflict with
U.S policy. ................................................................... 42

D.  The plaintiffs' claims are non-justiciable due to international comity. ......... 45

E.  The plaintiffs' claims involve non-justiciable political questions. ............... 50

IV. The Court should dismiss based on the doctrine of forum non conveniens. ....... 53

A.  Germany is an available and adequate alternative forum. ........................... 54

B.  The private interest factors favor litigation in Germany............................ 57

C.  The public interest factors favor litigation in Germany............................. 61

D.  The public and private interests overcome the plaintiffs' choice
of forum. ................................................................... 66

V.  The statute of limitations bars the claims. ......................................... 66

A.  The claims are time-barred. ......................................... 67

Conclusion ........................................................................ 69

# TABLE OF AUTHORITIES

**Page(s)**

## U.S. Cases

*A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*,
  62 F.3d 1454 (D.C. Cir. 1995) ............................................................................67

*Abad v. Bayer Corp.*,
  563 F.3d 663 (7th Cir. 2009) .............................................................................65

*\*Abelesz v. Magyar Nemzeti Bank*,
  692 F.3d 661 (7th Cir. 2012) ..................................................................... *passim*

*Agudas Chasidei Chabad of U.S. v. Russian Federation*,
  528 F.3d 934 (D.C. Cir. 2008) ............................................................................27

*\*Allen v. Russian Federation*,
  522 F. Supp. 2d 167 (D.D.C. 2007) ........................................................14, 15, 16

*Altmann v. Republic of Austria*,
  317 F.3d 954 (9th Cir. 2002) .............................................................................19

*\*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) ..........................................................................................42

*Am. Nat'l Ins. Co. v. JPMorgan Chase & Co.*,
  893 F. Supp. 2d 218 (D.D.C. 2012) ..............................................................30, 31

*Argentine Republic v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989) ..........................................................................................10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..........................................................................................49

*\*In re Assicurazioni Generali S.P.A. Holocaust Ins. Litig.*,
  340 F. Supp. 2d 494 (S.D.N.Y. 2004) ................................................................43

*Bakeir v. Capital City Mortg. Corp.*,
  926 F. Supp. 2d 320 (D.D.C. 2013) ....................................................................68

*Baker v. Carr*,
  369 U.S. 186 (1962) ..........................................................................................51

*Banco Nacional de Cuba v. Sabbatino*,
  376 U.S. 398 (1964) ..........................................................................................42

*Beg v. Islamic Republic of Pak.*,
   353 F.3d 1323 (11th Cir. 2003) ...............................................................13, 14

*Berk v. Sherman*,
   682 A.2d 209 (D.C. 1996) ....................................................................................32

*BlackRock, Inc. v. Schroders PLC*,
   No. 07 Civ. 3183(PKL), 2007 WL 1573933 (S.D.N.Y. May 30, 2007)...........48, 64

*BPA Int'l v. Kingdom of Swed.*,
   281 F. Supp. 2d 73 (D.D.C. 2003) .....................................................................54

*Burger-Fischer v. Degussa AG*,
   65 F. Supp. 2d 248 (D.N.J. 1999) ......................................................................38

*Cassirer v. Kingdom of Spain*,
   461 F. Supp. 2d 1157 (C.D. Cal. 2006) .......................................................18, 27

*Cassirer v. Kingdom of Spain*,
   616 F.3d 1019 (9th Cir. 2010) (en banc) ...........................................................18

*Cheeks v. Fort Myer Constr. Co.*,
   722 F. Supp. 2d 93 (D.D.C. 2010) ..............................................................29, 31

*Chuidian v. Philippine Nat'l Bank*,
   912 F.2d 1095 (9th Cir. 1990) ......................................................................18, 19

*Cicippio v. Islamic Republic of Iran*,
   30 F.3d 164 (D.C. Cir. 1994) ..............................................................................13

*City of Harper Woods Emps.' Ret. Sys. v. Olver*,
   577 F. Supp. 2d 124 (D.D.C. 2008) ...................................................................21

*City of Harper Woods Emps.' Ret. Sys. v. Olver*,
   589 F.3d 1292 (D.C. Cir. 2009).............................................................30, 34, 35

*Croesus EMTR Master Fund L.P. v. Federative Republic of Braz.*,
   212 F. Supp. 2d 30 (D.C. Cir. 2002).......................................................59, 61, 63, 64

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000).......................................................................................42, 44

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981)..............................................................................................44

*Davis v. Bandemer*,
   478 U.S. 109 (1986)..............................................................................................51

iv

*Dayton v. Czechoslovak Socialist Republic*,
  672 F. Supp. 7 (D.D.C. 1986) ..................................................................................67

*de Csepel v. Republic of Hung.*,
  714 F.3d 591 (D.C. Cir. 2013) ............................................................................48, 49

*de Csepel v. Republic of Hung.*,
  808 F. Supp. 2d 113 (D.D.C. 2011) ...........................................................24, 25, 49

*\*de Sanchez v. Banco Central de Nicar.*,
  770 F.2d 1385 (5th Cir. 1985) ............................................................................18, 19

*Detroit Inst. of Arts v. Ullin*,
  No. 06-10333, 2007 WL 1016996 (E.D. Mich. Mar. 31, 2007) ..............................69

*Deutsch v. Turner Corp.*,
  324 F.3d 692 (9th Cir. 2003) ...................................................................................42

*Dresdner Bank AG v. Haque*,
  161 F. Supp. 2d 259 (S.D.N.Y. 2001) .....................................................................48

*Dreyfus v. Von Finck*,
  534 F.2d 24 (2d Cir. 1976) ................................................................................18, 24

*Dunbar v. Seger-Thomschitz*,
  615 F.3d 574 (5th Cir. 2010) ...................................................................................69

*EEOC v. St. Francis Xavier Parochial Sch.*,
  117 F.3d 621 (D.C. Cir. 1997) ...................................................................................9

*El-Fadl v. Cent. Bank of Jordan*,
  75 F.3d 668 (D.C. Cir. 1996) ............................................................................54, 55

*F. Palicio y Compania, S.A. v. Brush*,
  256 F. Supp. 481 (S.D.N.Y. 1966) ...........................................................................17

*Fagan v. Deutsche Bundesbank*,
  438 F. Supp. 2d 376 (S.D.N.Y. 2006) ......................................................................56

*Filartiga v. Pena-Irala*,
  630 F.2d 876 (2d Cir. 1980) .....................................................................................18

*Finanz AG Zurich v. Banco Economico S.A.*,
  192 F.3d 240 (2d Cir. 1999) .....................................................................................46

*\*Fischer v. Magyar Allamvasutak Zrt.*,
  777 F.3d 847 (7th Cir. 2015) ....................................................................26, 28, 63

*Fogade v. ENB Revocable Trust*,
   263 F.3d 1274 (11th Cir. 2001) ...........................................................................18

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
   905 F.2d 438 (D.C. Cir. 1990) ..............................................................................10

*Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*,
   493 U.S. 331 (1990) ..........................................................................................30, 35

*\*Freund v. Republic of Fr.*,
   592 F. Supp. 2d 540 (S.D.N.Y. 2008) .......................................................47, 50, 52

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.*,
   717 F.2d 602 (D.C. Cir. 1983) ..............................................................................54

*Garb v. Republic of Pol.*,
   440 F.3d 579 (2d Cir. 2006) ..................................................................................14

*Garb v. Republic of Pol.*,
   207 F. Supp. 2d 16 (E.D.N.Y. 2002) ....................................................................20

*Gilson v. Republic of Ir.*,
   682 F.2d 1022 (D.C. Cir. 1982) ............................................................................67

*GoldenTree Asset Mgmt. LP v. BNP Paribas S.A.*,
   64 F. Supp. 3d 1179 (N.D. Ill. 2014) ..............................................................48, 56

*Goodman Holdings v. Rafidain Bank*,
   26 F.3d 1143 (D.C. Cir. 1994) ..............................................................................12

*Greenpeace, Inc. (U.S.A.) v. State of Fr.*,
   946 F. Supp. 773 (C.D. Cal. 1996) .......................................................................27

*Guirlando v. T.C. Ziraat Bankasi A.S.*,
   602 F.3d 69 (2d Cir. 2010).....................................................................................15

*Gulf Oil Corp. v. Gilbert*,
   330 U.S. 501 (1947)........................................................................................57, 61

*Gustave-Schmidt v. Chao*,
   226 F. Supp. 2d 191 (D.D.C. 2002) ........................................................................9

*Hall v. Clinton*,
   285 F.3d 74 (D.C. Cir. 2002) ................................................................................68

*\*Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venez.*,
   784 F.3d 804 (D.C. Cir. 2015) ..................................................................... *passim*

*Helog Ag v. Kaman Aerospace Corp.*,
    228 F. Supp. 2d 91 (D. Conn. 2002).................................................................56, 64

*Hilton v. Guyot*,
    159 U.S. 113 (1895)................................................................45, 46, 48, 49

*In re Nazi Era Cases Against German Defendants Litig.*,
    129 F. Supp. 2d 370 (D.N.J. 2001) ..................................................................38

*In re Vitro S.A.B. de CV*,
    701 F.3d 1031 (5th Cir. 2012) .......................................................................46

*Int'l Ass'n of Machinists & Aerospace Workers v. Tenn. Valley Auth.*,
    108 F.3d 658 (6th Cir. 1997) ........................................................................68

*Iragorri v. United Techs. Corp.*,
    274 F.3d 65 (2d Cir. 2001) (en banc)..............................................................66

*\*Irwin v. World Wildlife Fund, Inc.*,
    448 F. Supp. 2d 29 (D.D.C. 2006) ..............................................................54, 65

*Jafari v. Islamic Republic of Iran*,
    539 F. Supp. 209 (N.D. Ill. 1982) .................................................................18

*Janini v. Kuwait Univ.*,
    43 F.3d 1534 (D.C. Cir. 1995).......................................................................12

*Jones & Assocs., Inc. v. District of Columbia*,
    797 F. Supp. 2d 129 (D.D.C. 2011)..............................................................30, 31

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,
    115 F.3d 1020 (D.C. Cir. 1997).....................................................................12

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*
    *("Pertamina")*, 313 F.3d 70 (2d Cir. 2002).......................................................21

*Kelberine v. Societe Internationale, Etc.*,
    363 F.2d 989 (D.C. Cir. 1966).......................................................................51

*Kirch v. Liberty Media Corp.*,
    No. 04 Civ. 667(NRB), 2006 WL 3247363 (S.D.N.Y. Nov. 8, 2006) .....................56, 63, 65

*Labovitz v. Wash. Times Corp.*,
    172 F.3d 897 (D.C. Cir. 1999).......................................................................30

*Labovitz v. Wash. Times Corp.*,
    900 F. Supp. 500 (D.D.C. 1995)....................................................................31

*Laker Airways Ltd. v. Sabena, Belgian World Airlines,*
    731 F.2d 909 (D.C. Cir. 1984) .......................................................................45, 49

*M. Salimoff & Co. v. Standard Oil Co. of N.Y.,*
    262 N.Y. 220 (1933) ............................................................................................19

*Malewicz v. City of Amsterdam,*
    362 F. Supp. 2d 298 (D.D.C. 2005) ...............................................................26, 67

*Matter of Oil Spill by the Amoco Cadiz,*
    954 F.2d 1279 (7th Cir. 1992) ............................................................................21

*\*MBI Grp., Inc. v. Credit Foncier du Cameroun,*
    558 F. Supp. 2d 21 (D.D.C. 2008) ............................................................ *passim*

*McKesson Corp. v. Islamic Republic of Iran,*
    672 F.3d 1066 (D.C. Cir. 2012) ...........................................................................11

*Mezerhane v. Republica Bolivariana de Venez.,*
    785 F.3d 545 (11th Cir. 2015) .......................................................................18, 19

*Millicom Int'l Cellular, S.A. v. Republic of Costa Rica,*
    995 F. Supp. 14 (D.D.C. 1998) ......................................................................26, 27

*Mujica v. AirScan Inc.,*
    771 F.3d 580 (9th Cir. 2014) ........................................................................46, 47

*Mujica v. Occidental Petroleum Corp.,*
    381 F. Supp. 2d 1164 (C.D. Cal. 2005) ...............................................................43

*Museum of Fine Arts, Bos. v. Seger-Thomschitz,*
    623 F.3d 1 (1st Cir. 2010) ....................................................................................69

*Mwani v. bin Laden,*
    417 F.3d 1 (D.C. Cir. 2005) .................................................................................11

*Nat'l Foreign Trade Council v. Natsios,*
    181 F.3d 38 (1st Cir. 1999) ..................................................................................44

*NCA Holding Corp. v. Norddeutsche Landesbank Gironzentrale,*
    No. 96 Civ 9321(LMM), 1999 WL 39539 (S.D.N.Y. Jan. 28, 1999) ...................56

*Nemariam v. Fed. Democratic Republic of Eth.,*
    315 F.3d 390 (D.C. Cir. 2003) .................................................................18, 19, 55

*News World Commc'ns, Inc. v. Thompsen,*
    878 A.2d 1218 (D.C. 2005) ............................................................................67, 68

*Odhiambo v. Republic of Kenya,*
    764 F.3d 31 (D.C. Cir. 2014) ................................................................10, 12, 15

*Oetjen v. Cent. Leather Co.,*
    246 U.S. 297 (1918) ................................................................................45, 46

 *Orkin v. Taylor,*
    487 F.3d 734 (9th Cir. 2007) ..............................................................................69

*\*Pain v. United Techs. Corp.,*
    637 F.2d 775 (D.C. Cir. 1980) ..................................................................... *passim*

*Phila. Gear Corp. v. Phila. Gear de Mex., S.A.,*
    44 F.3d 187 (3d Cir. 1994) ................................................................................47

*\*Piper Aircraft Co. v. Reyno,*
    454 U.S. 235 (1981) ..................................................................................... *passim*

*Princz v. Federal Republic of Ger.,*
    26 F.3d 1166 (D.C. Cir. 1994) ............................................................................16

*Ramirez de Arellano v. Weinberger,*
    745 F.2d 1500 (D.C. Cir. 1984) ..........................................................................35

*Republic of Arg. v. Weltover,*
    504 U.S. 607 (1992) ..........................................................................................13

*Republic of Austria v. Altmann,*
    541 U.S. 677 (2004) ..........................................................................................19

*Rong v. Liaoning Province Gov't,*
    452 F.3d 883 (D.C. Cir. 2006) ......................................................................14, 15

*Rong v. Liaoning Provincial Gov't,*
    362 F. Supp. 2d 83 (D.D.C. 2005) ................................................................19, 22

*Saleh v. Titan Corp.,*
    580 F.3d 1 (D.C. Cir. 2009) ................................................................................43

*Sea Search Armada v. Republic of Colom.,*
    821 F. Supp. 2d 268 (D.D.C. 2011) .....................................................................67

*\*Siderman de Blake v. Republic of Arg.,*
    965 F.2d 699 (9th Cir. 1992) ........................................................................20, 24

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.,*
    549 U.S. 422 (2007) ....................................................................................53, 54

*Slate v. Pub. Defender Serv.*,
  31 F. Supp. 3d 277 (D.D.C. 2014) ......................................................................68

*Stromberg v. Marriott Int'l, Inc.*,
  474 F. Supp. 2d 57 (D.D.C. 2007) ...............................................................56, 65

*Tachiona v. Mugabe*,
  234 F. Supp. 2d 401 (S.D.N.Y. 2002) ..............................................................18

*Tahan v. Hodgson*,
  662 F.2d 862 (D.C. Cir. 1981) ..........................................................................46

*TMR Energy Ltd. v. State Prop. Fund of Ukr.*,
  411 F.3d 296 (D.C. Cir. 2005) ..........................................................................55

*Toledo Museum of Art v. Ullin*,
  477 F. Supp. 2d 802 (N.D. Ohio 2006) .............................................................69

*Ungaro-Benages v. Dresdner Bank AG*,
  379 F.3d 1227 (11th Cir. 2004) ........................................................................45

*United States v. Belmont*,
  301 U.S. 324 (1937) ..........................................................................................20

*United States v. Pink*,
  315 U.S. 203 (1942) ..........................................................................................44

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
  754 F.3d 712 (9th Cir. 2014) .................................................................. *passim*

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
  592 F.3d 954 (9th Cir. 2010) .................................................................. *passim*

*Wahba v. Nat'l Bank of Egypt*,
  457 F. Supp. 2d 721 (E.D. Tex. 2006) ..............................................16, 19, 22

*Westfield v. Fed. Republic of Ger.*,
  633 F.3d 409 (6th Cir. 2011) ......................................................................15, 16

*Whelan v. Abell*,
  953 F.2d 663 (D.C. Cir. 1992) ..........................................................................30

*Whiteman v. Dorotheum GmbH & Co. KG*,
  431 F.3d 57 (2d Cir. 2005) ................................................................................51

**U.S. Statutes**

28 U.S.C. § 1603 ...................................................................................................10

28 U.S.C. § 1604 .................................................................................................10

*28 U.S.C. § 1605 ............................................................................................ *passim*

*D.C. Code § 12-301 .........................................................................................67

**Other Authorities**

A.A. Cançado Trindade, *Origin and Historical Dev. of the Rule of Exhaustion of Local Remedies in Int'l Law*, 12 Belgian Rev. Int'l L. 499 (1976)...................................................28

Advisory Commission, Common Statement, www.lostart.de/Webs/EN/Koordinierungsstelle/GemeinsameErklaerung.html....................62

Advisory Commission, Recommendation concerning the Welfenschatz (Guelph Treasure) (March 20, 2014) *available at* www.lostart.de/Content/02_Aktuelles/2014/14-03 20%20Beratende%20Kommission%20Guelph%20Treasure%20Empfehlung.html ?nn=9848 ........................................................................................9, 41, 42

*Br. for the U.S. as Amicus Curiae, *Norton Simon Museum of Art at Pasadena v. Von Saher*, 135 S. Ct. 1158 (2015), 2011 WL 2134984...................................................... *passim*

Bundesgerichtshof [BGH] [Federal Court of Justice], Mar. 16, 2012, Neue Juristische Wochenschrift [NJW] 1796, 2012 ..............................................................28

Bundesgerichtshof [BGH] [Federal Court of Justice] Mar. 26, 1969, 52 Entscheidungen des Bundesgerichtshofes in Zivilsachen [BGHZ] 30 ................................................59

D.D.C. LCvR 7(a)..................................................................................................1

Declaration against Forced Transfers of Property in Enemy Controlled Territory, Jan. 5, 1943, 3 Bevans 754 ................................................................................37

Emmerich de Vattel, 2 *Le Droit des Gens, ou principes de la loi naturelle* 316 (Librairie de Guillaumin & Cie. 1863) ................................................................................28

Fed. R. Civ. P. 12 ..................................................................................................1

Fed. R. Civ. P. 17.......................................................................................... *passim*

Fed. R. Civ. P. 44.1..............................................................................................21

First Regulation to the Reich Citizenship Law of 14 Nov. 1935.................................25

Hugo Grotius, 3 *De Jure Belli et Pacis Libri Tres* 48–49 (W. Whewell trans.,1853).................28

*Interhandel (Switz. v. U.S.)*, 1959 I.C.J. 6 (Mar. 21) . ............................................25, 26

Mary V. Capisio, *Awards of Attorneys Fees by Federal Courts, Federal Agencies and Selected Foreign Countries* (2002) ........................................................................................................60

Matthew S. Duchesne, *The Continuous-Nationality-of-Claims Principle: Its Historical Development and Current Relevance to Investor-State Investment Disputes,* 36 Geo. Wash. Int'l L. Rev. 783 (2004) ..........................................................................................................28

Oberlandesgericht [OLG] [Hamm Higher Regional Court] Mar. 1, 2011, 25 U 2/08, juris .........60

Oscar Schachter, *The Twilight Existence of Nonbinding International Agreements*, 71 Am. J. Int'l L. 296 (1977)...........................................................................................................43

Presidential Advisory Commission on Holocaust Assets in the United States, *Plunder and Restitution: The U.S. and Holocaust Victims' Assets* (2000)...................................................37

Press Statement, Hillary Rodham Clinton, Secretary of State, Washington D.C. (January 16, 2013), *available at* www.state.gov/secretary/20092013clinton/rm/2013/01/202932.htm ......40

Reich Citizenship Law of 15 Sept. 1935 ......................................................................................25

Remarks of Ambassador Peter Wittig, Art Restitution Ceremony (May 5, 2015), *available at* www.germany.info/Vertretung/usa/en/__pr/P__Wash/2015/05/05-Art-Restitution-SP.html?archive=1980516)..........................................................................................................47

Restatement (Third) of Foreign Relations Law § 712 (1987)...................................................17, 21

Special Remarks of Douglas Davidson, Special Envoy for Holocaust Issues, Bureau of European and Eurasian Affairs, *Should Stolen Holocaust Art be Returned?*, N.Y. Cnty. Law Ass'n (N.Y.C., March 25, 2013), *available at* www.state.gov/p/eur/rls/rm/2013/mar/206719.htm................................................................40

Statute of the International Court of Justice, June 26, 1945, art. 38, ¶ 1(b), 59 Stat. 1055, U.S.T.S. 993.................................................................................................................................49

*Stuart E. Eizenstat, Head of U.S. Delegation to the Prague Holocaust Era Assets Conferences, Prague, Czech Republic, Opening Plenary Session Remarks at Prague Holocaust Era Assets Conference (June 28, 2009), *available at* www.state.gov/p/eur/rls/rm/2009/126158.htm ............................................................ *passim*

*U.S. Dep't of State, *Prague Holocaust Era Assets Conference: Terezin Declaration* (June 30, 2009), *available at* www.state.gov/p/eur/rls/or/126162.htm .......................... *passim*

*U.S. Dep't of State, *Washington Conference Principles on Nazi–Confiscated Art* (1998), *available at* www.state.gov/p/eur/rt/hlcst/122038.htm ...................................... *passim*

Wesley A. Fischer & Ruth Weinberger, *Holocaust-Era Looted Art: A Current World-Wide Overview* (2014) .......................................................................................... *passim*

xii

Zivilprozessordnung [ZPO] [Code of Civil Procedure], Dec. 5, 2005, Bundesgesetzblatt
    [BGBl.] [Federal Law Gazette] 1 page 3302, as amended, § 722 .........................................59

Zivilprozessordnung [ZPO] [Code of Civil Procedure], Dec. 5, 2005, Bundesgesetzblatt
    [BGBl.] [Federal Law Gazette] 1 page 3302, as amended, § 328 ..........................................59

Defendants Stiftung Preußischer Kulturbesitz (Prussian Cultural Heritage Foundation) (SPK) and the Federal Republic of Germany (Germany) submit this motion to dismiss and incorporated memorandum of law pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), 12(b)(3), 12(b)(6), and 17(a) and D.D.C. LCvR 7(a).

## INTRODUCTION

In 1929, a consortium of successful art dealer firms based in Frankfurt, Germany, came together to purchase a collection of medieval German church art from the Duke of Brunswick. Known as the Welfenschatz, or Guelph treasure, the collection was originally housed at the Brunswick Cathedral in Brunswick, Germany. The Consortium intended to resell the Welfenschatz and turn a profit, part of which they promised to the Duke. But their timing was unfortunate. Several weeks after they paid a princely sum for the collection, the U.S. stock market crashed, ushering in the years of worldwide hardship that would come to be known as the Great Depression. Art prices fell along with the stock market. The Consortium firms had invested a fortune in their joint investment, hoping for prompt profits, but they could find no buyers.

It was not for want of trying. The Consortium contacted museums and collectors in the U.S., Great Britain, and the rest of Europe, including the Metropolitan Museum in New York and the Victoria and Albert Museum in London. It even arranged an elaborate tour of the collection across the U.S., accompanied by a glossy book. Giving up its initial hope of selling the collection as a whole, the Consortium began to sell off pieces to individual collectors and to the Cleveland Museum. When it had sold what it could, the Consortium returned to Europe, storing the rest of the Welfenschatz in Amsterdam while the Great Depression ground on.

In Frankfurt a few years later, the Consortium began negotiating with a German bank that expressed interest in purchasing the remainder of the Welfenschatz for an undisclosed client. Initial offers were made on each side, and, after extensive negotiations, the Consortium and the

bank compromised on a number roughly midway between their initial offers. The Consortium received what was promised in the deal, and nothing more was heard for more than 70 years.

In 2008, plaintiffs—who claim to be heirs of owners of some of the firms that participated in the Consortium—contacted the Stiftung Preußischer Kulturbesitz (Prussian Cultural Heritage Foundation) (SPK), an umbrella organization of German museums, archives, institutes and libraries that exhibits the Welfenschatz in the Museum of Decorative Arts in Berlin. The plaintiffs advanced the theory that the Welfenschatz sale had been forced, because the owners of the art-dealer firms in the Consortium were German Jews, and the Nazi party had come to power in 1933. SPK conducted an extensive investigation into the circumstances of the 1935 transaction. Consistent with its policy of openness, it shared its findings with the plaintiffs through extensive correspondence and historical documentation. Based on the investigation, the SPK concluded that the 1935 sale had been a voluntary, fair-market transaction.

The plaintiffs disagreed. To resolve the disagreement, the SPK and the plaintiffs agreed to submit their dispute to Germany's "Advisory Commission in connection with the return of Nazi-confiscated art, especially Jewish property," created by Germany to hear Nazi-related art-restitution claims under the multinational Washington Conference Principles on Nazi-Confiscated Art. The U.S. and Germany are among the signatories to the Washington Principles, which aim to "expeditiously . . . achieve a just and fair solution" to remaining claims of Nazi-looted art. These principles arose out of the Washington Conference on Holocaust Era Assets, which called for the resolution of claims on the merits, by means more efficient and less expensive than traditional litigation, while recognizing that "there are differing legal systems and that countries act within the context of their own laws."

Both sides presented their cases on the merits to the Advisory Commission, often known as the Limbach Commission, in honor of its chair, Jutta Limbach, the former President (chief justice) of Germany's Federal Constitutional Court. The Advisory Commission also included Richard von Weizsäcker, who served as the first President of a reunified Germany, and the

former president of the Bundestag, Rita Süssmuth. On March 20, 2014, the Advisory

Commission concluded on the merits that the "sale of the Welfenschatz was not a compulsory

sale due to persecution." It found that:

> [a]lthough the commission is aware of the difficult fate of the art dealers and of
> their persecution during the Nazi period, there is no indication in the case under
> consideration by the Advisory Commission that points to the art dealers and their
> business partners having been pressured during negotiations, for instance by
> Göring. Furthermore, the effects of the world economic crisis were still being felt
> in 1934/1935. . . . Moreover, there is no evidence to suggest that the art dealers
> and their business partners were not free to dispose of the proceeds.

A few months later, and thousands of miles away, the plaintiffs filed this lawsuit, this

time against both SPK and the government of Germany.

Germany and the SPK understand and accept the responsibility that they bear to address

the injustices perpetrated by the Nazi regime, including the continuing issue of Nazi-looted art.

Germany has embraced the Washington Principles, and both Germany and the SPK have

committed to finding fair and just solutions to restitution claims. Since 1999, claimants alleging

Nazi-looted art have submitted more than 50 restitution claims to the SPK, which has responded

by returning more than 1000 objects from its collections. Those restituted objects include a van

Gogh drawing, a work by Munch, and the *Watzmann* by Caspar David Friedrich. Together with

the SPK, German museums and institutions have returned more than 14,300 Nazi-looted items.

Germany's progress in implementing the Washington Principles has been recognized by

the World Jewish Restitution Organization and the Conference on Jewish Material Claims

against Germany, both of which seek the restitution of Jewish property lost during the Holocaust,

including Jewish-owned art and cultural property. In their 2014 report evaluating the progress of

50 countries in implementing the Washington Principles, the WJRO and the Claims Conference

found that only four deserved inclusion in the top group of "countries that have made major

progress towards implementing the Washington Principles." Germany is one of those four.[1]

---

[1] Wesley A. Fischer & Ruth Weinberger, *Holocaust-Era Looted Art: A Current World-Wide Overview* 5 (2014) (WJRO Report), *available at* art.claimscon.org/wp-content/uploads/2014/09/Worldwide-Overview.pdf.

By choosing to file suit in the United States, the plaintiffs turned their backs on those principles. Their claim was heard by a highly-respected commission, convened in the country where the property is located, carrying out the central norms of the Washington Principles: adjudication on the merits, through an alternative dispute resolution mechanism, functioning consistently with local legal culture. Nothing in the Washington Principles or U.S. law allows them to try their luck again in a U.S. court. While the SPK and Germany would win on the merits here as surely as they did before the Advisory Commission, several doctrines of U.S. law require that the suit be dismissed now.

First, the plaintiffs cannot establish jurisdiction. They invoke two exceptions to the Foreign Sovereign Immunities Act, but neither applies here. The commercial activity exception permits suit for an alleged wrong outside the U.S. only if it had a direct effect in the U.S., and the 1935 sale of the Welfenschatz did not. The expropriation exception also does not apply, as the plaintiffs have not pleaded either a violation of international law or any efforts to exhaust their remedies in a German court (after failing before the Commission).

Second, the plaintiffs cannot establish standing. They purport to bring their own claims, but the owner of any claims that exist is the Consortium, and they have not taken the steps that German law requires to assert the Consortium's claims. As in U.S. law, where a shareholder generally cannot bring claims on behalf of a corporation in which he owns an interest, a member of a German consortium—a sort of informal partnership—cannot bring claims on behalf of the consortium unless authorized to do so.

Third, the plaintiffs' claims conflict with U.S. foreign policy, which for many decades has supported an "internal restitution" process in which nations resolve claims to Nazi-era property within their own borders. The Executive Branch has continuously supported the Washington Principles, and it has informed the Supreme Court that U.S. foreign policy supports other nations' implementation of the Washington Principles and opposes the re-filing of such

claims in U.S. courts. Because the claims conflict with U.S. foreign policy, three separate doctrines require dismissal: preemption, international comity, and the political question doctrine.

Fourth, the forum non conveniens doctrine requires dismissal. U.S. courts have consistently found Germany to be an available and adequate alternative forum, and the balance of private and public interest factors points squarely toward Germany. This case involves a dispute over a unique German cultural treasure, transferred in a German transaction, with the transfer documented in German. The deal was entered into by a German bank representing a German state, on the one hand, and a German consortium made up of German art dealers on the other. It will be fought with German documents, will be governed by German substantive law, and asks for an assessment of the German government's efforts in addressing its history. These are not D.C.'s concerns.

Finally, the claims come too late. The sale of the Welfenschatz took place in 1935. The Prussian state celebrated its purchase soon after. The whereabouts of the Welfenschatz have been known since shortly after the end of World War II, and it has been on public display for decades. This is not a case where a looted painting shows up after years in hiding, or where a piece of missing provenance is suddenly discovered after many years of effort. This is, instead, a case where sophisticated businessmen running a consortium got what they could from a doomed art investment in the midst of the Great Depression and never looked back.

## STATEMENT OF FACTS

The suffering of the Jewish people at the hands of the Nazi regime is beyond the imagination of those who did not live it. Jews were humiliated, exiled, tortured, and murdered by the millions. Among the many deprivations visited upon Jews by the Nazi regime was the plunder of personal property—including valuable fine art and objects of antiquity—by means ranging from outright confiscation to forced sale under duress.

This Court will not be called upon to decide in general whether such atrocities occurred during the Nazi era, for there is no question that they did. This Court will not be called upon to

decide whether these atrocities can be excused, for they cannot. And they must never be forgotten. About this much, the parties are in perfect accord.

**The Welfenschatz.** The plaintiffs' claims involve a collection of 42 medieval ecclesiastical objects known collectively as the "Guelph Treasure" or the "Welfenschatz." Compl. ¶¶ 28–29. These objects are presently part of the collection of the SPK's Museum of Decorative Arts in Berlin.

According to the plaintiffs, the Welfenschatz was acquired from the Duke of Brunswick-Lüneburg on October 5, 1929, by a "Consortium" consisting of "three art dealer firms in Frankfurt: J.&S. Goldschmidt, I. Rosenbaum, and Z.M. Hackenbroch." *Id.* ¶¶ 1, 32–33. The plaintiffs further allege that these three firms were owned respectively by Julius Falk Goldschmidt (Goldschmidt), Isaak Rosenbaum (Rosenbaum) and his partner Saemy Rosenberg (Rosenberg), and Zacharias Max Hackenbroch (Hackenbroch). *Id.* ¶¶ 1, 17–18, 32.

**Plaintiffs**. Plaintiff Alan Philipp alleges that he is a descendent of Hackenbroch, and plaintiff Gerald Stiebel alleges he is a descendent of Rosenbaum. *Id.* ¶¶ 17–18. The plaintiffs describe themselves as successors to the estates of their respective ancestors. *Id.* However, they do not explain the basis for this characterization, other than to say that Philipp is a grandson of Hackenbroch and Stiebel is a great-nephew of Rosenbaum. *Id.* Likewise, they do not state that they are the sole descendants of Hackenbroch and Rosenbaum, the sole successors to their estates, or the sole authorized representatives of those estates.

Moreover—and critically—the plaintiffs do not explain in their Complaint on what basis they represent the Consortium. The most they are able to do is allege that their ancestors— Hackenbroch and Rosenbaum—are two of the four "signatories" on the 1929 purchase contract. *Id.* ¶¶ 17–18, 32. The plaintiffs do not allege any right of succession to Rosenberg (Rosenbaum's partner) or to Goldschmidt, the other two "signatories" on the 1929 contract. They do not address the interests of the estate of Saemy Rosenberg, co-owner of the I. Rosenbaum firm. *See id.* ¶¶ 1,

6

18, 32. Ignored entirely is the interest of the J.&S. Goldschmidt art dealer firm that was owned by Julius Falk Goldschmidt, whose heirs are also not identified. *See id.* ¶¶ 1, 32.

Even leaving these gaps aside, the plaintiffs do not explain the basis for an actual ownership interest in the Consortium by any of the four "signatories" including their two ancestors. According to the Complaint, the Welfenschatz was not purchased in 1929 by the four "signatories," but by the Consortium, which consisted of "three art dealer *firms* in Frankfurt: J.&S. Goldschmidt, I. Rosenbaum, and Z.M. Hackenbroch." *Id.* ¶ 1 (emphasis added). The Complaint does not specify the allocation of shares within the Consortium among these three art dealer firms, and it does not specify the allocation of interests within the three firms.

**Defendants**. The Federal Republic of Germany is a sovereign nation. *Id.* ¶ 19. The SPK, an umbrella organization of German museums and other cultural institutions, is an instrumentality of the Federal Republic of Germany. *Id.* ¶ 20.

**June 14, 1935, Sale.** After it purchased the Welfenschatz from the Duke of Brunswick-Lüneburg on October 5, 1929, the Consortium did not sit idly on its investment. To the contrary, it made extensive efforts to sell the Welfenschatz throughout Europe and the U.S., ultimately succeeding in selling 40 of the original 82 objects in 1930 and 1931. *Id.* ¶ 39.

The Consortium was not successful, however, in finding a buyer for the remaining 42 objects between 1931 and 1934. That should come as no surprise in light of the Great Depression, which began with the crash of the stock market in the United States on October 29, 1929, just weeks after the Consortium bought the Welfenschatz. Although Germany's economy declined precipitously in the early 1930s, the Consortium managed to sell the rest of the Welfenschatz to the Dresdner Bank on June 14, 1935, at the extensively negotiated price of RM 4.25 million. *See id.* ¶¶ 12, 144.

The sale to the Dresdner Bank was not a forced or "duress sale" that victimized the plaintiffs' ancestors. The Welfenschatz was not part of a private family collection, but an asset owned by a commercial consortium that bought it solely to re-sell it. While the plaintiffs claim

that the Consortium could not fairly negotiate with Nazi-run Prussia, they acknowledge that the Consortium sold the Welfenschatz to the Dresdner Bank, *id.* ¶ 144, and that the Consortium dealt directly with the bank—and not its then-unidentified client, the government of Prussia—during negotiations, *id.* ¶¶ 133, 140, 250. Indeed, plaintiffs allege that the bank did not disclose the identity of its client, even to the point of claiming there would be a delay in responding to an offer because its client was "traveling." *Id.* ¶ 140.

Moreover, at the time of the negotiations, the Welfenschatz was not located in Germany, but in the Netherlands. *Id.* ¶¶ 76, 150. (Germany did not invade the Netherlands until 1940, five years after the sale.) Likewise, Rosenberg—who took the lead in negotiating the 1935 sale on behalf of the Consortium and signed the initial contract with the bank—was not then residing in Germany, having moved to the Netherlands with his partner Rosenbaum. *Id.* ¶ 164.

A sale by a commercial consortium of objects located in the Netherlands to a German bank negotiating on behalf of an unidentified client bears none of the hallmarks of a forced sale.

**The Advisory Commission**. In 1998, the United States hosted the Washington Conference on Holocaust Era-Assets, which issued the "Washington Conference Principles on Nazi-Confiscated Art." *Id.* ¶ 189. "Germany was a key participant" in the Washington Conference, *id.* ¶ 190, and the Federal Republic of Germany has recognized its "unique historical responsibility to victims of the Holocaust," *id.* ¶ 201. In 2009, the international community, including Germany, reaffirmed its commitment to the Washington Principles at the Prague Holocaust Era Assets Conference, which issued the Terezin Declaration. *Id.* ¶¶ 194–95.

In 2003, in keeping with its commitment to the Washington Conference Principles, the Federal Republic of Germany established the Advisory Commission on the return of cultural property seized as a result of Nazi persecution, especially Jewish property, also known as the Limbach Commission, for its chair Jutta Limbach, the former head of the Federal Constitutional Court. *Id.* ¶ 198. The Advisory Commission was formed under the Washington Principles in

order to provide an "alternative dispute resolution" process to identify and, in appropriate cases,
return "Nazi-confiscated art." *Id.* ¶¶ 190–95.

Plaintiffs made their first claim relating to the Welfenschatz in 2008, even though
occupying Allied Forces seized the Welfenschatz toward the end of the war, the SPK has owned
it since 1963, and it has been displayed in Berlin ever since. *Id.* ¶¶ 174–78. In response to the
2008 claim, the SPK conducted diligent research on the claim and concluded that it lacked merit.
The plaintiffs then asked the Advisory Commission to review their claim to the Welfenschatz. *Id.*
¶ 213. Both parties provided extensive evidence and argument, including "five experts"
presented by the plaintiffs, who had "devoted their academic careers to studying and
understanding this period." *Id.* ¶¶ 217, 219. After the positions of both sides were heard, on
March 20, 2014, the Advisory Commission concluded that the "sale of the Welfenschatz was not
a compulsory sale due to persecution." Specifically, it found:

> According to the findings of the commission, the art dealers had been trying to
> resell the Welfenschatz since its acquisition in 1929. They were able to sell 40
> individual items in 1930 and 1931, but did not receive any offers for the
> remaining 42 individual items. Dresdner Bank first expressed an interest in
> purchasing the remainder of the collection in 1934 on behalf of the Prussian State
> government. During the negotiations, which were drawn out over a lengthy period
> of time, the different target prices for both sides gradually approached each other.
> Although the commission is aware of the difficult fate of the art dealers and of
> their persecution during the Nazi period, there is no indication in the case under
> consideration by the Advisory Commission that points to the art dealers and their
> business partners having been pressured during negotiations, for instance by
> Göring. Furthermore, the effects of the world economic crisis were still being felt
> in 1934/1935. In the end, both sides agreed on a purchase price that was below the
> 1929 purchase price, but which reflected the situation on the art market after the
> world economic crisis. The art dealers used the proceeds primarily to repay the
> financial contributions of their domestic and foreign business partners.[2]

---

[2] Advisory Commission, Recommendation concerning the Welfenschatz (Guelph Treasure)
(March 20, 2014), *available at* www.lostart.de/Content/02_Aktuelles/2014/14-03-
20%20Beratende%20Kommission%20Guelph%20Treasure%20Empfehlung.html?nn=9848.
Plaintiffs have incorporated the Commission's decision by reference into their Complaint. *See*
Compl. ¶¶ 214–28. In resolving this motion, the Court may consider "documents attached as
exhibits or incorporated by reference in the complaint, and matters about which the Court may
take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002); *see
also EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

Dissatisfied with the result, plaintiffs now bring their claim in a U.S. court.

## DISCUSSION

### I.      Sovereign immunity requires dismissing all of the claims.

The FRG and the SPK have immunity under the Foreign Sovereign Immunities Act

(FSIA) from any claim brought against them in the U.S. unless the plaintiffs can establish an

exception to immunity for that claim. The plaintiffs allege that their claims fall within the

"expropriation exception" and the "commercial activity exception" to the FSIA. *See* 28 U.S.C. §

1605(a)(2), (3); Compl. ¶¶ 23–26. Neither saves their claims.

The commercial activity exception does not apply to the plaintiffs' claims because their

claims are based on sovereign activity, not commercial activity, and the alleged acts

undergirding their claims did not cause any direct effect in the U.S. The expropriation exception

does not apply either, because it does not permit claims arising from a state's alleged

expropriation of the property of its own nationals, as opposed to foreign nationals. Even if the

expropriation exception allowed such claims, it would require the plaintiffs to exhaust domestic

remedies in the expropriating state before pursuing FSIA claims, and the plaintiffs here have not.

### A.      The Foreign Sovereign Immunities Act is the only possible basis for jurisdiction.

The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts."

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). It provides that

"a foreign state shall be immune from the jurisdiction of the courts of the United States and of

the States" unless a statutory exception to this general grant of immunity applies. 28 U.S.C. §

1604. These statutory exceptions are "exhaustive; if no exception applies, the district court has

no jurisdiction." *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 34 (D.C. Cir. 2014). Because

sovereign immunity is jurisdictional, it spares sovereign defendants from the burdens of

litigation in the United States. *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d

438, 443 (D.C. Cir. 1990). Sovereign immunity protects foreign states as well as their political

subdivisions, agencies, and instrumentalities. 28 U.S.C. § 1603(a).

Because the plaintiffs concede that FRG is a sovereign state and SPK is its instrumentality (for the purposes of the FSIA), Compl. ¶¶ 19–21, the defendants are necessarily immune from all claims that do not fall within an FSIA exception. The plaintiffs assert that two exceptions apply: the "expropriation exception," 28 U.S.C. § 1605(a)(3), and the "commercial activity exception," 28 U.S.C. § 1605(a)(2).[3] Compl. ¶ 22. The claims must be dismissed if, assuming the truth of the factual allegations, the claims do not fall within either statutory exception. *Mwani v. bin Laden*, 417 F.3d 1, 15 (D.C. Cir. 2005).

### B.   The commercial activity exception does not apply.

The commercial activity exception fails to confer jurisdiction here. It provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2) (bracketed numbers added). The first two clauses require that the plaintiffs' action be "based upon" something that happened *in* the U.S., either commercial activity in the U.S. by the foreign state or an act performed in the U.S. that connects to foreign commercial activity of the foreign state. Plaintiffs cannot invoke those clauses here, because their claims are not "based upon" activity in the United States. The third clause permits suits "based upon" acts occurring *outside* the U.S. Plaintiffs invoke that clause here, apparently on the theory that "licensing and other activities" relating to the Welfenschatz—which are the only allegations of conduct occurring *in* the U.S.—constitute direct effects in the U.S. related to the commercial act abroad. Compl. ¶ 26.

---

[3] These FSIA exceptions do not themselves create causes of action; a plaintiff must have a cause of action from some other source. *See McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1075 (D.C. Cir. 2012). Thus, even if a cause of action falls within an FSIA exception, it does not necessarily state a cognizable claim.

Their assertion does not satisfy the commercial activity exception for two separate reasons. First, the claims attack a quintessentially sovereign act—the alleged expropriation of property—not acts connected with commercial activity by a foreign state. Courts have consistently rejected attempts to hold governments liable for their sovereign actions by mischaracterizing sovereign acts as commercial activity. Second, the acts on which the plaintiffs base their claims did not cause any direct effect in the U.S. Any direct effects of Prussia's alleged expropriation of the Welfenschatz from a German consortium of German art dealer firms owned by German nationals were felt in Europe.

1.     **The claims are "based upon" the alleged expropriation of the Welfenschatz in 1935, not on alleged licensing, exhibitions, and publication sales of the Welfenschatz decades later in the U.S.**

The first task in deciding whether a plaintiff's claims fall within the commercial activity exception is to "identify those acts upon which the action is (or is not) based." *Janini v. Kuwait Univ.*, 43 F.3d 1534, 1536 (D.C. Cir. 1995). For a suit to be "based upon" commercial activity, "the alleged commercial activity must establish a fact without which the plaintiff will lose." *Odhiambo*, 764 F.3d at 36 (internal quotation marks omitted); *accord Janini*, 43 F.3d at 1536 (explaining that the action must be based on facts that "if proven, would entitle a plaintiff to relief under his theory of the case") (internal quotation marks and alterations omitted). Commercial activity unrelated to the elements of a plaintiff's claims is irrelevant. *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1146 (D.C. Cir. 1994); *see also Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1030 (D.C. Cir. 1997) (holding that "the specific activity upon which the claim is based" is relevant but "general activity related to the claim," even if commercial in nature, is not).

Here, the claims are clearly based on the alleged expropriation of the Welfenschatz in 1935. That is the allegedly wrongful taking that, if proven, would entitle them to relief. The claims are not based on the allegations of modern commercial activity, such as licensing, exhibitions, and publication sales in the U.S. Since the plaintiffs do not allege any other activity

occurring in connection with the Welfenschatz in the U.S., their claims are not based on anything that occurred *in* the U.S. and are based on acts occurring entirely outside the U.S., in Europe in 1934–35. It follows that the first two clauses of the commercial activity exception do not apply, and the plaintiffs instead must rely on the third clause.

   2.   **The claims are based on sovereign activity, not commercial activity.**

   The third clause of the commercial activity exception applies when a plaintiff's suit is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). That clause sets two limits: a plaintiff's claim must be based on an act outside the United States that is connected with the foreign state's "commercial activity" abroad, and the act must cause a direct effect in the U.S. The plaintiffs' claims do not meet the first limit because they are based on allegations of inherently sovereign activity.

   When a foreign government does something a private party could do, it acts in a "commercial" capacity. In defining the word "commercial" in the FSIA, the Supreme Court distinguishes between whether the foreign government is acting as a market regulator or as a private player within it. *Republic of Arg. v. Weltover*, 504 U.S. 607, 614 (1992). When the foreign government engages in acts of a sovereign character, those acts are not "commercial" under the FSIA. *See id.* This distinction between sovereign and commercial acts is central to the "restrictive" theory of sovereign immunity codified by the FSIA. *See id.* at 612–14. Consistent with this legislative purpose, courts have recognized that the commercial activity exception applies only when the state is engaged in non-sovereign activities; states continue to enjoy sovereign immunity from suits based on their sovereign acts. *See, e.g.*, *Beg v. Islamic Republic of Pak.*, 353 F.3d 1323, 1326–28 (11th Cir. 2003) (holding that the Pakistani government's use of eminent domain was the exercise of sovereign power and did not fall within the commercial activity exception); *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 168 (D.C. Cir. 1994) (finding that commercial activity exception did not apply because the plaintiffs' claims were

13

based on Iran's behavior as a government); *Allen v. Russian Federation*, 522 F. Supp. 2d 167, 187–89 (D.D.C. 2007) (concluding that commercial activity exception did not reach sovereign activities by Russian government).

Because the commercial activity exception only abrogates sovereign immunity for commercial acts, not sovereign ones, courts have uniformly held that plaintiffs cannot pursue claims for expropriation of property under the commercial activity exception. Expropriation is an inherently sovereign act: private persons cannot exercise the power of eminent domain or effect a taking of property. *See Beg*, 353 F.3d at 1326; *Rong v. Liaoning Province Gov't*, 452 F.3d 883, 889–90 (D.C. Cir. 2006); *Allen*, 522 F. Supp. 2d at 187–89. An alleged expropriation cannot somehow become "commercial" in nature merely because, years later, the allegedly expropriated property is used for financial gain. *See Rong*, 452 F.3d at 890–91; *Garb v. Republic of Pol.*, 440 F.3d 579, 586–88 (2d Cir. 2006).

These cases bar the plaintiffs' claims, which are based on the Prussian state's alleged taking of the Welfenschatz from the Consortium in 1934–35. *See, e.g.*, Compl. ¶¶ 1–16. This alleged expropriation is central to all of the plaintiffs' legal theories and claims. *See id.* ¶¶ 231–85. To succeed in their suit, the plaintiffs would have to demonstrate that the Prussian state exercised the inherently sovereign power of expropriating the Welfenschatz in 1935; if the Prussian state acted as an ordinary market participant by purchasing the Welfenschatz through a voluntary market transaction, then the plaintiffs' claims fail. Indeed, the plaintiffs concede that their suit is based on an alleged act of expropriation by repeatedly referring to the sale of the Welfenschatz in 1935 as a "taking" and seeking to invoke the expropriation exception to the FSIA. Compl. ¶¶ 23, 179–88. Because the claims are based on alleged sovereign acts by the German government, not commercial ones, the commercial activity exception does not apply.

### 3.      The acts on which the claims are based did not cause any direct effect in the U.S.

The third clause of the commercial activity exception also requires that the acts occurring abroad on which a plaintiff's claim are based cause "a direct effect in the United States." 28

14

U.S.C. § 1605(a)(2). Because the Complaint does not allege a direct effect in the U.S., the commercial activity exception would not provide jurisdiction even if the alleged acts were commercial, not sovereign, in nature.

An act causes a "direct effect" in the U.S. if that effect "follows as an immediate consequence of the defendant's activity." *Weltover*, 504 U.S. at 618 (internal quotation marks and ellipsis omitted). "A direct effect is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption." *Allen*, 522 F. Supp. 2d at 189 (internal quotation marks and alterations omitted). Courts typically find this standard met when the defendant's actions directly involve the U.S., such as when a defendant fails to deliver money to the U.S. as required under a contract. *See, e.g.*, *Weltover*, 504 U.S. at 618–19; *Odhiambo*, 764 F.3d at 38–42 (discussing direct effect caselaw). But where the acts on which a claim is based occur entirely abroad, and do not immediately and obviously implicate the U.S., courts find no direct effect. *See, e.g.*, *Odhiambo*, 764 F.3d at 40 (plaintiff's presence in U.S. and U.S. citizenship not enough to create direct effect); *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 78 (2d Cir. 2010) (discussing the principle that physical or financial injury to a U.S. citizen outside of U.S. does not constitute direct effect in U.S.).

In cases involving facts similar to those here, courts have consistently found no direct effect in the U.S. For example, in *Westfield v. Federal Republic of Germany*, 633 F.3d 409, 412 (6th Cir. 2011), the U.S. heirs of a prominent German art dealer sought to recover the value of their ancestor's art collection, which was allegedly seized by Nazi officials in 1938–39. The plaintiffs could not demonstrate a direct effect in the U.S. from the alleged seizure, because the relevant events all occurred in Germany and had no direct connection with the United States. *Id.* at 415–18. The plaintiff argued that his German art dealer ancestor had planned to move his art collection to the U.S., where his family lived, and would have done so but for the seizure, but the court explicitly rejected the argument, finding no direct effect in the U.S. *Id.*

15

Courts routinely find no direct effect in the U.S. from alleged expropriations in foreign countries. *See, e.g., Allen*, 522 F. Supp. 2d at 189–90 (Russia's actions in expropriating Russian energy company, including arrests and tax proceedings, did not cause a direct effect in U.S.); *Wahba v. Nat'l Bank of Egypt*, 457 F. Supp. 2d 721, 733–35 (E.D. Tex. 2006) (seizure of assets in Egypt by the Egyptian government did not cause a direct effect in the U.S. because the transactions involving the assets were centered in Egypt). In *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1172–73 (D.C. Cir. 1994), the D.C. Circuit concluded that the plaintiff's enslavement by the Nazis during World War II did not establish a direct effect in the U.S., even though he was a U.S. citizen and later lived in the U.S.

This case is the same. The plaintiffs' claims are based on the alleged expropriation of the Welfenschatz from the Consortium, which occurred in Europe in 1934–35. *See* Compl. ¶¶ 28–169. The Welfenschatz was not in the U.S. at the time of the alleged expropriation. *Id.* ¶ 150. The only connection with the U.S. is that some of the art dealers or their heirs later moved to the United States—*after* all the relevant events had occurred. *Id.* ¶¶ 163, 169. Under *Westfield*, *Princz*, and *Allen*, these allegations do not establish a direct effect in the U.S.

## C.    The expropriation exception does not apply.

The expropriation exception provides jurisdiction over a foreign state only when:

> rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3). To meet the exception, two things would have to be true: the claims would have to involve "rights in property taken in violation of international law" and there must be some "commercial nexus" between the claims and the U.S. The plaintiffs' claims do not satisfy the first of these requirements.

16

1.  **A state's expropriation from its own nationals does not violate international law.**

The plaintiffs assert that their claims fall within the expropriation exception because they concern "rights in property taken by the State of Prussia and/or the German Reich, and/or Goering, in his capacity as Prime Minister of the State of Prussia in 1935, in violation of international law." Compl. ¶ 23. They allege that the taking served no public purpose, *id.* ¶ 23.i, was discriminatory, *id.* ¶ 23.ii, and provided no just compensation, *id.* ¶ 23.iii. They allege that Germany and the SPK continue to "wrongfully assert ownership" over the Welfenschatz. *Id.* ¶ 23.vi. While such allegations may state a claim under U.S. law or German law, they do not allege a taking in violation of *international* law.

a.  *International law does not prohibit a sovereign taking from its own nationals.*

It is well established that a state does not violate international law when it expropriates property from its own nationals. International law is implicated only when a state expropriates property from *foreign* nationals. This rule of international law, which existed long before the FSIA, is regularly invoked by courts assessing the expropriation exception. Here, the plaintiffs allege that Germany expropriated the Welfenschatz from a German consortium made up of German art dealerships owned by German nationals. The allegations cannot support the expropriation exception.

International law chiefly focuses on relations between states, or between one state and the nationals of another. It is hornbook law that with regard to takings, "international law" is only violated by "a taking by the state of the property *of a national of another state*." Restatement (Third) of Foreign Relations Law § 712(1) (1987) (emphasis added). As a result, "confiscations by a state of the property of its own nationals, no matter how flagrant and regardless of whether compensation has been provided, do not constitute violations of international law." *F. Palicio y Compania, S.A. v. Brush*, 256 F. Supp. 481, 487 (S.D.N.Y. 1966), *aff'd mem.*, 375 F.2d 1011 (2d

Cir. 1967), *cert. denied*, 389 U.S. 830. Courts nationwide have reiterated that principle,[4] and

have recognized it even in cases involving Nazi persecution. *See Dreyfus v. Von Finck*, 534 F.2d

24, 31 (2d Cir. 1976) (finding no violation of international law where the defendant participated

in the German government's forced sale of the property of a German Jew in 1938). While U.S.

courts now recognize that a state's treatment of its own nationals can violate international law in

some circumstances, *see, e.g.*, *Filartiga v. Pena-Irala*, 630 F.2d 876, 884–85 (2d Cir. 1980)

(holding that international law confers on people the fundamental right to be free from torture at

the hands of their own government), they continue to hold that a state's alleged expropriation of

the property of its own nationals is the concern of domestic, not international law, *see, e.g.*,

*Mezerhane v. Republica Bolivariana de Venez.*, 785 F.3d 545, 549–51 (11th Cir. 2015) (rejecting

the argument that present-day international law recognizes a norm prohibiting a state from

expropriating the property of its own nationals). This rule of international law is sometimes

referred to as the "domestic takings" rule. *See, e.g.*, *Helmerich & Payne Int'l Drilling Co. v.*

*Bolivarian Republic of Venez.*, 784 F.3d 804, 812 (D.C. Cir. 2015).

---

[4] *See Fogade v. ENB Revocable Trust*, 263 F.3d 1274, 1294 (11th Cir. 2001) ("[W]hen a foreign nation confiscates the property of its own nationals, it does not implicate principles of international law."); *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1105 (9th Cir. 1990) ("Expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law."), *abrogated on other grounds*, *Samantar v. Yousef*, 560 U.S. 305 (2010); *de Sanchez v. Banco Central de Nicar.*, 770 F.2d 1385, 1397 (5th Cir. 1985) ("[T]he taking by a state of its national's property does not contravene the international law of minimum human rights."); *Cassirer v. Kingdom of Spain*, 461 F. Supp. 2d 1157, 1165 (C.D. Cal. 2006) ("[E]xpropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law."), *aff'd in relevant part*, 616 F.3d 1019 (9th Cir. 2010) (en banc); *Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 101–02 (D.D.C. 2005) ("Expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law.") (internal quotation marks omitted), *abrogated on other grounds*, *Nemariam v. Fed. Democratic Republic of Eth.*, 491 F.3d 470 (D.C. Cir. 2007); *Tachiona v. Mugabe*, 234 F. Supp. 2d 401, 440 (S.D.N.Y. 2002) ("[There is] no authority . . . to support a determination that the state seizure of property of its own nationals without fair compensation . . . constitutes a violation of well-defined, universal and obligatory norms of international conduct."); *Jafari v. Islamic Republic of Iran*, 539 F. Supp. 209, 215 (N.D. Ill. 1982) ("[T]he 'law of nations' does not prohibit a government's expropriation of the property of its own nationals.").

Because a domestic taking is not a "violation of international law," 28 U.S.C. §

1605(a)(3), and because the domestic takings rule was clearly established long before the FSIA

was enacted in 1976, *see, e.g., M. Salimoff & Co. v. Standard Oil Co. of N.Y.*, 262 N.Y. 220, 227

(1933) (Soviet Russian taking of property from Russian nationals does not violate international

law), courts have consistently held that a foreign state's alleged taking of the property of its own

nationals does not fall within the expropriation exception. For example, in *Chuidian v. Philippine

Nat'l Bank*, 912 F.2d 1095, 1105 (9th Cir. 1990), *abrogated on other grounds*, *Samantar v.

Yousef*, 560 U.S. 305 (2010), the Ninth Circuit found the expropriation exception inapplicable

because the plaintiff was "a citizen of the Republic of the Philippines, the state which, through its

agent Daza, allegedly confiscated" the plaintiff's property. Similarly, in *de Sanchez v. Banco

Central de Nicaragua*, 770 F.2d 1385, 1395 (5th Cir. 1985), the Fifth Circuit dismissed the

plaintiff's claims arising from Nicaragua's alleged expropriation of her property because she was

a Nicaraguan national (even though a U.S. resident) at the time of the alleged expropriation.[5]

The rule applies equally when the property was allegedly expropriated from a corporate

entity that is regarded as a national of the expropriating state. In *Wahba v. National Bank of

Egypt*, 457 F. Supp. 2d 721, 731 (E.D. Tex. 2006), for example, the court dismissed claims

arising from the Egyptian government's expropriation of "Egyptian assets owned by Egyptian

corporations, the principal agent of which was an Egyptian citizen." Similarly in *Rong v.

Liaoning Provincial Government*, 362 F. Supp. 2d 83, 101–02 (D.D.C. 2005), *abrogated on

other grounds*, *Nemariam v. Fed. Democratic Republic of Ethiopia*, 491 F.3d 470 (D.C. Cir.

2007), the expropriation exception did not apply where a Chinese regional government allegedly

expropriated the property of a Chinese corporation. And in *Helmerich*, 784 F.3d at 812, the D.C.

---

[5] Many other courts have recognized this limitation on the expropriation exception. *See, e.g.*,
*Republic of Austria v. Altmann*, 541 U.S. 677, 713 (2004) (Breyer, J., concurring) (describing the
"consensus view" that the expropriation exception's "reference to 'violation of international law'
does not cover expropriations of property belonging to a country's own nationals"); *Mezerhane*,
785 F.3d at 549–51 (affirming dismissal based on rule); *Helmerich*, 784 F.3d at 812 (stating
rule); *Altmann v. Republic of Austria*, 317 F.3d 954, 968 (9th Cir. 2002) (stating rule).

Circuit recognized that the domestic takings rule bars claims based on a state's expropriation of the property of its own corporate citizens.[6]

Finally, courts have recognized that this rule of international law prevents them from exercising jurisdiction even over claims that a foreign state expropriated the property of its own nationals based on religious or ethnic discrimination. For example, in *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 702–703 (9th Cir. 1992), the plaintiffs brought a variety of claims arising from the Argentine junta's horrific torture and subsequent expropriation of property from the plaintiff and his family, acts that the plaintiffs alleged were motivated by anti-Semitism. *Id.* Nevertheless, the court found that three of the plaintiffs could not "assert a claim that comes within th[e expropriation] exception" because they were Argentine nationals at the time of the alleged expropriation.[7] *Id.* at 703, 711. Likewise in *Garb v. Republic of Poland*, 207 F. Supp. 2d 16, 18–19 (E.D.N.Y. 2002), *vacated on other grounds*, 72 F. App'x 850 (2d Cir. 2003), the plaintiffs, Polish Jews whose property was expropriated during and after the Holocaust, brought claims against Poland seeking damages for the expropriation. The court held that the claims did not fall within the expropriation exception because the plaintiffs were Polish nationals at the time of the alleged expropriation. *Id.* at 33–34. As the Supreme Court noted nearly eighty years ago—decades before the FSIA—"[w]hat another country has done in the way of taking over property of its nationals, and especially of its corporations, is not a matter for judicial consideration here. Such nationals must look to their own government for any redress to which they may be entitled." *United States v. Belmont*, 301 U.S. 324, 332 (1937).

---

[6] In *Helmerich*, a majority found that the domestic takings rule did not apply there, where a foreign state (Venezuela) allegedly expropriated the property of a domestic (Venezuelan) corporation that was wholly owned by an American corporation, and the foreign sovereign had allegedly expropriated the domestic corporation's property *because it was owned by an American corporation*. 784 F.3d at 812–13. Here, by contrast, the foreign sovereign (Germany) allegedly expropriated the property of a domestic (German) entity—composed of German firms in turn owned by German nationals—not one owned by foreigners.

[7] The court permitted a fourth plaintiff, who was a U.S. citizen and resident at the time of the alleged taking, to pursue a claim under the exception. 965 F.2d at 703, 711.

### b.       The domestic takings rule bars the plaintiffs' claims.

Presuming the truth of the plaintiffs' allegations that the Welfenschatz was expropriated in June of 1935,[8] the expropriation would not have violated international law because the collection was allegedly expropriated by the German government from a German consortium of German art dealer firms owned and run by German nationals.

The plaintiffs allege that a "Consortium" of art dealer firms was formed in 1929, and that this Consortium had exclusive ownership of the Welfenschatz until June 14, 1935, the date of the sale. Compl. ¶¶ 1, 32–33. The Consortium was a German entity. Op. of Professor Dr. Christian Armbrüster ¶¶ 20–24 (Armbrüster Op.).[9] It was a type of German partnership specified in the German Civil Code, known as a *Gesellschaft bürgerlichen Rechts*, or GbR. *Id.* ¶¶ 5–19. And the Consortium was the owner of the Welfenschatz from October 5, 1929, to June 4, 1935. *Id.* ¶¶

---

[8] The plaintiffs assert that the Prussian state's acquisition of the Welfenschatz was a taking in violation of international law because it served no public purpose, was discriminatory, and was not accompanied by just compensation. Compl. ¶¶ 23.i–iii. Because these allegations must be presumed true at the motion to dismiss stage, the defendants do not contest that these allegations would plead a taking in violation of international law if the Welfenschatz had been owned by *nationals of another state* at the time of the taking. *See* Restatement (Third) of Foreign Relations Law § 712(1) (1987). However, the defendants vigorously dispute the truth of these allegations: the evidence would demonstrate that, as the Advisory Commission concluded, the Welfenschatz was purchased from the Consortium in a voluntary transaction for a fair price in order to display the works in public museums.

[9] The expert opinion of Professor Dr. Christian Armbrüster is attached to this motion as Exhibit A. Professor Armbrüster, an expert on German corporate law, is Dean at the Free University of Berlin and a former judge of the Second Chamber of the Court of Appeals in Berlin, where he mainly adjudicated matters of corporate law. Armbrüster Opinion ¶ 1. This Court may consider his views on German law under Fed. R. Civ. P. 44.1, and because written testimony on foreign law is a question of law, it can appropriately be considered on a motion to dismiss. *See, e.g., City of Harper Woods Emps.' Ret. Sys. v. Olver*, 577 F. Supp. 2d 124, 128 (D.D.C. 2008). Moreover, the Federal Republic of Germany endorses the opinions of Professor Armbrüster cited in this memorandum, and a foreign sovereign's interpretation of its own law deserves substantial deference. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 92 (2d Cir. 2002); *Matter of Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1312 (7th Cir. 1992) ("A court of the United States owes *substantial* deference to the construction France places on its domestic law.") (emphasis added) (foreign sovereign's involvement in litigation does not justify failing to defer to foreign sovereign).

25–29; *see also* Compl. ¶¶ 32–33 ("On information and belief, the Consortium was solely entitled to ownership rights of the collection in the time period of October 5, 1929 to June 14, 1935 when the Welfenschatz had been in their possession."). Thus, if the German state of Prussia expropriated the Welfenschatz in 1935, as the plaintiffs allege, it expropriated it from a German legal entity. The German government's alleged expropriation of the property of a German legal entity does not fall within the expropriation exception. *See Helmerich*, 784 F.3d at 812; *Wahba*, 457 F. Supp. 2d at 731; *Rong*, 362 F. Supp. 2d at 101–02.

Even if the Court were to disregard the Consortium's status as a German legal entity, the sole alleged members of the Consortium were three art-dealer firms: Z.M. Hackenbroch, I. Rosenbaum, and J.&S. Goldschmidt. Compl. ¶¶ 1, 32. The purchase agreements attached to (and thus incorporated in) the Complaint establish that these three firms were based in Frankfurt and that they were German corporate entities. Armbrüster Op. ¶¶ 14–18, 22; *see* Compl. Ex. 1 at 1, 9; *id.* Ex. 5 at 3, 11. The domestic takings rule would thus apply in any event.

Indeed, even if the Court were to look to the nationality of the owners of the art dealer firms, the domestic takings rule would apply. The plaintiffs allege that the art-dealer firms— Z.M. Hackenbroch, I. Rosenbaum, and J.&S. Goldschmidt—were owned by Zacharias Max Hackenbroch, Isaak Rosenbaum[10] and Saemy Rosenberg,[11] and Julius Falk Goldschmidt, respectively. Compl. ¶¶ 1, 17–18. Plaintiff Alan Philipp alleges that he is the grandson and legal successor to the estate of Zacharias Hackenbroch. *Id.* ¶ 17. Plaintiff Gerald Stiebel alleges that he is the great-nephew of Isaak Rosenbaum and legal successor to his estate. *Id.* ¶ 18. According to the Complaint, Zacharias Hackenbroch lived in Germany throughout the relevant period and was clearly a German national in June 1935 when the contract selling the Welfenschatz to the

---

[10] The Complaint spells Isaak Rosenbaum's name both "Isaac" and "Isaak." *Compare, e.g.*, Compl. ¶ 1 *with id.* ¶ 18. Because the spelling "Isaak" is the more common variant in the Complaint, the defendants use that spelling throughout.

[11] Isaak Rosenbaum and Saemy Rosenberg are alleged to have been the co-owners of the firm I. Rosenbaum. Compl. ¶ 18.

Prussian state was signed. *E.g.*, *id.* ¶ 123 (stating that Hackenbroch continued to exercise his profession until 1937); *id.* ¶¶ 156, 161 (stating that Hackenbroch's widow emigrated from Germany in 1938 following Hackenbroch's death in Frankfurt the previous year). Similarly, Isaak Rosenbaum and Saemy Rosenberg, though living in Amsterdam in 1935, were German nationals and citizens in June 1935. *See, e.g.*, *id.* ¶ 164 (stating that Rosenberg and Rosenbaum's firm continued to operate in Frankfurt until 1937); *id.* ¶ 166 (stating that Saemy Rosenberg was stripped of his German citizenship in 1941). The Complaint thus makes plain that even the owners of the relevant art-dealer firms, which in turn owned the Consortium, were German nationals at the time of the alleged expropriation.[12] In short, the domestic takings rule bars the plaintiffs' claims no matter whether the Court looks to the nationality of the German Consortium, the German art-dealer firms that owned the Consortium, or the German individuals who owned the art-dealer firms.

### c.     *No exception to the domestic takings rule applies in this case.*

The plaintiffs might cite two cases to counter the domestic takings rule. In *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 674–77 (7th Cir. 2012), the plaintiffs sued over the expropriation of property from their Hungarian Jewish ancestors in 1944–45, when those ancestors were sent to concentration camps with the assistance of the Hungarian government. The Seventh Circuit recognized that a domestic taking does not ordinarily fall within the expropriation exception. *Id.* at 674–75. But it found the rule inapplicable because the expropriations in question were an integral part of a campaign of genocide, which unlike property expropriation is a clear violation of international law. *Id.* at 675–77. Specifically, these expropriations, occurring in 1944–45, funded the Hungarian government's participation in the Holocaust by providing it with money and resources to carry it out. *Id.*

---

[12] Neither plaintiff alleges he is an heir to Julius Goldschmidt, making his status as a German national irrelevant. In any event, Goldschmidt was also a German national at the time. *Id.* ¶¶ 122, 163 (stating he operated his German firm until he emigrated from Germany in 1936).

Unlike the allegations in *Abelesz*, which involved takings in 1944–45, in the midst of the Holocaust, the alleged taking of the Welfenschatz in 1935 predated the Holocaust by several years. And unlike the property in *Abelesz*, the Welfenschatz was not seized and auctioned to fund genocide. It did not "fund" anything: the German government of Prussia indisputably *spent* money to obtain the collection. *See* Compl. ¶¶ 152–53. The Welfenschatz was not then sold again for profit, but has remained in the possession of German entities and on display for the general public's education and enjoyment to this day. *Id.* ¶¶ 29, 150, 174, 177. The *Abelesz* court made precisely this point, distinguishing the plaintiffs' allegations there from cases like *Dreyfus*, 534 F.2d at 31, and *Siderman de Blake*, 965 F.2d at 711. *Abelesz* explicitly noted that in *Dreyfus* and *Siderman*, the plaintiffs had not been sent to concentration camps and the expropriation of their property was not used to finance genocide. 692 F.3d at 677 n.7. The narrow exception created in *Abelesz* has no application to the facts alleged here, involving the negotiated sale through a bank of an art collection stored in Amsterdam in 1935 and then displayed in public art museums for decades. *See* Compl. ¶¶ 76, 150 (conceding that the Welfenschatz was stored in Amsterdam at the time of the parties' negotiations and sale).

The plaintiffs might also try to rely on *de Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113, 129–31 (D.D.C. 2011), *aff'd in part, rev'd in part*, 714 F.3d 591. That case involved the expropriation of a Hungarian Jew's art collection by the Hungarian government in 1944–45. The court found the domestic takings rule did not apply because the anti-Semitic citizenship laws enacted by Hungary in World War II had essentially deprived the plaintiffs' predecessors of citizenship at the time of the expropriation. *Id.* at 129–30. The court also noted that the complaint specifically alleged that German Nazi officials—not only the Hungarian government—were actively involved in the taking, which meant the expropriation was accomplished by a foreign state. *Id.* at 130. The D.C. Circuit did not reach this rationale on appeal, 714 F.3d at 597–98, and the rationale has been criticized by the Seventh Circuit, which noted that the relevant inquiry is whether the plaintiffs (or their predecessors) were *nationals* of the expropriating state, not

24

whether they were citizens, *Abelesz*, 692 F.3d at 676 n.6. Regardless, the *de Csepel* district court's rationale would not apply here, as Germany did not strip Jews of citizenship until *after* the Welfenschatz transaction in June and July of 1935.[13]

Because the claims are based on a German government's alleged expropriation of property from a German consortium of German art dealer firms owned by German nationals, the expropriation exception to sovereign immunity does not provide jurisdiction over these claims.

### 2. The plaintiffs cannot invoke the expropriation exception because they have not exhausted their remedies in Germany.

The expropriation exception requires a plaintiff to exhaust domestic remedies in the allegedly expropriating country before pursuing a claim in the U.S. The United States itself has invoked this exhaustion principle of international law to obtain the dismissal of expropriation claims against it in international fora. International comity requires that the U.S. extend the same courtesy to foreign governments sued in U.S. courts. The plaintiffs have not exhausted their civil remedies in Germany and so cannot assert their present claims. If the plaintiffs believe that the Advisory Commission did them an injustice, they should present their claims in German court.

While the expropriation exception does not contain a textual provision explicitly requiring plaintiffs to exhaust remedies regarding an alleged expropriation of property in the allegedly expropriating country, it is a "well-established rule of customary international law" that "domestic remedies for expropriation [must] be exhausted before international proceedings may be instituted." *Abelesz*, 692 F.3d at 679 (internal quotation marks omitted). The United States has invoked this principle—successfully—in seeking to dismiss claims against it. In *Interhandel (Switz. v. U.S.)*, 1959 I.C.J. 6, 26–29 (Mar. 21), for instance, Switzerland espoused claims against

---

[13] Plaintiffs allege that Saemy Rosenberg was stripped of citizenship in 1941. Compl. ¶ 166. Jews were not stripped of citizenship before the Nuremberg Laws of September 15, 1935, Reich Citizenship Law of 15 Sept. 1935, art. II, ¶ 1, *reprinted in* 4 *Nazi Conspiracy and Aggression* 7–8 (U.S. Gov't Printing Office 1946), were implemented in November 1935, First Regulation to the Reich Citizenship Law of 14 Nov. 1935, art. IV, ¶ 1, *reprinted in* 4 *Nazi Conspiracy and Aggression* 9 (U.S. Gov't Printing Office 1946).

the United States by Interhandel, a Swiss company that the U.S. government had claimed was a front for a German chemical manufacturer during World War II. When Switzerland sued the United States in the International Court of Justice (ICJ) on Interhandel's behalf, the United States objected that the court lacked jurisdiction because Interhandel had not exhausted its remedies in the United States. The ICJ agreed and dismissed the case.[14] It would fly in the face of international comity if the United States invoked this principle to dismiss claims brought against it in non-U.S. fora but then, through its courts, refused to extend the same courtesy to foreign states sued in the United States over alleged expropriations occurring abroad.

Recognizing the imperative of comity, the Seventh Circuit has twice held that plaintiffs seeking to invoke the expropriation exception must either exhaust any remedies in the alleged expropriating state or demonstrate that those remedies are inadequate. *Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847, 856–59 (7th Cir. 2015); *Abelesz*, 692 F.3d at 678–85. In those cases, the Seventh Circuit dismissed the plaintiffs' claims seeking damages for Hungary's expropriation of their ancestors' property in 1944–45. While the court expressed sympathy for the plaintiffs' claims, it could not "overlook the comity and reciprocity between sovereign nations that dominate international law." *Abelesz*, 692 F.3d at 682. The court recognized that Hungary "should first have the opportunity to address these alleged takings, by its own means and under its own legal system, before a U.S. court steps in to resolve claims against a part of the Hungarian national government for these actions taken in Hungary so long ago." *Id.* District courts, including two in the District of Columbia, have similarly required plaintiffs to exhaust domestic remedies in the alleged expropriating country before pursuing claims in the United States under the expropriation exception. *Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298, 306–07 (D.D.C. 2005); *Millicom Int'l Cellular, S.A. v. Republic of Costa Rica*, 995 F. Supp. 14,

---

[14] This exhaustion principle appears in many international human rights conventions. *E.g.*, American Convention on Human Rights, art. 46, Nov. 22, 1969, 1144 U.N.T.S. 123; Convention for the Protection of Human Rights and Fundamental Freedoms, art. 26, Nov. 4, 1950, 213 U.N.T.S. 221.

22–23 (D.D.C. 1998); *Greenpeace, Inc. (U.S.A.) v. State of Fr.*, 946 F. Supp. 773, 783 (C.D. Cal. 1996). Because the exhaustion of local remedies is itself an important principle of international law, a "plaintiff who chooses to litigate in this country in disregard of the postdeprivation remedies in the 'expropriating' state may have trouble showing a 'tak[ing] in violation of international law.' 28 U.S.C. § 1605(a)(3)." *Altmann*, 541 U.S. at 714 (Breyer, *J.*, concurring) (noting that a plaintiff may have to "show an absence of remedies in the foreign country sufficient to compensate for any taking" before invoking FSIA expropriation exception).

To be sure, not all courts have concluded that the expropriation exception requires the exhaustion of local remedies. Yet those that have found no exhaustion requirement have examined only the text of the statute, ignoring the international law that the statute incorporates into U.S. law. In *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1034–37 (9th Cir. 2010) (en banc), for example, the Ninth Circuit concluded that exhaustion of domestic remedies was not statutorily required, based on its comparison of the expropriation exception with other exceptions that explicitly require exhaustion. However, that case, decided before *Abelesz*'s extensive discussion of the exhaustion requirement under international law, did not consider whether international law *itself* requires exhaustion of domestic remedies. *See id.*; *Abelesz*, 692 F.3d at 680 n.9 (distinguishing case on this ground). Moreover, even *Cassirer* recognized a prudential (as opposed to jurisdictional) exhaustion requirement, but declined to consider that issue in an interlocutory appeal. *Cassirer*, 616 F.3d at 1036–37. The D.C. Circuit has addressed in dicta whether the expropriation exception requires exhaustion of domestic remedies, stating that it "likely" does not. *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 948–50 (D.C. Cir. 2008). But the court found it unnecessary to resolve this question because the remedies identified by the defendant in that case were "plainly inadequate," *id.* at 948–50, meaning that exhaustion of domestic remedies would be futile in any event. Importantly, neither *Chabad* nor *Cassirer* considers—let alone rejects—the international-law principle of exhaustion later recognized by the Seventh Circuit in *Abelesz* and *Fischer*. If required to resolve the question

for the first time, the D.C. Circuit would no doubt recognize this long-standing exhaustion principle of international law identified by the Seventh Circuit[15] and would likely agree that this international principle is incorporated into the expropriation exception.

Under the exhaustion principle, the plaintiffs must first pursue their remedies in Germany. As discussed further below, the plaintiffs could pursue their claims in German court. *See infra* Section IV.A.[16] The defendants are both subject to service of process in Germany and are not protected by sovereign immunity from suit there. *See* Op. of Professor Dr. Rainer Schröder at 2–3 (Schröder Op.).[17] And German law recognizes claims for restitution of property obtained through duress or coercion. *Id.* at 3–10. These remedies have been invoked in German court against an instrumentality of Germany in the case of alleged Nazi expropriations. *Id.* at 10–11 (quoting Bundesgerichtshof [BGH] [Federal Court of Justice], Mar. 16, 2012, Neue

---

[15] The principle is reflected as early as the 17th and 18th century jurists Grotius and Vattel. Hugo Grotius, 3 *De Jure Belli et Pacis Libri Tres* 48–49 (W. Whewell trans.,1853); Emmerich de Vattel, 2 *Le Droit des Gens, ou principes de la loi naturelle* 316 (Librairie de Guillaumin & Cie. 1863); *see generally* A.A. Cançado Trindade, *Origin and Historical Development of the Rule of Exhaustion of Local Remedies in International Law*, 12 Belgian Rev. Int'l L. 499, 526 (1976) (tracing rule to Middle Ages and noting that "by the end of the nineteenth century . . . it became difficult to deny that it had gradually crystallized into a customary rule of international law, as undisputedly acknowledged by State practice nowadays."); Matthew S. Duchesne, *The Continuous-Nationality-of-Claims Principle: Its Historical Dev. and Current Relevance to Investor-State Investment Disputes,* 36 Geo. Wash. Int'l L. Rev. 783, 788 n.24 (2004) ("[T]he local remedies rule has particularly deep roots.").

[16] In the forum non conveniens context, the defendant must demonstrate that an alternative forum provides adequate remedies. *See, e.g.*, *Fischer*, 777 F.3d at 867. But in the context of international law's exhaustion requirement under the expropriation exception, the *plaintiff* must demonstrate that the courts of the alleged expropriating state do not provide the plaintiff with adequate remedies, as it is the plaintiff's burden to show jurisdiction. *Id.* at 859, 867.

[17] The opinion of Professor Dr. Rainer Schröder is attached to this motion as Exhibit B. Dr. Schröder is a professor of law at Humboldt University of Berlin and has taught for decades on the Nazi era in German law. *Id.* at 1–2. He has lectured at the University of Tel Aviv (Israel), Université Paris-Sorbonne, University of Leyden (Netherlands), and Renmin University (Beijing), among others; has published papers supporting compensation for forced laborers; and has given numerous expert opinions on behalf of parties seeking compensation or restitution in connection with alleged Nazi-era seizures from Jewish citizens. *Id.*

Juristische Wochenschrift [NJW] 1796, 2012) (allowing plaintiff's restitution claim against an instrumentality of Germany). The plaintiffs have not even tried to avail themselves of the German system, and the exhaustion principle of international law—incorporated in the FSIA expropriation exception—thus precludes them from pursuing their claims here. Their failure to satisfy the exhaustion requirement, like their failure to establish a violation of international law, renders the expropriation exception inapplicable.

Because neither the expropriation exception nor the commercial activity exception apply, the defendants are immune under the FSIA and this Court should dismiss the suit.

## II.     The plaintiffs lack standing to assert their claims.

The plaintiffs cannot bring their substantive claims in their individual capacity because the claims belong to the Consortium, a business entity. In deciding whether a particular claim belongs to a business entity, or can be asserted directly by a person with some interest in the entity, courts look to the law of the jurisdiction where the entity is based. Under German law, the plaintiffs' claims belong to the Consortium, a type of German partnership. The plaintiffs cannot assert the Consortium's claims in their individual capacities, and they cannot assert them on behalf of the Consortium unless and until they comply with procedures of German law intended to ensure that they have the authority to act on behalf of the Consortium. Because they could have complied with these German procedures, but have not done so, they lack standing.

### A.     Both the prudential standing rule and Rule 17(a) require that claims on behalf of an entity be brought by authorized individuals.

A plaintiff who claims an ownership interest in a business entity generally cannot personally assert the entity's claims against third parties. Courts commonly analyze this issue under the prudential standing doctrine, which prohibits the owner of a share in a corporation from initiating an action seeking to enforce the corporation's rights. *See, e.g.*, *Cheeks v. Fort Myer Constr. Co.*, 722 F. Supp. 2d 93, 108–10 (D.D.C. 2010). Other courts consider this question under the "real party in interest" standard of Federal Rule of Civil Procedure 17(a), which requires that an action "be brought by the person entitled under the governing substantive

29

law to enforce the asserted right." *Whelan v. Abell*, 953 F.2d 663, 672 (D.C. Cir. 1992); *see Am. Nat'l Ins. Co. v. JPMorgan Chase & Co.*, 893 F. Supp. 2d 218, 227 (D.D.C. 2012). Under either analysis, the plaintiffs lack standing to assert the causes of action alleged in their complaint.

"As a general matter, it is well understood that the party invoking federal jurisdiction bears the burden of establishing its standing." *City of Harper Woods Emps.' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009) (internal quotation marks omitted). Standing consists of two components: "the constitutional requirements of Article III and nonconstitutional prudential considerations." *Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 335 (1990). Article III standing requires the plaintiff to show that he or she has suffered some actual or threatened injury, that the injury is causally connected to the defendant's conduct, and that the injury is likely to be addressed by a favorable decision. *Id.* The defendants concede that the plaintiffs' allegations are sufficient for Article III standing purposes.

However, a plaintiff must also satisfy the prudential standing requirements, including the requirement that a plaintiff must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 336 (internal quotation marks omitted). Rule 17(a) likewise requires that all actions "be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a). As the D.C. Circuit has noted, this means "the action must be brought by the person entitled under the governing substantive law to enforce the asserted right." *Whelan*, 953 F.2d at 672. When a claim belongs to a corporation, the corporation is the real party in interest, and a shareholder cannot pursue a claim in her individual capacity. *See id.* at 671–72; *Labovitz v. Wash. Times Corp.*, 172 F.3d 897, 900 n.6 (D.C. Cir. 1999); *Am. Nat'l Ins. Co.*, 893 F. Supp. 2d at 227.

## B.     Under German law, the claims belong to the Consortium, not the plaintiffs.

Where a plaintiff seeks to bring claims on behalf of a foreign entity, courts look to the law of the foreign jurisdiction to determine who has prudential standing to assert the claim. *City of Harper Woods*, 589 F.3d at 1298; *see also, e.g., Jones & Assocs., Inc. v. District of Columbia*,

797 F. Supp. 2d 129, 134–36 (D.D.C. 2011) (finding, under D.C. law, that partner lacked prudential standing to assert claim belonging to partnership). Likewise, in the Rule 17(a) analysis, courts look to the law of the place of incorporation to decide whether a claim is a derivative claim belonging to the business entity or a direct claim belonging to the individual plaintiff. *Am Nat'l Ins. Co.*, 893 F. Supp. 2d at 230; *Labovitz v. Wash. Times Corp.*, 900 F. Supp. 500, 503 (D.D.C. 1995).

Based on the allegations in the Complaint and its exhibits, the Consortium was a kind of partnership organized under the German Civil Code, known as a *Gesellschaft bürgerlichen Rechts*, or GbR. Armbrüster Op. ¶¶ 5–19; *see* Compl. ¶¶ 1, 32 (discussing the Consortium). The 1929 contract between the Consortium and the Duke of Brunswick-Lüneburg establishes that the art-dealer firms were jointly acquiring the Welfenschatz in order to attempt to resell it at a profit. Armbrüster Op. ¶ 8 (citing Compl. Ex. 1 at 10–12). Under German law, an agreement to cooperate in purchasing and reselling property is one of the classic examples of a GbR. *Id.* ¶ 12. Further, six years later, when the parties agreed to sell the Welfenschatz, the art-dealer firms used the term "Consortium" to refer to their arrangement, and "Consortium" was a legal term commonly used in that era to describe a GbR. *Id.* ¶ 13 (citing Compl. Ex. 6 at 11, Ex. 6 at 3); *see also id.* ¶¶ 5–13 (describing facts alleged in Complaint and German legal principles compelling the conclusion that the Consortium is a GbR). In short, the three art-dealer firms formed a GbR under German law. *Id.* ¶ 19.

Since the Consortium was essentially a German partnership, German law controls whether the plaintiffs' claims belong to the Consortium itself or whether they can be asserted by the individual plaintiffs.[18] *See, e.g.*, *Am Nat'l Ins. Co.*, 893 F. Supp. 2d at 230; *Cheeks*, 722 F.

---

[18] Under German law, a business entity is generally deemed to be based in the jurisdiction where its administrative functions are centered. Armbrüster Op. ¶ 21. According to the complaint, the three art-dealer firms that formed the Consortium were based in Frankfurt and the parties' activities were centered in Germany, so German law would treat the Consortium as a German entity. *Id.* ¶¶ 22–24.

Supp. 2d at 108. The plaintiffs bring these claims in their individual capacities, as alleged heirs of some of the owners of two members of the alleged three-member Consortium.[19]

Like U.S. law, German law distinguishes between claims brought on behalf of an entity and claims brought by individuals claiming an ownership interest in that entity. Under German law, the claims asserted by the plaintiffs regarding the Welfenschatz belong to the Consortium, not individually to those claiming an interest in the Consortium. As noted previously, the plaintiffs allege that the Consortium was the legal owner of the Welfenschatz from October 5, 1929, to June 14, 1935. Compl. ¶ 32; *accord* Armbrüster Op. ¶¶ 25–29 (stating that under German law, the Consortium would be regarded as the legal owner of the Welfenschatz from October 5, 1929, to June 14, 1935). As a result, any claims regarding the Consortium's loss or transfer of the Welfenschatz on June 14, 1935, belong to the Consortium, as it was the entity allegedly deprived of its ownership rights. Armbrüster Op. ¶¶ 30–33. Likewise, the Consortium—not heirs of some of the individual owners of two of the three art-dealer firms— would have the right to any remedy. *Id.* ¶ 34. That was not changed by the Consortium's apparent dissolution after June 1935; any claims regarding the Welfenschatz continue to belong to the Consortium, notwithstanding its decades of inactivity, and it alone can assert them.[20] *Id.* ¶¶ 32–34. These claims cannot be asserted by the plaintiffs in their individual capacity: the claims

---

[19] Specifically, Alan Philipp alleges that he is the legal successor of the estate of Zacharias Max Hackenbroch, who was sole owner of the firm Z.M. Hackenbroch, one of the three members of the Consortium. Compl. ¶¶ 1, 17, 32. Gerald Stiebel alleges that he is the legal successor to the estate of Isaak Rosenbaum, a co-owner of the firm I. Rosenbaum, itself one of the three members of the Consortium. *Id.* ¶¶ 1, 18, 32. The Complaint does not discuss the estate of the other co-owner of the I. Rosenbaum firm, Saemy Rosenberg. Nor does it discuss the estate of the owners of the third member of the Consortium, the J.&S. Goldschmidt firm.

[20] This is also similar to the law of many U.S. states. Under the Uniform Partnership Act, for instance, a partnership is dissolved when its business purpose has been satisfied, but it is not terminated until all of its assets have been liquidated, which in some cases may not occur until after the partnership has resolved legal claims against third parties. *See, e.g.*, *Berk v. Sherman*, 682 A.2d 209, 213–14 (D.C. 1996) (discussing similar issue under Maryland law).

belong to the Consortium, and the plaintiffs' only injury is derivative of their alleged ancestors' ownership interest in the Consortium.[21]

### C.     The plaintiffs lack authority to assert claims on behalf of the Consortium.

Because the plaintiffs' claims belong to the Consortium, not to the plaintiffs individually, the plaintiffs can assert these claims only if German law would allow them to bring claims on the Consortium's behalf. In circumstances such as those here, where a dissolved GbR continues to have assets that have not been liquidated, German law provides certain procedures for the orderly liquidation of the newly discovered assets. Armbrüster Op. ¶¶ 34–38. Because the plaintiffs have not followed those procedures in Germany, they lack authority to assert claims on behalf of the Consortium. *Id.* ¶¶ 39–40.

Most often, GbR partners or their heirs appoint a joint representative, who asserts claims on behalf of the GbR and then liquidates the remaining assets. *Id.* ¶ 36. Alternatively, all partners or their heirs may act individually, meaning that all partners or heirs become parties to any litigation involving the partnership.[22] *Id.* German law strictly prohibits parties from asserting claims belonging to a GbR before following one of these procedures, thus ensuring that the GbR is liquidated transparently and fairly. *Id.* ¶¶ 37–38. If a plaintiff has not followed one of these procedures, he lacks authority to commence claims on behalf of the GbR. *Id.* ¶ 39–40.

---

[21] As Professor Armbrüster notes, the art dealers were not themselves members of the Consortium: their art-dealer *firms* formed the Consortium in their corporate capacities. Armbrüster Op. ¶¶ 14–18. Thus the plaintiffs' claims are doubly derivative: they allege that they inherited an interest in a firm, and that the firm held an ownership interest in the Consortium. On the allegations of the complaint, plaintiffs must establish standing at both levels. *I.e.*, Philipp must establish he has standing under German law to pursue derivative claims belonging to the Z.M. Hackenbroch firm and that the Z.M. Hackenbroch firm has standing to bring derivative claims belonging to the Consortium. Likewise, Stiebel must establish that he has standing under German law to pursue derivative claims belonging to the I. Rosenbaum firm, and that the I. Rosenbaum firm has standing to bring derivative claims belonging to the Consortium.

[22] In certain cases, such as when the large number of partners makes appointing a joint representative impractical, a German court can appoint a liquidator to act on behalf of the GbR, but this procedure has never been used for smaller GbRs like the Consortium. *Id.* ¶ 37.

Because the plaintiffs have not complied with any of these procedures, they lack standing to assert their claims on behalf of the Consortium. As the party invoking federal jurisdiction, it is their burden to plead and prove standing. *City of Harper Woods*, 589 F.3d at 1298. They do not plead that they have taken the steps necessary under German law to assert these claims.

Moreover, the Complaint does not allege that the plaintiffs have sought and obtained the approval of all of the other members of the Consortium. It identifies no heirs of Julius Falk Goldschmidt, named by the Complaint as sole owner of the J.&S. Goldschmidt firm, one of the Consortium's three partners. Compl. ¶¶ 1, 32. Nor does it discuss the estate of Saemy Rosenberg, co-owner of the I. Rosenbaum firm, also one of three partners in the Consortium. *Id.* ¶¶ 1, 18, 32. Finally, the Complaint merely alleges that Alan Philipp and Gerald Stiebel are "legal successors" to the estates of Zacharias Max Hackenbroch and Isaak Rosenbaum, respectively. *Id.* ¶¶ 17, 18. It does not allege that Philipp and Stiebel are these individuals' *sole* heirs or that they have otherwise inherited the entirety of their ancestors' interests in their art-dealer firms.

In short, the plaintiffs cannot satisfy either the prudential standing doctrine or Rule 17(a).

### D. *Helmerich* does not change this analysis.

The plaintiffs may argue that the D.C. Circuit's recent decision in *Helmerich*, 478 F.3d 804, somehow supports their standing to bring these claims. It does not. *Helmerich* addressed only the language of the FSIA's expropriation exception to sovereign immunity, not the prudential standing doctrine or Rule 17(a).

*Helmerich* involved a U.S. corporation's suit against Venezuela for that nation's alleged expropriation of the primary assets of a Venezuelan corporation that the U.S. corporation wholly owned. 784 F.3d at 808–11. Venezuela argued that the U.S. plaintiff could "not invoke the FSIA's expropriation exception" because it "applies only to plaintiffs having 'rights in property' taken in violation of international law" and the U.S. parent had "no rights in [its Venezuelan subsidiary's] property." *Id.* at 814 (citing 28 U.S.C. § 1605(a)(3)). Venezuela argued that the text of the expropriation exception requires a plaintiff to own the allegedly expropriated property

directly; owning it through a wholly-owned subsidiary would not constitute a "right in property" under the statute. The D.C. Circuit rejected this argument, concluding that a parent's derivative interest in a wholly-owned subsidiary's property constitutes a "right[] in property" under the statute. *Id.* at 815–16. In reaching this result, the Circuit relied on Article III standing case law, which recognizes that a shareholder suffers an "injury" for Article III standing purposes when a corporation in which he owns a share is harmed. *Id.* (citing *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1517–1520 (D.C. Cir. 1984), *vacated on other grounds* 471 U.S. 1113 (1985)); *see also Franchise Tax Bd. of Cal.*, 493 U.S. at 336.

The question here is not whether the plaintiffs have a right in property under the statute, or whether they have Article III standing, but whether the prudential standing doctrine and Rule 17(a) allow them to bring claims belonging to the Consortium. The Supreme Court has clearly explained that a shareholder's derivative injury from a wrong done to a corporation may be enough for Article III standing purposes *but still not suffice for prudential standing*, "which generally prohibits shareholders from initiating actions to enforce the rights of the corporation." *Franchise Tax Bd. of Cal.*, 493 U.S. at 336–37. The same is true here: the plaintiffs may have Article III standing and their claims may put "rights in property . . . in issue," triggering the possible availability of the expropriation exception. 28 U.S.C. § 1605(a)(3).[23] But that does not mean that the prudential standing doctrine or Rule 17(a) permits them to bring claims alleging injuries that are purely derivative of an injury to the Consortium.

*Helmerich* did not consider prudential standing or Rule 17(a) questions because they were not raised by the parties. Nothing in that decision indicates that the court intended to overrule well-established D.C. Circuit case law on prudential standing and Rule 17(a), *see, e.g.*, *City of Harper Woods*, 589 F.3d at 1298, or that it intended to hold that those precedents did not apply when a plaintiff sues a foreign government.

---

[23] The plaintiffs cannot invoke the expropriation exception for other reasons. *See supra* Section I.C.

Moreover, the facts of *Helmerich* differ starkly from those here. That case involved a

U.S. corporation bringing claims for losses suffered by its wholly-owned subsidiary. This case,

by contrast, involves two individuals asserting claims deriving from long-deceased relatives,

whose claims in turn derive from firms they owned (or co-owned), the claims of which derive

from a single transaction executed by a consortium in which those firms participated eighty years

ago. *See* Compl. ¶¶ 1, 17–18, 32. It is far from clear that the plaintiffs in this case adequately

represent the interests of the Consortium and all those who might claim some interest in it. *See*

*supra* Subsection II.C (noting that neither plaintiff alleges he is an heir of the sole owner of the

firm J.&.S. Goldschmidt and that neither plaintiff alleges that he is an heir of Saemy Rosenberg,

co-owner of the firm I. Rosenbaum). The prudential standing doctrine and Rule 17(a) address

precisely such problems. And for much the same reasons, German law limits individuals' ability

to bring derivative claims belonging to a GbR until those individuals demonstrate their right to

act on behalf of it. Until the plaintiffs here satisfy those procedural requirements of German law,

the prudential standing doctrine and Rule 17(a) bar their claims.[24]

### III.  The plaintiffs' claims are preempted and otherwise non-justiciable because they conflict with U.S. foreign policy.

U.S. foreign policy has long supported a process of internal restitution, under which other

nations adjudicate claims to Nazi-looted art within their borders. Since the 1990s, U.S. policy has

promoted the Washington Principles, which endorse merits-based adjudication of claims to Nazi-

looted art in the context of dispute resolution mechanisms that are sensitive to the legal culture of

---

[24] Even before approaching the Advisory Commission, SPK raised the issue of whether the claimants represented the entire Consortium, but SPK also stated clearly that within the Advisory Commission proceedings—and in all communications under the Washington Principles—SPK was prepared to discuss the case on its merits and would not make resolving this issue a prerequisite. Germany and the SPK are committed to merits adjudications of claims to Nazi-looted art, which is why Germany created the Advisory Commission, and why the SPK voluntarily submitted itself to it. However, Germany's choice to create a commission which issues recommendations based on a moral and ethical appraisal of the merits without consideration of technical defenses, and the SPK's choice to submit itself to that commission, do not mean that the defendants will not invoke such defenses when sued outside their borders.

the implementing nation. Because the plaintiffs' state-law claims conflict with that policy, they must be dismissed for three separate reasons: they are preempted; they are non-justiciable under the comity doctrine; and they are non-justiciable under the political question doctrine.

**A.      U.S. foreign policy promotes alternative dispute resolution mechanisms, in the relevant nation, for claims of Nazi-looted art.**

The United States has long used diplomacy and executive action to address restitution claims arising out of Nazi-era acts. *See Von Saher v. Norton Simon Museum of Art at Pasadena* (*Von Saher I*), 592 F.3d 954, 961–63 (9th Cir. 2010). These efforts started even before the end of World War II. In 1943, the United States and other nations signed the Declaration against Forced Transfers of Property in Enemy Controlled Territory, Jan. 5, 1943, 3 Bevans 754, a non-binding joint declaration known as the London Declaration. That measure "reserved the right to invalidate wartime transfers of property, regardless of whether" those transfers took the form of open looting, plunder, or forced sales. *Von Saher I*, 592 F.3d at 962 (internal quotation marks omitted).

As the U.S. entered German territory near the end of the war, it found large caches of artwork in German possession, "hidden in castles, banks, salt mines, and even caves." *Id.* "U.S. authorities established several central collection points within the U.S. Zone to assemble the recovered artwork . . . ." *Id.* Due to the scale of the artwork collected, the U.S. developed a system for returning the artwork. *See* Presidential Advisory Commission on Holocaust Assets in the United States, *Plunder and Restitution: The U.S. and Holocaust Victims' Assets* SR-139 (2000) (Presidential Advisory Commission Report);[25] *Von Saher I*, 592 F.3d at 962. The U.S. returned the art to the nation of origin, but "[o]nce assets had been delivered to representatives of claimant nations, no further U.S. involvement was deemed necessary." Presidential Advisory Commission Report SR-140; *Von Saher I*, 592 F.3d at 962. The U.S. wanted to avoid the administrative burden of determining individual ownership and sought to avoid unnecessarily

---

[25] An electronic copy of this Presidential Advisory Committee Report is available at govinfo.library.unt.edu/pcha/PlunderRestitution.html/html/Home_Contents.html.

entangling itself in the internal restitution processes of the claimant nations. Presidential

Advisory Commission Report SR-140; *Von Saher I*, 592 F.3d at 962.

The U.S. handled restitution within Germany with similar policy goals in mind. "As a

practical matter, the claims of those injured by the Nazi government were first covered by

military rules and regulations administered by the Allied armies which occupied Germany." *In re

Nazi Era Cases Against German Defendants Litig.*, 129 F. Supp. 2d 370, 376 (D.N.J. 2001). But

"U.S. policy aimed to return governmental responsibilities to German hands as soon as possible,

not only to relieve U.S. forces of many administrative burdens, but also to begin teaching

German politicians the precepts of democracy." Presidential Advisory Commission Report SR-

151. With that in mind, "U.S. officials repeatedly emphasized that in Germany the administration

of restitution to victims ('internal restitution') should be handled by Germans." *Id.* at 9. By the

mid-50s, the U.S. had shifted "responsibility for compensating victims of Nazi

oppression . . . directly to the Federal Republic of Germany." *In re Nazi Era Cases*, 129 F. Supp.

2d at 376; *see also Burger-Fischer v. Degussa AG*, 65 F. Supp. 2d 248, 267–68 (D.N.J. 1999).

The modern U.S. policy toward recovered art is an extension of that decision. As the

world began to recognize some of the inadequacies of the post-war restitution process in Europe,

the U.S. convened the Conference on Holocaust Era Assets to develop a more equitable approach

to Nazi-looted art. In 1998, representatives of 13 nongovernmental organizations and 44

governments, including the United States and Germany, agreed to the Washington Conference

Principles on Nazi-Confiscated Art (Washington Principles). U.S. Dep't of State, *Washington

Conference Principles on Nazi–Confiscated Art* (1998), *available at*

www.state.gov/p/eur/rt/hlcst/122038.htm; *see Von Saher v. Norton Simon Museum of Art at

Pasadena*, 754 F.3d 712, 721 (9th Cir. 2014) (*Von Saher II*). That set of "non-binding principles"

recognized the need to "expeditiously . . . achieve a just and fair solution" to remaining claims of

Nazi-confiscated art. Washington Principles; *see Von Saher II*, 754 F.3d at 721. The signatory

nations promised "to develop national processes to implement these principles" through

alternative dispute resolution mechanisms designed to address the merits of each claim. The Washington Conference "achieved . . . important moral authority" by, among other things, providing that "a system of conflict resolution would be established to prevent art claims from turning into protracted legal battles." Stuart E. Eizenstat, Head of U.S. Delegation to the Prague Holocaust Era Assets Conferences, Prague, Czech Republic, Opening Plenary Session Remarks at Prague Holocaust Era Assets Conference (June 28, 2009), *available at* www.state.gov/p/eur/ rls/rm/2009/126158.htm (Eizenstat Remarks). The Washington Principles "unequivocally" changed how countries addressed Nazi-looted art. *Id.*

Eleven years later, the international community reaffirmed its commitment at the Prague Holocaust Era Assets Conference, which issued the Terezin Declaration. *See* Compl. ¶195.[26] Like the Washington Principles, the Terezin Declaration emphasizes the need for countries to "ensure that their legal systems or alternative processes, while taking into account the different legal traditions, facilitate just and fair solutions with regard to Nazi-confiscated and looted art." *Id.* (internal quotation marks omitted). The Terezin Declaration addressed U.S. concerns that "too many claims result in litigation, which can be costly and time consuming and which exclude claimants for items of lower value," and it heeded the U.S. call "to redouble [the] commitment to the Washington Principles on Nazi Confiscated Art, and their emphasis on alternative dispute resolution mechanisms to resolve disputed ownership issues." Eizenstat Remarks. The Terezin Declaration called for countries to develop processes to resolve claims "expeditiously and based on the facts and merits of the claims," "in a manner consistent with national laws and regulations as well as international obligations." Compl. ¶ 195 (internal quotation marks omitted).

Taken together, the Washington Principles and Terezin Declaration "favor[] dialogue and negotiation—mediation, if you will—over litigation" and encourage the use of "national processes for alternate dispute resolution mechanisms." *See* Special Remarks of Douglas

---

[26] *See also* U.S. Dep't of State, *Prague Holocaust Era Assets Conference: Terezin Declaration* (June 30, 2009), *available at* www.state.gov/p/eur/rls/or/126162.htm.

Davidson, Special Envoy for Holocaust Issues, Bureau of European and Eurasian Affairs, *Should Stolen Holocaust Art be Returned?*, N.Y. Cnty. Law Ass'n (N.Y.C., March 25, 2013), *available at* www.state.gov/p/eur/rls/rm/2013/mar/206719.htm. "The Terezin Declaration, like the Washington Principles before it, does not mandate a particular outcome." *Id.*

In order for this mechanism to work, the State Department defers to other nations' internal proceedings under the Washington Principles. The United States has "commit[ed] to respect the finality of 'appropriate actions' taken by foreign nations to facilitate the internal restitution of plundered art." *Von Saher II*, 754 F.3d at 721. As the State Department explained just four years ago in an amicus brief to the Supreme Court, the U.S. is committed to "respecting the bona fide internal restitution proceedings of foreign governments." *See* Br. for the U.S. as Amicus Curiae, *Norton Simon Museum of Art at Pasadena v. Von Saher*, 135 S. Ct. 1158 (2015) (No. 09-1254), 2011 WL 2134984, at \*6–7 (recommending deference to Dutch commission) (U.S. *Von Saher* Br.). By extension, the United States "does not support relitigation of all art claims in U.S. courts" and instead "encourage[s] resort to alternative dispute resolution." *Id.* at \*18 In other words, where a foreign government "has afforded [claimants] adequate opportunity to press their claims," the United States "has a substantial interest in respecting the outcome of that nation's proceedings." *Id.* at \*19. As the then-Secretary of State later reiterated, "U.S. policy will continue to support the fair and just resolution of claims involving Nazi-confiscated art . . . while also respecting the bona fide internal restitution proceedings of foreign governments."[27]

As one court has explained, U.S. foreign policy on Nazi-looted art has six tenets:

> (1) a commitment to respect the finality of "appropriate actions" taken by foreign nations to facilitate the internal restitution of plundered art; (2) a pledge to identify Nazi-looted art that has not been restituted and to publicize those artworks in order to facilitate the identification of prewar owners and their heirs; (3) the encouragement of prewar owners and their heirs to come forward and claim art that has not been restituted; (4) concerted efforts to achieve expeditious,

---

[27] *See* Press Statement, Hillary Rodham Clinton, Secretary of State, Washington D.C. (January 16, 2013) (Sec'y of State 2013 Statement), *available at* www.state.gov/secretary/20092013 clinton/rm/2013/01/202932.htm.

just and fair outcomes when heirs claim ownership to looted art; (5) the encouragement of everyone, including public and private institutions, to follow the Washington Principles; and (6) a recommendation that every effort be made to remedy the consequences of forced sales.

*Von Saher II*, 754 F.3d at 721.

### B.      Germany provided the plaintiffs with an opportunity to make their claims.

Germany has embraced the Washington Principles, which it implemented domestically by creating the Advisory Commission. *See* Compl. ¶ 198; Advisory Commission, www.lostart.de /Webs/EN/Kommission/Index.html (last visited October 23, 2015). Chaired by the former chief justice of Germany's Federal Constitutional Court, the Commission has the moral authority to mediate claims between former owners of cultural property and German state museums. *Id.*

Plaintiffs made their initial claims to the Welfenschatz in 2008. They admit that the Welfenschatz was seized by the occupation authorities during the war and later handed over in trust to the State of Hessen. Compl. ¶ 174. In 1963, the collection, the location of which had been publicly known since the Allies took custody of it near the end of WWII, was taken over by the SPK and since then has been exhibited in Berlin. *Id.* ¶¶ 1, 29, 177. Within the context of the post-war reparation and restitution procedures described above, neither the Consortium nor the plaintiffs made any claim to the Welfenschatz.

In 2012, the plaintiffs and the SPK agreed to submit their claims to the Advisory Commission. *Id.* ¶ 213. The parties presented extensive documentation, written submissions, legal argument, and witnesses. Plaintiffs admit they presented "five experts" who had "devoted their academic careers to studying and understanding this period," *id.* ¶¶ 217, 219, and admit that there was "ample time" to collect evidence, *id.* ¶ 221. In March 2014, the Commission issued its opinion. The Commission—headed by the former President of the German Federal Constitutional Court (Chief Justice) Limbach, and then including the former German president, Richard von Weizsäcker (first president of reunified Germany), and the former president of the Bundestag, Rita Süssmuth—found "there is no indication in the case under consideration by the Advisory Commission that points to the art dealers and their business partners having been

pressured during negotiations." Advisory Commission, Recommendation concerning the Welfenschatz (Guelph Treasure) (March 20, 2014).[28] Because the Commission concluded on the merits that there had been no duress, it did not "recommend the return of the Welfenschatz to the heirs of the four art dealers and any other previous co-owners." *Id.*

### C.    The plaintiffs' claims are preempted because they conflict with U.S policy.

Though they invoke the FSIA for jurisdiction, the plaintiffs plead only state-law causes of action. In order for the plaintiffs to prevail, this Court would have to apply those state-law causes of action in a manner conflicting with U.S. foreign policy. The claims are thus preempted.

"[T]he Constitution allocates the power over foreign affairs to the federal government exclusively. . . ." *Deutsch v. Turner Corp.*, 324 F.3d 692, 713–14 (9th Cir. 2003). "In the absence of some specific action that constitutes authorization on the part of the federal government, states are prohibited from exercising foreign affairs powers, including modifying the federal government's resolution of war-related disputes." *Id.* at 714. This doctrine reflects "the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n. 25 (1964)). Accordingly, U.S. foreign policy preempts any state law likely to "produce something more than [an] incidental effect in conflict with express foreign policy of the National Government," *id.* at 420, or that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of" that federal policy, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (internal quotation marks omitted).

This foreign affairs power preempts not only state laws that take aim at federal policy, but also state laws of general applicability that, as applied, would undermine federal policy. *Saleh v. Titan Corp.*, 580 F.3d 1, 12 n.8 (D.C. Cir. 2009) ("[I]t is a black-letter principle of

---

[28] *Available at* www.lostart.de/Content/02_Aktuelles/2014/14-03-20%20Beratende%20Kommission%20Guelph%20Treasure%20Empfehlung.html?nn=9848.

preemption law that generally applicable state laws may conflict with and frustrate the purposes of a federal scheme just as much as a targeted state law."). "Courts have found individual claims, or even entire lawsuits, preempted where a plaintiff relies on a statute of general applicability." *Von Saher II*, 754 F.3d at 720. For example, in *In re Assicurazioni Generali S.P.A. Holocaust Insurance Litigation*, 340 F. Supp. 2d 494, 501 (S.D.N.Y. 2004), the court held that plaintiffs' "Holocaust-era insurance claims" were preempted by executive branch policy favoring resolution of such claims by the International Commission on Holocaust Era Insurance Claims (ICHEIC). The court reasoned that it had to dismiss "claims arising under generally applicable state statutes and common law as well as customary international law" because they "necessarily conflict[ed] with the executive policy favoring voluntary resolution of such claims through ICHEIC." *Id.*; *see also Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1187–88 (C.D. Cal. 2005) (finding plaintiffs' state law tort claims preempted by the U.S. foreign policy interest in its "bilateral relationship with the Columbian government") (internal quotation marks omitted).

Like the claims in *Assicurazioni Generali*, the plaintiffs' claims here necessarily conflict with the executive policy favoring mediation through the Washington Principles.[29] The U.S. has determined that claims to Nazi-looted art should be resolved through the informal, nation-based processes envisioned by the Washington Principles. It is the Executive Branch, of course, that has the "vast share of responsibility for the conduct of our foreign relations." *Garamendi*, 539 U.S. at 414 (internal quotation marks omitted); *see also United States v. Pink*, 315 U.S. 203, 233

---

[29] The fact that the Washington Principles and Terezin Declaration are non-binding is irrelevant. In *Garamendi*, the Supreme Court recognized that a non-binding executive agreement preempted conflicting state law because it represented a clear foreign policy preference of the President in his conduct of foreign affairs and reflected the mechanism he chose to achieve his prescribed objective. 539 U.S. at 420–25. In short, "non-binding" does not mean "the agreement need not be observed or that the parties are free to act as if there were no such agreement." Oscar Schachter, *The Twilight Existence of Nonbinding International Agreements*, 71 Am. J. Int'l L. 296, 300 (1977). Many major international agreements are non-binding, including the Yalta and Potsdam Agreements that concluded World War II. *Id.* at 297 n.10.

(1942); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 49–50 (1st Cir. 1999). That responsibility carries with it the power to enter into executive agreements or settle private claims for war-related injuries, *see Dames & Moore v. Regan*, 453 U.S. 654, 679–80 & n.8 (1981); *Pink*, 315 U.S. at 240 (Frankfurter, *J.*, concurring), including the power to enter into executive agreements determining how restitution or reparation claims arising out of the Holocaust should be resolved, *see, e.g., Garamendi*, 539 U.S. at 414–16.

The plaintiffs cannot prevail on their state-law claims without undermining U.S. foreign policy commitments to mediating such claims in national fora. As noted above, the U.S. has committed "to respect the finality of 'appropriate actions' taken by foreign nations to facilitate the internal restitution of plundered art." *See supra* Section III.A. As the executive branch has explicitly stated to the Supreme Court, the United States does "not support relitigation of all art claims in U.S. courts" and instead "encourage[s] resort to alternative dispute resolution." U.S. *Von Saher* Br., 2011 WL 2134984, at *18. The plaintiffs here, intent at a second bite at the apple, simply ignore U.S. foreign policy. Yet "conflict is imminent" where "two separate remedies . . . are brought to bear on the same activity." *Crosby*, 530 U.S. at 379–80 ("[A] common end hardly neutralizes conflicting means.") (internal quotation marks and alterations omitted). Allowing the plaintiffs to pursue their claims in a U.S. court would signal fundamental disrespect for the process that Germany implemented to execute the Washington Principles. In so doing, it would undermine both the Washington Principles and U.S. foreign policy.

Further, allowing this lawsuit to proceed would encourage the very "protracted litigation" that the State Department feared would exclude claimants for lesser value items and subject all parties to lengthy U.S.-style discovery. *See Eizenstat Remarks*. Countries may hesitate to establish alternative dispute resolution mechanisms, with all of the attendant burdens and expenses, if they know that unhappy claimants will still be able to drag them into U.S. courts. This is particularly true where, as here, plaintiffs challenge the mediation process itself. *See* Compl. ¶¶ 213–30. This would invariably delay the resolution of these claims, and undermine

the U.S. goal of "expeditious, just and fair outcomes when heirs claim ownership to looted art." *Von Saher II*, 754 F.3d at 721.[30]

> **D.      The plaintiffs' claims are non-justiciable due to international comity.**

Even if U.S. foreign policy did not preempt this suit, principles of international comity would require dismissal. "'Comity' summarizes in a brief word a complex and elusive concept— the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984). It embodies "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895); *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004). "[T]he central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts, since recognition fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations." *Laker Airways*, 731 F.2d at 937. This serves the interest of "the foreign court because its laws and policies have been vindicated" and serves "the domestic country because international cooperation and ties have been strengthened." *Id.* As the Supreme Court has long recognized, "permit[ting] the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations." *Oetjen v. Cent. Leather*

---

[30] While the policies identified in *Von Saher II* apply in this case, the court's decision on the merits does not. In *Von Saher II*, the plaintiffs sought restitution of Nazi-looted art that the U.S. had returned to the Netherlands. The plaintiffs' claims to the artworks had never been considered in any internal restitution proceedings (under either post-war processes or the Washington Principles) because the Netherlands had given the art to another claimant. 754 F.3d at 721–23. The Netherlands claimed that federal preemption required dismissal of the suit, but the Ninth Circuit disagreed because the works had *not* been subject to internal restitution proceedings in the Netherlands. *Id.* By contrast, the plaintiffs here admit that the German commission implementing the Washington Principles heard their claims. Compl. ¶¶ 213–30. That prompts the foreign policy considerations identified in *Von Saher II*, but distinguishes the case on the merits.

*Co.*, 246 U.S. 297, 304 (1918) (internal quotation marks omitted) (discussing international comity as basis for act of state doctrine).

Accordingly, "United States courts . . . ordinarily defer to proceedings taking place in foreign countries, so long as the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999) (internal citations and quotation marks omitted). In determining whether to grant comity, the Supreme Court has cautioned, "the merits of the case should not . . . be tried afresh" based "upon the mere assertion of the party that the judgment was erroneous in law or in fact." *Hilton*, 159 U.S. at 202–03; *see Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981). Instead, courts weigh three things: "the interests of the foreign state or states involved," "the interests of the United States," and "the mutual interests of the family of nations in just and efficiently functioning rules of international law." *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1053 (5th Cir. 2012) (internal quotation marks omitted); *see also Mujica v. AirScan Inc.*, 771 F.3d 580, 609 (9th Cir. 2014).

All of those interests compel dismissal based on comity. Germany unquestionably has a strong interest in addressing Holocaust-related claims through the Advisory Commission. Germany has invested substantial time, effort, and resources in establishing and maintaining the Advisory Commission, and it looks to that system to mediate claims to artwork in the possession of the German government and its instrumentalities, public museums, and libraries. Not only is Germany a litigant, but the plaintiffs acknowledge that Germany and the SPK recognize their "unique historical responsibility to victims of the Holocaust . . . ." Compl. ¶ 201. Addressing claims to Nazi-stolen art are part of their ongoing effort to understand and tackle the injustices perpetrated by the Nazi regime. As the German Ambassador to the United States noted several months ago, "As Germans, we are aware of our special responsibility to ensure the return of Nazi-stolen artworks to their rightful owners. Germany remains committed to the 1998

Washington Principles."[31] Moreover, the gravamen of the plaintiffs' claims is conduct in Germany, by the German government, against German nationals. *See Mujica*, 771 F.3d at 611 (noting Colombia's strong interest in resolving claims based on activity occurring in Colombia). This lawsuit threatens to undermine the German implementation of the Washington Principles and Germany's significant efforts in the restitution of Nazi-looted art.

Like German interests, U.S. interests would be served by dismissal on comity grounds. *See Phila. Gear Corp. v. Phila. Gear de Mex., S.A.*, 44 F.3d 187, 191 (3d Cir. 1994) ("[C]omity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect.") (internal quotation marks omitted). This lawsuit takes direct aim at the Advisory Commission, insinuating that it is fraudulent and illegitimate. Compl. ¶ 228. To hear those claims, this Court would have to judge the validity and structure of a German commission; one set up by German federal, state, and municipal governments; headed by the former chief justice of Germany's Federal Constitutional Court; numbering among its members a former German president; and designed to address a central historical issue facing the German nation. As noted above, the U.S. has previously asked for deference to foreign countries' implementation of the Washington Principles. *See* U.S. *Von Saher* Br., 2011 WL 2134984, at *18–19; Sec'y of State 2013 Statement; *Von Saher II*, 754 F.3d at 721. The need for deference is even greater here, where the plaintiffs concede that the Welfenschatz was subject to a German proceeding under the Washington Principles. Under the circumstances, it is not the Court's role to second-guess the executive branch's judgment as to the proper role of comity concerns. *See Freund v. Republic of Fr.*, 592 F. Supp. 2d 540, 579 (S.D.N.Y. 2008) (recognizing that exercising jurisdiction where the Executive Branch has recommended comity "would imply that federal courts possess greater aptitude than both the Executive and the French government to

---

[31] *See* Remarks of Ambassador Peter Wittig, Art Restitution Ceremony (May 5, 2015), *available at* www.germany.info/Vertretung/usa/en/__pr/P__Wash/2015/05/05-Art-Restitution-SP.html?archive=1980516).

compensate Holocaust victims for atrocities committed by other foreign states, which occurred outside United States borders."). To be sure, factual allegations raising a real possibility of "prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment" can justify ignoring comity. *Hilton*, 159 U.S. at 202–03. The plaintiffs here make several conclusory assertions in this direction, *see* Compl. ¶¶ 215, 229, but these amount to nothing but the sort of "mere assertion[s] . . . that the judgment was erroneous in law or in fact" that the Supreme Court has warned should not override comity, *Hilton*, 159 U.S. at 202–03. They fault the German Commission's fact-finding[32] and supposed errors in law,[33] but admit that the Commission allowed them to press their claims and present five separate expert witnesses. *Id.* ¶ 217. They also admit that there was "ample time" to gather evidence. *Id.* ¶¶ 217, 221.[34] The plaintiffs do not allege that the Commission is generally incapable of rendering impartial decisions or that Germany's laws are biased—they are just unhappy with the result here. In fact, the plaintiffs endorse other decisions by the Advisory Commission, complaining only about the result in their case. *Id.* ¶¶ 199, 225.[35] When viewed in light of "Germany's otherwise laudable

---

[32] Compl. ¶ 215 (alleging Commission "turned a blind eye to the desperate circumstances" surrounding the sale); *id.* ¶¶ 220-21 (failed to properly credit testimony of plaintiffs' experts).

[33] *Id.* ¶ 216 ("ignored . . . presumption of duress"); *id.* ¶¶ 224–27 (did not follow precedent).

[34] The plaintiffs assert that defendants "are likely the custodians of additional relevant documents" that were not produced as part of the proceedings before the Advisory Commission. *See id.* ¶ 222. Their speculation does not count as an allegation, but even if it did, the wider availability of discovery in U.S. courts does not make proceedings in other nations undeserving of comity. Despite its different discovery rules, U.S. courts dismiss cases on forum non conveniens grounds in favor of adjudication in Germany, *GoldenTree Asset Mgmt. LP v. BNP Paribas S.A.*, 64 F. Supp. 3d 1179, 1193 (N.D. Ill. 2014) (collecting cases); *BlackRock, Inc. v. Schroders PLC*, No. 07 Civ. 3183(PKL), 2007 WL 1573933, at *7 (S.D.N.Y. May 30, 2007) (noting that courts "have repeatedly found Germany to be an adequate alternative forum despite the differences in discovery procedures"), and grant enforcement in the U.S. of German judgments, *see, e.g., Dresdner Bank AG v. Haque*, 161 F. Supp. 2d 259 (S.D.N.Y. 2001).

[35] That distinguishes this case from *de Csepel v. Republic of Hungary*, 714 F.3d 591 (D.C. Cir. 2013), where plaintiffs sued Hungary to recover art taken by the Nazis, and the court declined to dismiss on comity grounds because the plaintiffs' allegations did not foreclose the plaintiffs from arguing they had been denied due process. While the plaintiffs here concede that the Advisory

approach to confronting history," *id.* ¶ 202, and their citations with approval of other Commission decisions, *id.* ¶¶ 199, 225, the plaintiffs' complaints about the result in their case do not take this case out of the heartland of comity.[36]

Finally, recognizing comity here would serve not only German and U.S. interests, but also the interests of the family of nations in functioning rules of international law. While nations enforce their domestic laws through a monopoly on the legitimate use of force, international law lacks any such enforcement mechanism, and relies instead on cooperation and a felt obligation to participate.[37] That is all the more true when nations participate in and negotiate a set of nonbinding norms like the Washington Principles, which depend on good-faith implementation of the agreed-to principles. A large majority of nations affected by claims to Nazi-era looted art participated in the Washington Principles, and the U.S. and Germany have been at the forefront

---

Commission has rendered fair decisions and complain only about the result in *their* case, Compl. ¶¶ 199, 225, the plaintiffs in *de Csepel* alleged forty years of a Hungarian "dictatorship that had no independent judiciary and which recognized only extremely limited individual property rights." *See* Compl. ¶ 76, *de Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113 (D.D.C. 2011) (Civ. No. 10-1261 (ESH)). Even after the end of the dictatorship, the plaintiffs in *de Csepel* alleged, Hungary struggled to accept and address its role as a former Axis power. It signed the Washington Principles, but "never designated a commissioner [to address Nazi restitution claims], and has not taken any other action to restitute cultural assets that remain in the wrongful possession of its Museums." *Id.* ¶ 84; *cf.* WJRO Report at 4–5 (noting that Germany is in the very top rank of nations dealing with Nazi-era restitution claims).

[36] The plaintiffs allege that the German commission rendered "on information and belief, a politically motivated decision," *Id.* ¶ 215, but they allege no facts supporting the conclusory assertion. Aside from *Hilton*, plaintiffs' conclusory assertions run afoul of *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (holding that pleadings that amount to no more than legal conclusions "are not entitled to the assumption of truth").

[37] *See Laker Airways*, 731 F.2d at 937 ("Comity is a necessary outgrowth of our international system of politically independent, socio-economically interdependent nation states. . . . [N]o nation can expect its laws to reach further than its jurisdiction to prescribe, adjudicate, and enforce. Every nation must often rely on other countries to help it achieve its regulatory expectations. Thus, comity compels national courts to act at all times to increase the international legal ties that advance the rule of law within and among nations."); *cf.* Statute of the International Court of Justice, June 26, 1945, art. 38, ¶ 1(b), 59 Stat. 1055, U.S.T.S. 993 (noting that customary international law requires multinational state practice through a felt obligation)

of efforts to implement them.[38] If one signatory to the Washington Principles believes that

another has not lived up to its commitments, the international community is best served by

diplomatic communications, where shortcomings can be candidly discussed in a cooperative

manner, sensitive to the need to continue to develop the felt obligation to honor the Principles.

By contrast, if the complaining state opened its courts for do-overs of matters tried in the

processes implemented by the other nation, relationships would worsen, undermining

multinational cooperation and the community of nations' need to continue to develop a sense of

respectful obligation to international law. Indeed, if any do-over from the alternative dispute

resolution process called for by the Washington Principles were needed, then international law

would strongly prefer that it take place in German courts, not the courts of a nation far removed

from the acts in dispute. *See supra* Subsection I.C.2 (discussing the international law doctrine

requiring exhaustion of local remedies).

In light of the above, it is not surprising that courts have concluded that comity required

the dismissal of similar Holocaust-related claims. For example, in *Freund*, 592 F. Supp. 2d at

577–78, the court dismissed claims by victims against France and its instrumentalities to recover

property allegedly confiscated during the Nazi-era. The court deferred to a French commission

designed to address such Nazi-era claims against French companies. *Id.* Like the French

commission, the German Advisory Commission provided an adequate alternative forum

endorsed by the U.S., and international comity requires dismissal.

### E.    The plaintiffs' claims involve non-justiciable political questions.

As the above shows, this lawsuit attacks Germany's implementation of the Washington

Principles. Passing judgment on that implementation would require the Court to decide a

---

[38] As noted above, the 2014 report of the WJRO and Claims Conference evaluating the progress
made by 50 countries in implementing the Washington Principles and the Terezin Declaration
found that Germany was among only four "countries that have made major progress towards
implementing the Washington Principles and the Terezin Declaration." WJRO Report at 4–5
(ranking Israel and the U.S. a category lower than Germany).

controversy that the Constitution commits to the political branches, making the case non-justiciable under the political question doctrine. *See, e.g., Baker v. Carr*, 369 U.S. 186, 210–11 (1962); *Kelberine v. Societe Internationale, Etc.*, 363 F.2d 989, 995 (D.C. Cir. 1966) (affirming dismissal against a Swiss corporation alleged to have participated in Nazi atrocities because claims were "not within the established scope of judicial authority").

The Constitution commits resolution of "political questions" to the political branches—the executive and the legislature, *Baker*, 369 U.S. at 210—and requires courts to dismiss cases when adjudication would infringe on the powers of the political branches, *id.* at 217; *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 69 (2d Cir. 2005). Because not every case involving foreign affairs or foreign relations raises a political question, courts must consider whether the case presents: (1) a demonstrable constitutional commitment of the issue to a coordinate political department; (2) the lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of making a decision without first making a policy determination of the type clearly outside judicial discretion; (4) the court's inability to resolve the issue without expressing lack of respect to the coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potential for embarrassment from multifarious pronouncements by various departments on one question. *See Baker*, 369 U.S. at 210–11; *Davis v. Bandemer*, 478 U.S. 109, 121–22 (1986) (reciting *Baker* formulation). If even *one* of these factors exists, a court should dismiss the case as non-justiciable because it involves a political question. *Baker*, 369 U.S. at 217. Plaintiffs' claims implicate multiple *Baker* factors.

First, there is a demonstrable constitutional commitment of the issue of Holocaust-related restitution to the Executive Branch. Historically, courts grant great deference to the Executive in the conduct of foreign relations. *See Baker*, 369 U.S. at 211; *Whiteman*, 431 F.3d at 69. As the Supreme Court has held, the resolution of Holocaust-era compensation claims is a matter "well within the Executive's responsibility for foreign affairs." *Garamendi*, 539 U.S. at 420–21.

51

Because "claims remaining in the aftermath of hostilities may be 'sources of friction' acting as an 'impediment to resumption of friendly relations' between the countries involved, there is a longstanding practice' of the national Executive to settle them in discharging its responsibility to maintain the Nation's relationships with other countries." *Id.* at 421 (internal citations omitted).

At its core, the plaintiffs' action seeks to use state law to undermine that federal policy. They challenge Germany's implementation of the Washington Principles and Terezin Declaration, but those two agreements merely reflect the U.S. Executive's longstanding policy on Holocaust-era art restitution claims, as well as its broader policy of encouraging volunteer settlements and mediation in lieu of litigation. As discussed in detail above, the Executive has called on each nation to establish its own process to resolve claims in light of "different legal traditions" and "in a manner consistent with national laws and regulations as well as international obligations." Compl. ¶ 195; Davidson Remarks; Eizenstat Remarks (Washington Principles and Terezin Declaration "prevent[] art claims from turning into protracted legal battles" that further delay resolution of these claims). These policies are part of the six-decade-long effort by the Executive to shift responsibility to European nations to resolve these claims on the merits, a policy decision squarely within the province of the Executive.

The fourth, fifth and sixth political question considerations (the need to adhere to and respect prior political decisions) also support dismissal. By considering plaintiffs' claims, the Court would implicitly call into question (1) the Executive's longstanding policies concerning the Washington Principles and Terezin Declaration; (2) the legitimacy of Germany's implementation of these principles; and (3) international efforts to establish a resolution model based on mediation or arbitration, rather than litigation. *See supra* Section III.A. As a court noted in a related context, "[r]efusing to abstain here would imply that federal courts possess greater aptitude than both the Executive and the [foreign] government to compensate Holocaust victims for atrocities committed by other foreign states, which occurred outside United States borders." *Freund*, 592 F. Supp. 2d at 579. Evaluating the sufficiency and efficacy of U.S. foreign policy,

political branch efforts, or international agreements negotiated and implemented by the U.S. is a political task that is not an appropriate judicial function. Moreover, given the Executive's consistent efforts over the past seventy years to promote alternative dispute resolution mechanisms for Holocaust-related claims, there is a special need for this Court to abstain and refrain from sitting in review of the Advisory Commission.

IV.    **The Court should dismiss based on the doctrine of forum non conveniens.**

Forum non conveniens permits dismissal when litigation in a foreign jurisdiction is more convenient for the parties, the courts, or serves the public interest. Litigation in Germany would be more convenient and less expensive, because the merits of this case turn on the interpretation of hundreds of documents written in German and found in German historical archives, all of which must be translated into English for litigation in this district. Germany also has compelling interests in having this litigation resolved in its courts: the case concerns events that took place in Germany involving German nationals, it centers around a collection of historically significant German artifacts displayed in one of Germany's most prominent museums, and it implicates Germany's profound ethical and moral commitment to ensure that the real victims of Nazi persecution obtain restitution of Nazi-looted art. By contrast, the subject matter of this suit has no connection with the U.S. or the District of Columbia. For these reasons, the Court should dismiss this case so the plaintiffs can pursue their claims in the German courts.

Dismissal under forum non conveniens "reflects a court's assessment of a range of considerations, most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007) (internal quotation marks omitted). The doctrine is broad and flexible, permitting courts to dismiss whenever the specific facts or issues raised by a case make litigation in a foreign jurisdiction preferable to litigation in the jurisdiction where the plaintiff filed suit. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 262–63 (1981). Because forum non conveniens is meant to spare the expense of litigating a case at all in an inconvenient, unduly

expensive, or improper forum, a court may dismiss a suit on this ground before reaching more complicated questions such as the existence of subject-matter or personal jurisdiction. *Sinochem*, 549 U.S. at 432–35; *see MBI Grp., Inc. v. Credit Foncier du Cameroun*, 558 F. Supp. 2d 21, 27–36 (D.D.C. 2008) (dismissing case against foreign sovereign based on forum non conveniens before deciding whether FSIA exception to sovereign immunity applied).

"[A]t the outset of any forum non conveniens inquiry, the court must determine whether there exists an alternative forum." *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 717 F.2d 602, 607 (D.C. Cir. 1983) (internal quotation marks and alterations omitted). An alternative forum exists if the defendant is subject to process in the foreign jurisdiction and if it can provide the plaintiff with a remedy. *See id.* If an alternative forum exists, the court should balance "the private interests of the litigants in keeping the case in the District of Columbia or dismissing it in favor of the foreign court, and the interests of the public and the courts of this district in keeping the case here." *Irwin v. World Wildlife Fund, Inc.*, 448 F. Supp. 2d 29, 32–33 (D.D.C. 2006). If the balance of these factors favors litigation in the alternative forum, the court may dismiss based on forum non conveniens. *MBI Grp.*, 558 F. Supp. 2d at 27.[39]

### A.      Germany is an available and adequate alternative forum.

A foreign forum is available to litigate the plaintiffs' claims when the defendant is "amenable to process in the other jurisdiction." *Piper Aircraft*, 454 U.S. at 254 n.22 (internal quotation marks omitted). The alternative forum must also be adequate, which means it must provide the plaintiff with some remedy and cannot entirely bar litigation regarding the subject matter of the dispute. *Id.* Germany is an available and adequate forum under these standards: the defendants can be sued in Germany, where the courts permit litigation of claims like those here.

---

[39] The defendant bears the burden of proof at both steps of the forum non conveniens analysis, which it can satisfy by providing the court with declarations and expert opinions establishing the relevant law and facts. *See El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996), *abrogated on other grounds*, *Samantar v. Yousuf*, 560 U.S. 305 (2010); *BPA Int'l v. Kingdom of Swed.*, 281 F. Supp. 2d 73, 78–80, 84–86 (D.D.C. 2003).

The defendants in this case, the German government itself and a major German cultural institution, are both subject to service of process in Germany. *See* Schröder Op. at 2–3 (noting that German government and government entities are subject to suit under German law).Thus the FRG and the SPK can be sued in Germany like any other German defendant. *Id.* The plaintiffs can serve the defendants and commence suit against them there. This establishes that Germany is an available alternative forum. *See Piper Aircraft*, 454 U.S. at 254 n.22.

Germany also provides an adequate alternative forum. A forum is inadequate only if "the remedy offered by the . . . forum is clearly unsatisfactory," a "rare circumstance[]" found only when the "alternative forum does not permit litigation of the subject matter of the dispute" or when the only available remedy "is so clearly inadequate or unsatisfactory that it is no remedy at all." *Id.* at 254 & n.22. Significantly, a "foreign forum is not inadequate merely because it has less favorable substantive law, because it employs different adjudicative procedures, or because of general allegations of corruption in the judicial system." *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 678 (D.C. Cir. 1996) (internal citations omitted), *abrogated on other grounds*, *Samantar v. Yousuf*, 560 U.S. 305 (2010).[40] Here, German law permits individuals to pursue claims for restitution of property obtained through duress or coercion. Schröder Op. at 3–8. It also permits individuals to pursue claims for damages based on fraud or coercion. *Id.* at 8–10. In

---

[40] The D.C. Circuit has found a proposed alternative forum inadequate only when it does not permit the plaintiff to pursue claims at all. *See, e.g.*, *TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 303–04 (D.C. Cir. 2005) (plaintiff filed U.S. action to confirm arbitration award so as to attach property in the U.S., and court found no adequate alternative forum in Ukraine, as U.S. property could not be attached there); *Nemariam v. Fed. Democratic Republic of Eth.*, 315 F.3d 390, 394 (D.C. Cir. 2003) (concluding that the Ethiopia/Eritrea Claims Commission was not an adequate forum because it did not permit individuals to file claims); *El-Fadl*, 75 F.3d at 678–79 (holding that the defendant had not shown that Jordan was an adequate alternative forum because a Jordanian statute granted immunity to the defendant for the plaintiff's claims).

fact, individuals seeking restitution for alleged Nazi expropriations have brought suit under German law, seeking these remedies. *Id.* 10–11.[41]

Finally, since the plaintiffs' claims will likely be governed by German law whether pursued here or in Germany, *see infra* Section IV.C, any details of German law that limit the plaintiffs' potential remedies would apply in the U.S. as well as in Germany. *See, e.g.*, *Stromberg v. Marriott Int'l, Inc.*, 474 F. Supp. 2d 57, 61–62 (D.D.C. 2007) (concluding that because Mexican law would govern the claims in the D.D.C. or Mexico, Mexican law's limits on vicarious liability could not render Mexico an inadequate forum). The details of German law thus cannot make Germany an inadequate forum.

Courts have consistently found Germany an adequate and available alternative forum.[42] Of roughly 200 nations in the world, Germany is one of only thirteen "whose courts have been consistently deemed to be adequate alternative fora" by U.S. courts. *GoldenTree Asset Mgmt. LP v. BNP Paribas S.A.*, 64 F. Supp. 3d 1179, 1193 (N.D. Ill. 2014). Because Germany is an adequate and available alternative, this Court must analyze the private and public interest factors.

---

[41] In addition, Germany's statute of limitations does not make it an inadequate forum. As Professor Schröder notes, limitations-based defenses in Germany are generally affirmative defenses, which a court will not consider unless raised by the parties. Schröder Op. at 11–12. If this Court were to dismiss this case based on forum non conveniens, and if the plaintiffs choose to file suit in Germany, the defendants will not assert a time-bar defense in that suit.

[42] Courts repeatedly reject arguments that Germany is inadequate. *See GoldenTree Asset Mgmt. LP v. BNP Paribas S.A.*, 64 F. Supp. 3d 1179, 1192–93 (N.D. Ill. 2014) (different rules for testimony); *Kirch v. Liberty Media Corp.*, No. 04 Civ. 667(NRB), 2006 WL 3247363, at *6 (S.D.N.Y. Nov. 8, 2006) (different pleading standards and discovery rules); *Fagan v. Deutsche Bundesbank*, 438 F. Supp. 2d 376, 382–83 (S.D.N.Y. 2006) (different rules of evidence); *Helog Ag v. Kaman Aerospace Corp.*, 228 F. Supp. 2d 91, 93 (D. Conn. 2002) (no jury trials or punitive damages); *NCA Holding Corp. v. Norddeutsche Landesbank Gironzentrale*, No. 96 Civ. 9321(LMM), 1999 WL 39539, at *2 (S.D.N.Y. Jan. 28, 1999) (prohibition on contingency fees).

**B.      The private interest factors favor litigation in Germany.**

The private interest factors look to whether suit in the alternative forum is more

convenient for the parties than suit in the chosen forum. In *Gulf Oil Corp. v. Gilbert*, 330 U.S.

501 (1947), the Supreme Court provided a non-exhaustive list of factors that bear on this issue:

> Important considerations are the relative ease of access to sources of proof;
> availability of compulsory process for attendance of the unwilling, and the cost of
> obtaining attendance of willing, witnesses; possibility of view of premises, if view
> would be appropriate to the action; and all other practical problems that make trial
> of a case easy, expeditious and inexpensive. There may also be questions as to the
> enforceability of a judgment if one is obtained.

330 U.S. at 508. As the D.C. Circuit has recognized, the court must understand the parties'

theories of the case in order to evaluate what evidence or witnesses are likely to be relevant to

the dispute. *Pain v. United Techs. Corp.*, 637 F.2d 775, 786 (D.C. Cir. 1980). As explained in the

declaration of the Berlin attorney who represented the SPK on the merits before the Advisory

Commission, defendants do not know of any living witnesses to the events in question, which

occurred more than eighty years ago. Decl. of Martin Seyfarth ¶ 6 (Seyfarth Decl.).[43] But the

dispute on the merits would likely involve hundreds of hard copy documents from many

different German archives, *id.*¶ 11, requiring document custodian witnesses from Germany.

More important, though, is the location and language of the key evidence in this case: the

abundant documentary evidence regarding the Consortium's acquisition of the Welfenschatz in

1929; its efforts to sell the Welfenschatz in 1929–35; and its negotiations with the Dresdner

Bank, operating on behalf of the Prussian State, culminating in the purchase of the Welfenschatz

from the Consortium in 1935. The Complaint focuses heavily on these events. *See* Compl. ¶¶

32–154 (focusing on events of this period). The plaintiffs contend that the Consortium was

forced by Nazi persecution to sell the Welfenschatz for below its market value. *Id.* ¶ 1. By

contrast, the defendants, having closely examined the relevant documentary evidence, believe

that the Consortium purchased the Welfenschatz in 1929 in order to sell it for a profit; that the

---

[43] The declaration of Martin Seyfarth is attached to this motion as Exhibit C.

Great Depression, coming just weeks after the Consortium's purchase, devastated the worldwide market for art, particularly large and expensive collections of medieval art; and that the Consortium, after years of failed efforts to find buyers across the United States and Europe, eventually sold the Amsterdam-stored Welfenschatz for the highest price it could to the sole interested party: a bank acting on behalf of the Prussian government. The Consortium voluntarily agreed to sell the Welfenschatz and got a fair market price.

Deciding which party's view of the facts is correct depends on the sole source of factual evidence: the documentary record from 1929–35. This record consists of contracts, letters, minutes of meetings, and other business records from many historical archives, most of which are located in Germany. *See* Seyfarth Decl. ¶¶ 7–11 (describing some of the important sources of relevant documents). The German historical archives' documents have mostly not been digitized and are available only in hard copy format there. *Id.* ¶ 11. Based on the proceedings before the Advisory Commission, the defendants expect that hundreds of documents would be introduced into evidence in any merits litigation of this case. *Id.* ¶ 7–11. Nearly all of these documents were written in German and so must be translated for litigation in the U.S. *Id.* ¶ 12. Moreover, the parties would likely disagree about the correct translation of many documents, requiring them to obtain language experts to offer opinions supporting their positions. *Id.* ¶ 13–14. Indeed, translation issues could be more contentious here than in contemporary commercial disputes: Most of the relevant documents in this case are more than 80 years old, and if analyzed in this Court, would require not just translation, but historically appropriate translation. The translation and translation-expert fees would cost many tens of thousands of dollars (at least), *id.* ¶¶ 12, 14, an expense that would not exist if this case were tried in Germany. As several courts in this district have recognized, the expense of translating foreign-language documents into English for litigation in the U.S. in document-intensive cases like this one counsels strongly in favor of a forum non conveniens dismissal. *See, e.g.*, *MBI Grp.*, 558 F. Supp. 2d at 32–33 (dismissing case filed in the U.S. in favor of litigation in Cameroon in part because the relevant documentary

evidence was located in Cameroon and written in French); *Croesus EMTR Master Fund L.P. v. Federative Republic of Braz.*, 212 F. Supp. 2d 30, 38–39 (D.C. Cir. 2002) (concluding that litigation in Brazil is preferable because the issues in the case would center on the interpretation of Brazilian legal documents, located in Brazil and written in Portuguese).

The enforceability of a potential judgment also counsels in favor of dismissal. The plaintiffs' primary request for relief asks the Court to order the defendants to give them the Welfenschatz. Compl. Prayers for Relief (B). But as the Complaint also states, the artifacts comprising the Welfenschatz are currently in the possession of the SPK and on display in the Kunstgewerbemuseum in Berlin. *Id.* ¶ 29. Any judgment of a U.S. court directing a German museum to turn over property would have to be registered in Germany and found enforceable by that nation's courts. In other words, a German court would have to be involved in any event, and starting a lawsuit here that would have to finish there is, by itself, a marker of inconvenience. But the inconvenience goes further. Foreign judgments (i.e., judgments from other than the courts of EU Member States) can only be enforced in Germany after they have been recognized and declared enforceable by a German court. *See* Zivilprozessordnung [ZPO] [Code of Civil Procedure], Dec. 5, 2005, Bundesgesetzblatt [BGBl.] [Federal Law Gazette] 1 page 3302, as amended, § 722, para. 1. German law precludes recognition and enforcement of a foreign judgment if "the courts of the state to which the foreign court belongs do not have jurisdiction according to German law." *Id.* § 328, para. 1, sentence 1. In analyzing the question of jurisdiction, German courts do not defer to the foreign court's exercise of jurisdiction, as the question is one of German law. *See* Bundesgerichtshof [BGH] [Federal Court of Justice] Mar. 26, 1969, 52 Entscheidungen des Bundesgerichtshofes in Zivilsachen [BGHZ] 30, paras. 15, 36.[44] A German court would almost certainly conclude under German law that this Court lacked

---

[44] For the same reason, comity plays no part: the foreign court has considered jurisdiction under its own laws, and the German court likewise analyzes whether jurisdiction exists under German rules and precedents. *Id.*

jurisdiction over this dispute between the alleged heirs of interests in a German consortium, on the one hand, and the Federal Republic of Germany and its instrumentality, on the other, regarding a sale of property that occurred in Germany. *See* Oberlandesgericht [OLG] [Hamm Higher Regional Court] Mar. 1, 2011, 25 U 2/08, juris (where plaintiffs located in a foreign nation claimed that they were the rightful owners of a claim to an unpaid brokerage fee earned by their ancestor under a contract with a German company, and where the plaintiffs obtained a judgment in the foreign nation, German law does not permit enforcement of the judgment because the defendant was located in Germany and the contract was performed in Germany). A U.S. court's inability to provide relief directly to the plaintiffs counsels in favor of a defendant's motion to dismiss for forum non conveniens. *See Chabad*, 528 F.3d at 951.

No private factor weighs in favor of litigation in the District of Columbia. Neither plaintiff lives in or near D.C.; according to the Complaint, they live in London and New Mexico. Compl. ¶ 17–18. Thus suit in D.C. or Germany entails travel for both, and for one plaintiff, travel to Germany is likely cheaper and more convenient. Further, retaining German counsel and initiating proceedings in Germany cannot be unduly burdensome for the plaintiffs, since they did exactly that when they brought claims before the Advisory Commission. *Id.* ¶¶ 214–30. In fact, the Complaint is signed by a German lawyer, Markus H. Stötzel. And suit in the D.C. is plainly inconvenient for the defendants, which have been forced to retain private U.S. counsel in this matter instead of relying on (less costly) German lawyers to represent them, as Germany would if sued in Germany. The absence of any factors making D.C. convenient for the parties suggests that the plaintiffs simply shopped for a forum where the loser does not have to pay the winner's attorney fees.[45] Preventing such forum shopping and harassment is one of the foremost purposes

---

[45] Germany, like the U.K. and nearly every Western democracy except the U.S., requires the loser of a civil suit to pay the winner's statutory attorney fees. *See generally* Mary V. Capisio, *Awards of Attorneys Fees by Federal Courts, Federal Agencies and Selected Foreign Countries* (2002).

of forum non conveniens. *Pain*, 637 F.2d at 783–84. Suit in the D.C. is not convenient for the parties, counseling strongly in favor of dismissal.

### C.      The public interest factors favor litigation in Germany.

D.C. has no significant connection to this lawsuit. Germany has a very significant connection to it. The public interest factors overwhelmingly support litigation in Germany.

*Gulf Oil* listed some of the relevant public interest factors:

> Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. . . . In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity cases in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

330 U.S. at 508–09. The D.C. Circuit has derived three principles from this list: courts may "validly protect their dockets from cases which arise within their jurisdiction, but which lack significant connection to it"; "legitimately encourage trial of controversies in the localities in which they arise"; and "validly consider its familiarity with governing law when deciding whether or not to retain jurisdiction over a case." *Pain*, 637 F.2d at 791–92 (footnotes omitted).

There is no reason for this case, which lacks any "significant connection" to D.C., to burden the docket of the courts of this district. *See id.* None of the relevant events alleged in the Complaint occurred in D.C. (or even in the U.S.). None of the plaintiffs reside within 1500 miles of D.C., and only one even lives in the U.S. The defendants are both foreign government entities, and the Welfenschatz itself is in a museum in Berlin. The only apparent connection this case has to D.C. is that decades after all the relevant events occurred, an American citizen living out west allegedly inherited his ancestor's rights, if any, arising out of a transaction entered into in Germany long ago, and chose to sue in D.C. As in many other FSIA cases brought in D.C., this case has a "striking lack of any significant contacts between the event[s] in dispute and the forum

chosen by the plaintiffs." *Croesus EMTR Master Fund L.P.*, 212 F. Supp. 2d at 40 (quoting *Pain*, 637 F.2d at 792) (internal quotation marks and alterations omitted).

Unlike D.C., Germany has a compelling interest in seeing this case litigated in its courts. The relevant events occurred in Germany, and if the plaintiffs' claims had merit, then any injury would have arisen there as well. Courts "may legitimately encourage trial of controversies within the localities in which they arise." *Pain*, 637 F.2d at 792; *see MBI Grp., Inc.*, 558 F. Supp. 2d at 34–35 (concluding that Cameroon has a much stronger interest in claims of government corruption occurring in Cameroon than the U.S. does); *Irwin*, 448 F. Supp. 2d at 36 (concluding that Gabon, where plaintiff's injury occurred, has much stronger interest in subject matter of dispute than D.C. does). The claims in this case arose in Germany and should be tried there.

Moreover, the subject matter and allegations of this case raise unique issues that give Germany a compelling interest in this litigation. As Germany, the international community, and the plaintiffs themselves recognize, Germany has had, since 1945, a powerful interest in remedying the crimes of the Nazi government and in providing compensation and restitution of Nazi-looted art to victims of Nazi persecution. That is why, immediately after the war and in "accordance with the requirements of the Allied restitution provisions, the Federal Act on Restitution and the Federal Indemnification Act, the Federal Republic of Germany has fulfilled merited claims on grounds the confiscation of works of art by the Nazi regime after WW II, and set up the necessary procedures and institutions for enabling persons entitled to such indemnification to enforce their claims vis-à-vis other parties liable to restitution." Common Statement, www.lostart.de/Webs/EN/Koordinierungsstelle/GemeinsameErklaerung.html.[46] And that is why, irrespective of such material compensation, the Federal Republic of Germany

---

[46] *See also* Compl.¶ 201 (noting Germany's "unique historical responsibility to victims of the Holocaust"); *id.* ¶¶ 190, 195 (quoting the Washington Principles and the Terezin Declaration, which call on states to identify Nazi-expropriated art in their museums and cultural institutions and to ensure that their legal systems provide for restitution of such art); *id.* ¶ 198 (noting that Germany publicly acknowledges these principles).

declared its readiness at the Washington Conference on Holocaust-Era Assets on December 3, 1998, to facilitate just and fair solutions with regard to Nazi-looted art, in particular restitution. Courts have recognized the interests of other states in remedying Nazi-era crimes committed by their own (previous) governments. *See Fischer*, 777 F.3d at 871 (noting Hungary's "significant legal interest in hearing . . . claims [relating to the Hungarian Holocaust] in Hungarian courts"). Moreover, the plaintiffs allege that Germany "has no coherent policy towards victims of Nazi-looted art" and that the Advisory Commission—a commission chaired by the former president of the Federal Constitutional Court of Germany and consisting of numerous eminent retired German politicians and jurists—is little more than a sham that the German government uses to flout its obligations under international law. *See* Compl. ¶¶ 203, 206, 212, 215, 220, 229–30. Plainly, Germany has a strong public interest in adjudicating these troubling allegations in German courts. *See MBI Grp.*, 558 F. Supp. 2d at 34–35 (noting Cameroon's strong interest in hearing a case involving allegations of corruption against the Cameroonian government); *Kirch v. Liberty Media Corp.*, No. 04 Civ. 667(NRB), 2006 WL 3247363, at *8 (S.D.N.Y. Nov. 8, 2006) (recognizing Germany's interest in adjudicating claims that Germany's former Chancellor and Germany's largest bank conspired to bankrupt a prominent German media company); *Croesus EMTR Master Fund L.P.*, 212 F. Supp. 2d at 40 (noting Brazil's compelling interest in deciding in Brazil claims that "implicate the fiscal structure and monetary policy of Brazil, not to mention the propriety of the actions of its government officials"). And even apart from its unique interest in addressing its Nazi past, Germany has significant interest in the precise subject matter of the dispute. This case concerns a collection of medieval German religious artifacts publicly displayed in one of Germany's preeminent museums. The plaintiffs seek either the return of this collection or damages of a quarter billion dollars. Compl. Prayers for Relief (B), (C). Surely, Germany is the nation whose courts should decide the rightful owner of this property and whether the plaintiffs are entitled to this extraordinary damages sum. *See, e.g.*, *MBI Grp.*, 558 F. Supp. 2d at 34–35; *Kirch*, 2006 WL 3247363, at *8–9; *Croesus EMTR Master Fund L.P.*, 212 F.

Supp. 2d at 40. The interest of the District of Columbia in the subject matter of this dispute (if any) pales in comparison to Germany's compelling interest.

Finally, choice-of-law issues strongly favor litigation in Germany. As the D.C. Circuit stated in *Pain*, courts should consider their "familiarity with governing law when deciding whether or not to retain jurisdiction over a case." 637 F.2d at 791–92 (footnote omitted). D.C. courts regularly dismiss cases that will be governed by unfamiliar or uncertain foreign law. *See, e.g.*, *MBI Grp.*, 558 F. Supp. 2d at 35–36 (FSIA case); *Croesus EMTR Master Fund L.P.*, 212 F. Supp.2d at 40–41 (FSIA case). This is particularly so when the governing law is not written in English, as the language barrier prevents U.S. courts from directly consulting foreign law sources and makes them dependent on foreign legal experts. *See, e.g.*, *MBI Grp.*, 558 F. Supp. 2d at 35; *Croesus EMTR Master Fund L.P.*, 212 F. Supp.2d at 40–41. Moreover, the doctrine of forum non conveniens aims "to help courts avoid conducting complex exercises in comparative law." *Piper Aircraft*, 454 U.S. at 251. Thus, a court need not determine that foreign law certainly applies; it need only determine that the case raises substantial choice-of-law issues and a reasonable likelihood that foreign law will apply. *See BlackRock, Inc. v. Schroders PLC*, No. 07 Civ. 3183(PKL), 2007 WL 1573933, at *11 (S.D.N.Y. May 30, 2007) (likelihood that German law applies counsels in favor of dismissal); *Helog Ag v. Kaman Aerospace Corp.*, 228 F. Supp. 2d 91, 93 (D. Conn. 2002) (same).

This is plainly so here. Under D.C. choice-of-law principles, a court deciding a choice-of-law question "must first determine if there is a conflict between the laws of the relevant jurisdictions." *Stromberg*, 474 F. Supp. 2d at 61 (internal quotation marks omitted).[47] If the court finds a conflict, it then must determine which forum has a "more substantial interest" in the resolution of the precise issue. *Id.* (internal quotation marks omitted). In doing so, D.C. courts apply "a modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute." *Id.* at 61–62 (internal quotation marks omitted).

---

[47] A district court sitting in diversity applies the choice of law rules of its jurisdiction. *Id.*

This requires the court to "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review." *Id.* at 62 (internal quotation marks omitted). Given this analysis, litigating this case in the D.C. will involve countless "complex exercises in comparative law," *Piper Aircraft*, 454 U.S. at 251, because the Court will have to decide whether there is a conflict between D.C. law and German law on every issue in the case.[48] And in the event of a conflict between the two, D.C. law will almost certainly *not* apply because, for the reasons above, D.C. has no connection to the suit, meaning that no D.C. governmental policy could be advanced by applying D.C. law. *See Stromberg*, 474 F. Supp. 2d at 62. Instead, for most if not all of the issues, Germany would be the jurisdiction whose governmental policy would be most advanced by applying its own law, because the case involves events and transactions occurring in Germany and property that is currently located in a German public museum.[49] Because German law almost certainly applies, and because German courts have more competence than D.C. courts in German law, Germany is a far preferable forum. *See, e.g.*, *Abad v. Bayer Corp.*, 563 F.3d 663, 671 (7th Cir. 2009) (Posner, *J.*) ("[A]n Argentine court is the more competent maker of Argentine law—more competent in the sense of more legitimate, but also more competent in the sense of being better able to decide the case correctly because more at home in the relevant legal tradition than an American court would be."); *MBI Grp.*, 558 F. Supp. 2d at 35 (difficulty of reading and applying Cameroonian law favors dismissal); *Stromberg*, 474 F. Supp. 2d at 63 (same for law of Mexico); *Kirch*, 2006 WL 3247363, at *9 (complex questions of German law raised by claims favors dismissal); *Irwin*, 448 F. Supp. 2d at 36 (same for Gabon).

---

[48] The exercise in comparative law is even more complex here, as some issues in the case may be governed by *historical* German law, e.g., German law as of 1935. While the application of foreign law always presents challenges, the application of historical foreign law is even more difficult, requiring translation not only across space and culture, but also across time.

[49] The plaintiffs recognize the significance of German law to their claims, alleging that the sale of the Welfenschatz cannot have conveyed good title *under German law*. Compl. ¶¶ 183–88.

**D.      The public and private interests overcome the plaintiffs' choice of forum.**

Although a plaintiff's choice of forum is entitled to some deference, courts have recognized the deference is greatly diminished in cases involving non-U.S. plaintiffs or when the plaintiff engages in forum shopping by choosing to sue in a jurisdiction without a meaningful connection to the subject matter of the litigation or the convenience of the parties. *See, e.g.*, *Piper Aircraft*, 454 U.S. at 255–56; *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71–72 (2d Cir. 2001) (en banc) (holding that a plaintiff's choice of forum is entitled to less deference when it appears to be motivated by forum shopping rather than genuine convenience); *Pain*, 637 F.2d at 783–84 (stating that plaintiff should provide reasonable explanation for suing in jurisdiction unconnected with facts giving rise to the suit, in order to deter forum shopping). Here, as in *Pain*, "the most striking feature of this case is the lack of any significant contacts between the event[s] in dispute and the forum chosen by the plaintiffs in which to litigate the consequences of [those] event[s]." 637 F.2d at 792. This suggests that the plaintiffs' choice of forum was motivated by tactical considerations, such as a desire to avoid Germany's fee-shifting rules or to force the defendants to litigate the case in a much more costly forum. Their forum choice is thus entitled to little deference. *See Iragorri*, 274 F.3d at 71–72. But whatever the level of deference, the private and public factors above make plain that the case should be dismissed for forum non conveniens.

**V.      The statute of limitations bars the claims.**

The SPK voluntarily submitted itself to the Advisory Commission, well aware that defendants agreeing to go before that commission cannot raise time-based defenses and must make their cases solely on the merits. That is because the SPK was—and is—committed to adjudications on the merits of claims to Nazi-looted art. So is Germany, which is why it created the Advisory Commission in the first place. The defendants are committed to the Washington Principles and the Terezin Declaration, and they commit considerable resources to investigating and researching claims of Nazi-looted art. But the plaintiffs have now turned their back on the Advisory Commission's findings on the merits, choosing instead to file suit in a distant and expensive jurisdiction, where the loser is not required to pay the winner's attorney's fees. Their

lawsuit here flies in the face of the Washington Principles and the Terezin Declaration, neither of which contemplates second-chance litigation, let alone second-chance litigation in a foreign forum unconnected to the alleged expropriation and distant from the dispute resolution process that already addressed the merits. *Cf.* U.S. *Von Saher* Br., 2011 WL 2134984, at *18–19 (U.S. "policy does not support relitigation of all art claims in U.S. courts."). In this circumstance—far distant from the merits adjudications called for by the Washington Principles—the defendants will invoke the statute of limitations. Had the plaintiffs brought their claims to a German court, or if they did so after this suit is dismissed, the defendants would not invoke the time-bar.

> **A.     The claims are time-barred.**

D.C. law determines the applicable statute of limitations. *See Gilson v. Republic of Ir.*, 682 F.2d 1022, 1024 n.7 (D.C. Cir. 1982) (law of local forum sets limitations period in FSIA case). While German *substantive* law applies here, *see supra* Section IV.C, "D.C. choice-of-law rules . . . treat statutes of limitations as procedural, and therefore almost always mandate application of the District's own statute of limitations." *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995); *see Dayton v. Czechoslovak Socialist Republic*, 672 F. Supp. 7, 13 & n.6 (D.D.C. 1986) (applying D.C. Code § 12-301 to property claims in FSIA case).

Under D.C. law, a three-year statute of limitations began to run when the plaintiffs' claims accrued. *See* D.C. Code § 12-301(2) (3-year limitations period for claims "for the recovery of personal property or damages for its unlawful detention"); D.C. Code § 12-301(7) (3-year limitation period for breach of contract); *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1221 (D.C. 2005) (unjust enrichment); D.C. Code § 12-301(8) (3-year limitation period for claims not otherwise enumerated).

All of the plaintiffs' claims based on the initial sale of the Welfenschatz accrued in 1935:

- The replevin and conversion claims accrued "immediately" because they allege that the defendants "did not acquire the property lawfully in the first instance . . . ." *Malewicz*, 517 F. Supp. 2d at 335 (citing *Shea v. Fridley*, 123 A.2d 358, 361 (D.C. 1956)); *see also Sea Search Armada v. Republic of Colom.*, 821 F. Supp. 2d 268, 273 (D.D.C. 2011)

(claim accrued immediately because plaintiff claimed Colombia's conversion of a found shipwreck was at all times "unlawful"). The plaintiffs contend that the initial sale was unlawful. *See* Compl. ¶¶ 1–13; 23.i–iii.; 179–88; 231–48.

- The unjust enrichment claim also accrued in 1935, as it accrued "upon the occurrence of the wrongful act giving rise to a duty of restitution." *News World Commc'ns*, 878 A.2d at 1223 (internal quotation marks omitted).

- The claim for breach of the covenant of good faith and fair dealing accrued on the date of the alleged breach, *see Slate v. Pub. Defender Serv.*, 31 F. Supp. 3d 277, 314 (D.D.C. 2014) (collecting cases); because the plaintiffs base the claim on pre-contractual conduct, the alleged breach occurred no later than June 12, 1935. Compl. ¶¶ 262–67.

- The fraudulent inducement claim similarly accrued nearly 80 years ago, when the plaintiffs knew or should have known of the supposed fraud. *See Bakeir v. Capital City Mortg. Corp.*, 926 F. Supp. 2d 320, 334 (D.D.C. 2013). Plaintiffs claim that Germany fraudulently used a "straw man" to trick the Consortium into selling the Welfenschatz to Prussia. Compl. ¶¶ 133, 140, 251. But soon after the sale, the identity of the purchaser became global news. Prussia released "propaganda films . . . to celebrate the acquisition" of the Welfenschatz and in 1936 proclaimed "[t]he Welfenschatz was recovered for Germany in the summer of 1935 *by the Prussian state government*." *Id.* ¶ 170–71 (emphasis added). If the Consortium members did not know the identity of the purchaser on the day of sale, they should have known the purchaser's identity by 1936.

- The declaratory judgment claim accrued no later than 1936. "Because a declaratory judgment action is a procedural device used to vindicate substantive rights, it is time-barred only if relief on a direct claim would be barred." *Int'l Ass'n of Machinists & Aerospace Workers v. Tenn. Valley Auth.*, 108 F.3d 658, 668 (6th Cir. 1997) (internal quotation marks omitted). Plaintiffs seek a declaration that they own the Welfenschatz based on the alleged illegality of the initial sale. *See* Compl. ¶¶ 231–35. This is the same conduct underlying the conversion, replevin, and unjust enrichment claims.

- Likewise, because there is no independent cause of action for civil conspiracy under D.C. law, dismissal of the other claims disposes of any underlying tort to which the conspiracy claim could have attached. *See Hall v. Clinton,* 285 F.3d 74, 82 (D.C. Cir. 2002) (civil conspiracy is not actionable on its own and cannot stand as an isolated cause of action).

All of these claims accrued long ago. That is so whether they accrued in 1935 when the sale occurred, later that year when the plaintiffs claim the identity of the buyer was revealed, or ten years later when the Allies took over the post-war administration of Germany, making it possible for the plaintiffs to effectively pursue their claims. Even if the claims did not accrue until decades later—and the defendants know of no theory by which the claims could have accrued any later than the late 1940's—the 3-year statute of limitations would have run long ago.

In the United States, statutes of limitations "serve important interests" and "cannot be fairly characterized as technicalities." *Museum of Fine Arts, Bos. v. Seger-Thomschitz*, 623 F.3d 1, 14 (1st Cir. 2010). In fact, U.S. courts routinely apply state statutes of limitations to bar untimely Holocaust-related claims. *See Seger-Thomschitz,* 623 F.3d 1 at 14; *Dunbar v. Seger-Thomschitz*, 615 F.3d 574, 578–79 (5th Cir. 2010); *Orkin v. Taylor*, 487 F.3d 734, 741–42 (9th Cir. 2007) (affirming that statute of limitations barred claims to Van Gogh painting previously sold by Berlin Jew in 1930s); *Detroit Inst. of Arts v. Ullin*, No. 06-10333, 2007 WL 1016996, at *3 (E.D. Mich. Mar. 31, 2007) (holding statute of limitations barred claim by heirs of German Jew to Van Gogh painting allegedly subject to forced sale in 1939); *Toledo Museum of Art v. Ullin*, 477 F. Supp. 2d 802, 807 (N.D. Ohio 2006) (same holding in case of Gauguin painting).

## CONCLUSION

The plaintiffs brought and lost this case on the merits in Germany. Unsatisfied with the just result rendered by the Advisory Commission, they are trying again, choosing a jurisdiction thousands of miles and an ocean away from the disputed transaction. If the case ever reached the merits on these foreign shores, the plaintiffs would lose again, as surely and as soundly as they lost the first time. But the law of the forum they shopped for—U.S. law—will not let them reach the merits here. The case should be dismissed in full for any (or all) of these reasons:

- The defendants have sovereign immunity;

- The plaintiffs lack standing;

- The claims are preempted;

- The claims are non-justiciable under the international comity doctrine;

- The claims are non-justiciable under the political question doctrine;

- Forum non conveniens requires that any claims be brought in Germany; and

- The claims are time-barred.

October 29, 2015                    Respectfully Submitted,


                                   By:    /s/ Jonathan M. Freiman
                                          Jonathan M. Freiman (#D00322)
                                          David L. Hall (pro hac vice)
                                          Tahlia Townsend (pro hac vice)
                                          David Roth
                                          (pro hac vice application pending)
                                          Benjamin M. Daniels
                                          (pro hac vice application pending)
                                          WIGGIN AND DANA LLP
                                          One Century Tower
                                          New Haven, Connecticut  06508-1832
                                          (Tel.) 203-498-4400
                                          (Fax) 203-782-2899
                                          jfreiman@wiggin.com
                                          dhall@wiggin.com
                                          ttownsend@wiggin.com
                                          droth@wiggin.com
                                          bdaniels@wiggin.com


                                          *Counsel to Defendants*

**<u>CERTIFICATION</u>**

I hereby certify that on October 29, 2015, a copy of the foregoing Motion to Dismiss and Incorporated Memorandum of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Jonathan M. Freiman
Jonathan M. Freiman (#D00322)
WIGGIN AND DANA LLP
One Century Tower
New Haven, Connecticut  06508-1832
(Tel.) 203-498-4400
(Fax) 203-782-2899
jfreiman@wiggin.com

24977/1/3368946.1

71