**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ALAN PHILIPP, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>FEDERAL REPUBLIC OF GERMANY,<br>*et al.*.,<br><br>　　　　Defendants. | Civil Action No. 15-266 (CKK) |

**MEMORANDUM OPINION**
(March 31, 2017)

　　This case centers around the June 14, 1935, sale of a collection of medieval relics known as the "Welfenschatz" by a consortium of three art dealer firms in Frankfurt ("Consortium") to the State of Prussia through the Dresdner Bank. Plaintiffs Alan Philipp, Gerald G. Stiebel, and Jed R. Leiber, legal successors of the estates of members of the Consortium, filed suit against Defendants the Federal Republic of Germany ("Germany") and Stiftung Preussischer Kulturbesitz ("SPK"), an instrumentality of Germany, alleging that the SPK is in wrongful possession of the Welfenschatz because the 1935 sale was coerced as part of the Nazi persecution of the Jewish sellers. Presently before the Court is Defendants' [18] Motion to Dismiss the First Amended Complaint and Incorporated Memorandum of Law, requesting that the Court dismiss all of Plaintiffs' claims on the grounds that: (1) Defendants are entitled to sovereign immunity; (2) the claims are preempted and non-justiciable because they conflict with U.S. foreign policy; and/or (3) the doctrine of forum non conveniens favors dismissal.[1]

---

[1] Defendants also advanced an argument that Plaintiffs' claims are barred by the statute of limitations in their motion. However, Defendants formally withdrew their statute of limitations

Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as a whole, the Court GRANTS IN PART and DENIES IN PART Defendants' [18] Motion to Dismiss the First Amended Complaint for the reasons described herein.  Specifically, the Court GRANTS as conceded Defendants' request that the Court dismiss the following five non-property based claims because Defendants are entitled to sovereign immunity on each claim: fraud in the inducement (Count V); breach of fiduciary duty (Count VI); breach of the covenant of good faith and fair dealing (Count VII); civil conspiracy (Count VIII); and tortious interference (Count X). The Court DENIES Defendants' request for dismissal on the remaining five claims: declaratory relief (Count I); replevin (Count II); conversion (Count III); unjust enrichment (Count IV); and bailment (Count IX).

## I. BACKGROUND

In or around 1929, the Consortium was formed by three art dealer firms owned by German Jews in Frankfurt.  The three firms, J.&S. Goldschmidt, I. Rosenbaum, and Z.M. Hackenbroch, were owned by Plaintiffs' ancestors and/or predecessors-in-interest.[3]  Compl. ¶ 34.   The

---

argument without prejudice with the possibility of it being raised later in light of the enactment of the Holocaust Expropriated Art Recovery Act of 2016, H.R. 6130, Pub L. No. 114-308, which was signed into law after briefing was complete on the pending motion to dismiss.  Defs.' Notice at 3. As such, the Court shall not consider this argument at this time.  However, Defendants are not barred from raising this issue at a later time.

[2] While the Court bases its decision on the record as a whole, its consideration has focused on the following documents: 1st Am. Compl. ("Compl."), ECF No. [14]; Defs.' Mot. to Dismiss 1st Am. Compl. & Incorp. Mem. of Law ("Defs.' Mot."), ECF No. [18]; Pls.' Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n"), ECF No. [19]; Defs.' Reply in Further Supp. of Mot. to Dismiss 1st Am. Compl. ("Defs.' Reply"), ECF No. [20]; Pls.' Notice, ECF No. [21]; Defs.' Notice, ECF No. [22]; Pls.' Stmt. on HEAR Act as it Relates to U.S. Policy ("Pls.' Stmt."), ECF No. [23]; Jt. Status Report on Need for Further Briefing on Effect of HEAR Act ("Jt. Status Report"), ECF No. [24]. These motions are fully briefed and ripe for adjudication. In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering its decision. *See* LCvR 7(f).

[3] Specifically, Plaintiff Philipp, a citizen of the United Kingdom and a resident of London, is the grandson and sole legal successor to the estate of the late Zacharias Max Hackenbroch, the

Consortium acquired the Welfenschatz on October 5, 1929, pursuant to a written agreement with the Duke of Brunswick-Lüneberg.  *Id.* ¶ 35.  The Welfenschatz is comprised of 82 medieval reliquary and devotional objects, dating primarily from the 11th to 15th century, that were originally housed in the Braunschweiger Dom (Brunswick Cathedral) in Germany.  *Id.* ¶¶ 30, 41.  The Consortium eventually brought the Welfenschatz to the United States to offer it for sale to museums and, by 1931, sold 40 of the 82 pieces to museums and individuals in Europe and the United States, including the Cleveland Museum of Art.  *Id.* ¶ 41.  Plaintiffs' claims center around the remaining 42 objects that were acquired by the State of Prussia pursuant to a contract with the Consortium on June 14, 1935, which was facilitated through the Dresdner Bank.[4]  *Id.* ¶ 151.  Defendant SPK, an instrumentality of Germany, was created for the purpose of succeeding all of Prussia's rights in cultural property and currently is in possession of the Welfenschatz.  *Id.* ¶ 184.  The Welfenschatz currently is located at the SPK-administered Museum of Decorative Arts ("Kunstgewerbemuseum") in Berlin.[5]  *Id.* ¶ 26(iv).

Plaintiffs' position is that the 1935 sale between the Consortium and the State of Prussia, a political subdivision of the German Weimar Republic and later the Third Reich, was coerced as

---

sole owner of the former Hackenbroch art dealers.  Compl. ¶ 17.  Plaintiff Stiebel, a U.S. citizen and a resident of Santa Fe, New Mexico, is the great nephew and legal successor of the estate of the late Isaak Rosenbaum, co-owner of I. Rosenbaum art dealers.  *Id.* ¶ 18.  Plaintiff Leiber, a U.S. citizen and resident of West Hollywood, California, is the grandson and sole heir of Saemy Rosenberg, the other co-owner of Rosenbaum art dealers, and the great nephew of Isaak Rosenbaum and partly a successor to his estate.  *Id.* ¶ 19.  Plaintiffs are the assignees of the claims of Julius Falk Goldschmidt by written instrument from the sole owners of the J.&S. Goldschmidt firm.  *Id.* ¶ 20.

[4] For ease of reference, the Court shall refer to these 42 objects at issue as "the Welfenschatz," even though Plaintiffs' claims do not involve the 40 of the 82 objects in the collection that were sold in the United States and Europe prior to the 1935 transaction.  *See* Compl. ¶ 31 (listing the objects at issue).

[5] During World War II, the Welfenschatz was shipped out of Berlin to be saved from destruction and robbery.  It was seized by U.S. troops and handed over in trust to the State of Hesse.  Compl. ¶ 181.

part of the Nazi persecution of the Jewish sellers of the Welfenschatz and, as such, the Court shall briefly summarize the allegations in the complaint that Plaintiffs rely on in support of this position. *Id.* ¶ 22.  Specifically, Plaintiffs allege the 1935 transaction was spearheaded by Nazi-leaders Hermann Goering and Adolf Hitler, who were involved in explicit correspondence to "save the Welfenschatz" for the German Reich.  *Id.* ¶¶ 2, 9.  Further, the 1935 sale resulted in a payment of 4.25 million RM, which Plaintiffs assert demonstrates the lack of an arms'-length transaction because it was barely 35% of the market value of the Welfenschatz.  *Id.* ¶¶ 4, 12.  Further, the money exchanged was never fully accessible to the Consortium because it was split and partly paid into a blocked account, and was subject to "flight taxes" that Jews had to pay in order to escape. *Id.* ¶¶ 4, 12.  Moreover, in November of 1935, Goering presented the Welfenschatz as a personal "surprise gift" to Hitler during a ceremony.  *Id.* ¶¶ 13, 179.

Plaintiffs contend that during the time that the Consortium possessed the Welfenschatz, there were concerted efforts by Germany's Reichsregierung (Reich Government), the Prussian State Government and several other entities and museum officials to regain possession of the Welfenschatz starting in 1930.  *See generally id.* ¶¶ 37-40.  After the Nazi rise to power in Germany, *see generally id.* ¶¶ 44-65, Plaintiffs point to more statements regarding an interest in Germany regaining possession of the Welfenschatz.  Specifically, Plaintiffs point to a letter written by the new Mayor of Frankfurt Friedrich Krebs to Hitler requesting that Hitler "create the legal and financial preconditions for the return of the [Welfenschatz]."  *Id.* ¶ 69 (quoting Compl., Ex. 2).  Plaintiffs also reference a letter from 1933 written by a Frankfurt museum director to the President of the German Association for the Preservation and Promotion of Research indicating that one member of the Consortium indicated the owners were "very willing . . . to enter into negotiations with the Reich," *id.* ¶ 77, and minutes from a 1934 meeting among several museum

directors and a board member of the Dresdner Bank when the purchase of the Welfenschatz was again discussed, *id.* ¶ 79.

Dresdner Bank, which was majority-owned by the German state at the time of the Nazi rise to power, served as the intermediary facilitating the 1935 transaction between the Consortium and Prussia. *Id.* ¶¶ 88-89. Plaintiffs cite to an investigative report from a German weekly news magazine noting that it "shows the [Dresdner] bank took part early on in Third Reich's policy of confiscating Jewish property and wealth." *Id.* ¶ 90; *see also id.* ¶ 132. Plaintiffs detail the history of the discussions between the Dresdner Bank and the Consortium regarding the sale price of the Welfenschatz, noting that in January 1934, the Consortium was unwilling to sell the objects for below 6.5 million RM or 6 million RM in "extreme circumstances," *id.* ¶ 92, while the Dresdner Bank indicated the sale price could not exceed 3.5 million RM, *id.* ¶ 93. Plaintiffs also point to a record from May 1934 indicating that the Consortium advised the Dresdner Bank that it had an offer of 7 million RM, probably from a Berlin private banker. *Id.* ¶ 94. Further, Plaintiffs point to a draft letter written to Hitler by the Secretary of the Prussian State Ministry and provided to the Deputy Minister of the Ministry of Science in July 1934 regarding acquisition of the Welfenschatz through Prussian treasury bonds in order to "bring the historically, artistically and national-politically valuable [Welfenschatz] to the Reich in addition to many other valuable cultural treasures," and specifically referencing the role of Prussian Prime Minister Goering. *Id.* ¶¶ 103, 111 (quoting Compl., Ex. 3). In February 1935, the Dresdner Bank Director noted that the Prussian Finance Minister asked him to handle the Welfenschatz matter. *Id.* ¶ 133.

In April 1935, an owner of a Berlin art dealership who served as the messenger between the Bank and the Consortium, notified the Bank's Director that he had been "intensely preoccupied with the matter" for a year and a half and reported that the problem with acquiring the

Welfenschatz was that the members of the Consortium were confident in the asking price. *Id.* ¶¶ 83, 137. Later that month, the Dresdner Bank Director authorized a bid of 3.7 million on behalf of its client. *Id.* ¶ 140. At some point, the Consortium sent word that it was willing to sell the Welfenschatz for 5 million RM. *Id.* ¶ 139. Plaintiffs also point to a new museum that intended to acquire the Welfenschatz and allege that "[t]he 'authoritative entities' were . . . invited to review the plans at [the prospective buyer museum] to ensure that there was no 'conflict,'" which resulted in the elimination of an independent interested purchaser. *Id.* ¶ 143.

On May 4, 1935, the Consortium offered the Welfenschatz for a sale price of 4.35 million RM to the Dresdner Bank, *id.* ¶ 146, and, after receiving a response from the Dresdner Bank, submitted its final offer on May 17, 1935, *id.* ¶ 148. The contract was executed on June 14, 1935, selling the Welfenschatz for the price of 4.25 million RM. *Id.* ¶ 151. On July 18, 1935, the Welfenschatz was packed for shipping from Amsterdam, where it was housed, for delivery to Berlin, and the Dresdner Bank made the requisite payment on the following day. *Id.* ¶¶ 157-58. The payments were split, with 778,125 RM paid into a blocked account with Dresdner Bank, and 3,371,875 RM, paid to three different bank accounts in Germany. *Id.* ¶¶ 159-60. Plaintiffs agreed to accept art objects in Berlin museums to satisfy some of the purchase price. *Id.* ¶ 159. However, the objects were not selected by art dealers, as the parties had agreed to, but rather by museum officials. *Id.* The Consortium also was required to pay a 100,000 RM commission to the Berlin art dealer who served as the messenger between the Bank and the Consortium. *Id.* The Consortium used the proceeds from the sale to pay back investors who financed the 1929 purchase of the Welfenschatz. *Id.* ¶ 161.

Plaintiffs raised their claims related to the Welfenschatz before the German Advisory Commission for the Return of Cultural Property Seized as a Result of Nazi Persecution, Especially

Jewish Property ("Advisory Commission") which was established by Germany in 2003 to address Nazi-looted art claims in accordance with the Washington Conference on Holocaust Era-Assets' Principles on Nazi-Confiscated Art. *Id.* ¶¶ 15, 196-98, 205.  After hearing testimony from five experts presented by Plaintiffs, the Advisory Commission issued a non-binding recommendation that the 1935 sale at issue was not a coerced transaction and, as such, the Advisory Commission did not recommend the return of the Welfenschatz to Plaintiffs. *Id.* ¶¶ 224, 227-28.

Plaintiffs now bring the following ten claims related to the 1935 sale of Welfenschatz, which Plaintiffs' assert was made under duress, against Germany and the SPK: declaratory relief (Count I); replevin (Count II); conversion (Count III); unjust enrichment (Count IV); fraud in the inducement (Count V); breach of fiduciary duty (Count VI); breach of the covenant of good faith and fair dealing (Count VII); civil conspiracy (Count VIII); bailment (Count IX); and tortious interference (Count X).  Defendants seek dismissal of each of the claims on the grounds that: (1) Defendants are entitled to sovereign immunity on each Plaintiffs' claims; (2) Plaintiffs' claims are preempted and non-justiciable because they conflict with U.S. foreign policy; and (3) the doctrine of forum non conveniens requires that Plaintiffs' claims be resolved in Germany, rather than in this Court.

## II. LEGAL STANDARD

A court must dismiss a case when it lacks subject matter jurisdiction pursuant to Rule 12(b)(1).  In so doing, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted).  "At the motion to dismiss stage, counseled complaints, as well as *pro se* complaints, are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact."  *Settles v. U.S. Parole Comm'n*, 429

F.3d 1098, 1106 (D.C. Cir. 2005).  In spite of the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence.  *Am. Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000).  Furthermore, a court need not accept inferences drawn by the plaintiff if those inferences are not supported by the facts alleged in the complaint.  *Odhiambo v. Republic of Kenya*, 930 F. Supp. 2d 17, 22-23 (D.D.C. 2013), *aff'd* 764 F.3d 31 (D.C. Cir. 2014) (citing *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)).

## III. DISCUSSION

### A.  Sovereign Immunity

Under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-1611, "a foreign state is presumptively immune from the jurisdiction of United States courts," and "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see also* 28 U.S.C. §§ 1604-1605.  The FSIA defines the term "foreign state" to include a state's political subdivisions, agencies, and instrumentalities.  28 U.S.C. § 1603(a).  The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country."  *Nelson*, 507 U.S. at 355 (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989) (internal quotation marks omitted)).  Because "subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions . . . [a]t the threshold of every action in a district court against a foreign state . . . the court must satisfy itself that one of the exceptions applies."  *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493-94 (1983).  "In other words, U.S. courts have no power to hear a case brought against a foreign sovereign *unless* one of the exceptions applies."  *Diag Human S.E. v. Czech Republic-Ministry of Health*, 64 F. Supp. 3d 22, 30 (D.D.C. 2014),

*rev'd on other grounds* 824 F.3d 131 (D.C. Cir. 2016).  Plaintiffs assert that this Court has subject

matter jurisdiction over each of their claims against Germany and its instrumentality, the SPK,

under FSIA's expropriation exception, 28 U.S.C. § 1605(a)(3).

The FSIA's expropriation exception to foreign sovereign immunity allows a party to

proceed with a claim:

> in which rights in property taken in violation of international law are in issue and
> that property or any property exchanged for such property is present in the United
> States in connection with a commercial activity carried on in the United States by
> the foreign state; or that property or any property exchanged for such property is
> owned or operated by an agency or instrumentality of the foreign state and that
> agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3).  As such, in order to satisfy the expropriation exception, a claim must

satisfy three requirements: "(i) the claim must be one in which 'rights in property' are 'in issue';

(ii) the property in question must have been 'taken in violation of international law'; and (iii) one

of two commercial-activity nexuses with the United States must be satisfied."  *Simon v. Republic

of Hung.*, 812 F.3d 127, 140 (D.C. Cir. 2016).

The U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has

clarified that for the purposes of the analysis under this exception, the district court must examine

the relationship between the jurisdictional question and the merits determination.  *See id.* at 140-

41.  Specifically, the D.C. Circuit recognized situations in which a plaintiff raises a basic

expropriation claim, arguing that his or her property has been taken without just compensation in

violation of international law.  *Id.*  In such instances, the merits of the claim directly mirror the

jurisdictional standard, i.e., a determination as to whether the property was taken in violation of

international law.  *Id.*  When there is a complete overlap between the inquiries, "the plaintiff need

only show that its claim is 'non-frivolous' at the jurisdictional stage, and then must definitively

prove its claim in order to prevail at the merits stage."  *Id.* at 141.  However, in other situations, a

plaintiff may seek recovery based on "garden-variety common-law causes of action such as conversion, unjust enrichment, and restitution," and plead a violation of international laws to give rise to jurisdiction but not to establish liability on the merits.  *Id.*  In those situations, the court requires more than a mere non-frivolous argument to satisfy the jurisdictional standard.  *Id.*

The parties dispute which standard the Court should apply in this case.  Plaintiffs assert that they need only advance a non-frivolous argument because the alleged coerced sale of the Welfenschatz is a taking in violation of international law.  Defendants argue that Plaintiffs raise common-law causes of action in which there is not a complete overlap between the jurisdictional issue and the merits of the claims.  The Court agrees with Defendants that the merits of Plaintiffs' common law claims do not mirror the jurisdictional standard because in order for this Court to have jurisdiction, Plaintiffs must demonstrate that the takings were in violation of *international law*, a showing that is not required in order to succeed on the merits of their claims.  *See de Csepel v. Republic of Hung.* (*de Csepel III*), 169 F. Supp. 3d 143, 157 (D.D.C. 2016) (finding that the plaintiffs' claims did not directly mirror the expropriation jurisdictional standard because plaintiffs relied on a violation of international law exclusively for jurisdictional purposes and not to establish liability on the merits).  As such, the Court shall require that Plaintiffs advance more than a mere non-frivolous argument with respect to Plaintiffs' assertion that a taking in violation of international law is at issue.

Bearing this in mind, the Court now turns to the issue of whether the FSIA's expropriation exception gives rise to subject matter jurisdiction in this Court over Plaintiffs' ten claims.[6]  The Court shall address each of the requirements of the expropriation exception in turn.

---

[6] In their initial motion, Defendants appear to contend that Plaintiffs only advanced their unjust enrichment claim (Count IV) under the FSIA's commercial activity exception and not under the expropriation exception.  Defs.' Mot. at 9.  However, the Complaint indicates that Plaintiffs

1. <u>Rights in Property</u>

Defendants argue that the Court should dismiss the following five claims because they do not directly implicate property interests or rights to possession of property: fraud in the inducement (Count V); breach of fiduciary duty (Count VI); breach of the covenant of good faith and fair dealing (Count VII); civil conspiracy (Count VIII); and tortious interference (Count X).  Instead, Defendants assert these five claims to "seek damages for allegedly wrongful conduct and are not property claims concerning the rightful ownership or possession of the Welfenschatz."  Defs.' Mot. at 12.  Indeed, this Court is required to "make FSIA immunity determinations on a claim-by-claim basis."  *Simon*, 812 F.3d at 141.  In order to meet the requirements of the expropriation exception, each claim must "'directly implicat[e] property interests or rights to possession,' . . . , thus satisfying the 'rights in property . . . in issue' requirement of § 1605(a)(3)."  *Id.* at 142.

Despite Defendants setting forth this argument in a separate subsection of their motion, *see* Defs.' Mot. at 11-12, Plaintiffs did not directly respond to this argument in their opposition, *see generally* Pls.' Opp'n at 22-39.  Defendants in a separate section of their reply brief request that the Court find Plaintiffs conceded this argument by failing to respond in their opposition.  Defs.' Reply at 4-5.  Plaintiffs have not sought leave to file a surreply or otherwise respond to this argument.  Here, Plaintiffs have only alleged that this Court has jurisdiction over the five claims at issue based on the FSIA's expropriation exception.  As such, the Court shall treat Defendants' argument as conceded and dismiss these five claims on the basis that this Court lacks subject matter jurisdiction over these claims.  *See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F.

---

rely on the expropriation exception as a basis for proceeding with their claims, but also rely on the commercial activity exception only for their unjust enrichment claim.  *See* Compl. ¶¶ 25, 28. Plaintiffs clarified this point in their opposition, noting "the expropriation exception provides jurisdiction over *all* of the Plaintiffs' claims," which necessarily includes their unjust enrichment claim.  Pls.' Opp'n at 39 (emphasis added).

Supp. 2d 174, 178 (D.D.C. 2002) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."); *Achagzai v. Broad. Bd. of Governors*, 109 F. Supp. 3d 67, 70 n.2 (D.D.C. 2015) (points not disputed in opposition to motion to dismiss conceded) (citing *Hopkins*, 238 F. Supp. 2d at 178); *Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 82 n.7 (D.D.C. 2004) (applying this principle to arguments regarding the grounds for jurisdiction).

2.   Taking in Violation of International Law

Defendants next contend that Plaintiffs failed to sufficiently plead that the Welfenschatz was taken in violation of international law. Here, Plaintiffs allege that the 1935 sale was made under duress as part of the Nazi's systematic organized plunder of Jewish property in furtherance of the genocide of the Jewish people during that time. For the reasons described herein, the Court finds that Plaintiffs sufficiently pled the taking of the Welfenschatz was part of the genocide of the Jewish people during the Holocaust and, accordingly, violated international law.

The D.C. Circuit has recognized that takings may fall within the expropriation exception when "the takings of property described in the complaint bear a sufficient connection to genocide that they amount to takings 'in violation of international law.'" *Simon*, 812 F.3d at 142. In such situations, the expropriations themselves constitute genocide and genocide itself is a clear violation of international law. *Id.* As the D.C. Circuit recognized, the generally accepted definition of genocide for the purposes of customary international law is as follows:

> [A]ny of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:
>
> (a) Killing members of the group;

(b) Causing serious bodily or mental harm to members of the group; [or]

(c) *Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part . . .*

*Id.* at 143 (quoting Convention on the Prevention and Punishment of the Crime of Genocide (Genocide Convention), art. 2, Dec. 9, 1948, 78 U.N.T.S. 277 (emphasis added)).

In *Simon v. Republic of Hungary*, the D.C. Circuit considered claims arising out of actions carried out against Hungary's Jewish population starting in 1941 with a systematic campaign of discrimination culminating in the implementation of policies calling for the total destruction of that population by Hungary's fanatically anti-Semitic Prime Minister Döme Sztójay between 1944 and 1945. *Id.* at 133. As the D.C. Circuit noted, the complaint in that case detailed the persecution, property confiscation and ghettoization, and transport and murder in death camps of the Hungarian Jewish population during this time period. *Id.* at 133-34. The claims brought by Jewish survivors of the Hungarian Holocaust against the Republic of Hungary, a state-owned Hungarian railway, and an Austrian rail-freight company alleged that Hungary collaborated with the Nazis to exterminate Hungarian Jews and expropriate their property and that the railway defendants played an integral role in these efforts by transporting Hungarian Jews to death camps and confiscating their property. *Id.*

The D.C. Circuit applied the allegations in that case to the definition of genocide set forth above and found that the complaint sufficiently alleged takings of property intended to "[d]eliberately inflict[ ] on the group conditions of life calculated to bring about its physical destruction in whole or in part to bring about its physical destruction." *Id.* at 143 (quoting Genocide Convention, art. 2(c)). Specifically, the D.C. Circuit explained:

The Holocaust's pattern of expropriation and ghettoization entailed more than just moving Hungarian Jews to inferior, concentrated living quarters, or seizing their

property to finance Hungary's war effort. Those sorts of actions would not alone amount to genocide because of the absence of an intent to destroy a people. The systematic, "wholesale plunder of Jewish property" at issue here, however, aimed to deprive Hungarian Jews of the resources needed to survive as a people. Expropriations undertaken for the purpose of bringing about a protected group's physical destruction qualify as genocide.

*Id.* (internal citation omitted).   The D.C. Circuit found the allegations in the complaint to be sufficient under the FSIA's expropriation exception because "the complaint describe[d] takings of property that are *themselves* genocide within the legal definition of the term" and, as such, takings in violation of international law.  *Id.* at 144.

The Court finds that, like in *Simon*, the taking of the Welfenschatz as alleged in the complaint bears a sufficient connection to genocide such that the alleged coerced sale may amount to a taking in violation of international law.  Plaintiffs sufficiently pled that they were targeted because they were Jewish sellers in possession of property that was of particular interest to the Nazi regime. The complaint further includes sufficient allegations that the taking of this property was in furtherance of the genocide of the Jewish people during the Holocaust.  Indeed, in addition to the allegations highlighted in the background section of this opinion surrounding the 1935 transaction, Plaintiffs describe the hostile environment for Jews in Germany following Adolf Hitler's ascension to power in 1933.  Compl. ¶¶ 44-65.  Plaintiffs allege that members of the Consortium were particularly vulnerable to persecution because of their ownership of the Welfenschatz and because of their prominence and success.  *Id.* ¶ 67.  Specifically, Plaintiffs assert that the Geheime Staatspolizei ("the Gestapo") opened files on members of the Consortium, *id.*, and that the members of the Consortium were subject to direct threats of violence for being Jewish and for trying to sell the Welfenschatz, *id.* ¶ 10.  With this context in mind, the Court finds that Plaintiffs have sufficiently alleged a taking in violation of international law to satisfy the FSIA's expropriation exception.

In the interest of completeness, the Court shall address Defendants' arguments that the facts at issue in this case are distinguishable from those in *Simon*.  First, Defendants point to the subject of the alleged taking.  Here, Defendants assert that the Consortium's 1929 purchase of the Welfenschatz was a business investment because the Consortium planned to flip it for a profit and, as such, the Welfenschatz was not "property indispensable for individual survival."  Defs.' Mot. at 22.  Second, Defendants point to the nature of the transaction.  Defendants assert that Plaintiffs merely allege a forced sale for less than market value and not the outright plunder of the Welfenschatz.  *Id.*  The Court is not persuaded by these arguments.

First, the Court finds that expropriating property that Plaintiffs planned to sell for a profit falls within the definition of genocide that includes deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part.  Plaintiffs alleged that the coerced sale of the Welfenschatz was accomplished to deprive the Consortium of their ability to earn a living and the motivation for the taking was to deprive the Consortium of resources needed to survive as a people in furtherance of the genocide of the German Jews during the Holocaust.  *C.f. de Csepel III*, 169 F. Supp. 3d at 163-64 (noting that the confiscation of artwork during the Holocaust in furtherance of the Nazis' campaign of genocide satisfies the elements of the expropriation exception as recognized by the D.C. Circuit in *Simon*).  Indeed, Plaintiffs allege that they were specifically targeted because they were Jewish.  Further, the fact that there was money exchanged for the Welfenschatz does not undermine Plaintiffs' assertion that this was a sham transaction meant to deprive them of their property as part of the genocide that occurred during the Holocaust.  As another judge in this district noted, "the legislative history of the FSIA makes clear that the phrase 'taken in violation of international law' refers to 'the nationalization or expropriation of property without payment of the *prompt, adequate, and effective compensation*

*required by international law*." *Id.* at 166 (quoting H.R. Rep. No. 91-1487, at 19 (emphasis added)).  As such, Plaintiffs' allegations that the 1935 sale was coerced without adequate and effective compensation meets the requirements of the expropriation exception of the FSIA.

Finally, Defendants advance an argument that the takings at issue in this case cannot be one made in violation of *international* law because Plaintiffs merely argue that Germany expropriated property of its own nationals.  Defs.' Mot. at 13.  In such instances, Defendants contend that purely domestic taking cannot fall within the expropriation exception and the "domestic takings" rule as set forth in the Restatement (Third) of Foreign Relations § 712(1) bars such actions from proceeding in this Court.  *Id.* at 13-14.  As the D.C. Circuit explained, "[t]he domestic takings rule means that, as a general matter, a plaintiff bringing an expropriation claim involving an intrastate taking cannot establish jurisdiction under the FSIA's expropriation exception because the taking does not violate international law."  *Simon*, 812 F.3d at 144-45. However, in *Simon*, the D.C. Circuit expressly rejected the application of the domestic takings rule in the context of intrastate genocidal takings.  *Id.* at 145.  Rather, the D.C. Circuit, tracing the development of international human rights law, noted that in those circumstances the relevant international law violation for jurisdictional purposes under the expropriation exception is genocide, including genocide perpetuated by a foreign state against its own nationals.  *Id.* at 145-46.  In light of the D.C. Circuit's holding in *Simon*, the Court rejects Defendants' argument that the domestic takings rule precludes the application of the FSIA's expropriation exception in these circumstances.  In sum, the Court finds Plaintiffs have set forth allegations sufficient to establish a takings in violation of international law at the motion to dismiss stage based on this record.

3. <u>Commercial Activity Nexus</u>

Defendants next allege that Plaintiffs have failed to adequately plead a commercial activity nexus with respect to Germany.  Defendants concede that Plaintiffs have adequately pled a commercial-activity nexus as to the SPK, an instrumentality of Germany.[7]  Defs.' Mot. at 23.  The FSIA provides two avenues for establishing jurisdiction under the expropriation exception, one that addresses the commercial activity requirements for a foreign state, like Germany, and one that addresses the requirements for an instrumentality of a foreign state, like the SPK.  As discussed above, the Court finds that the parties sufficiently pled that the rights in property taken in violation of international law are at issue.  The statute provides that a foreign state, like Germany, is not immune from a suit when: "that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; *or* that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States . . . ." 18 U.S.C. § 1605(a)(3) (emphasis added).

The crux of the issue before the Court is whether Plaintiffs must satisfy both clauses, the first to proceed against Germany and the second to proceed against its instrumentality SPK, or whether the two clauses present alternative requirements and, as such, Plaintiffs need to only satisfy one requirement to proceed.  If Plaintiffs are only required to satisfy one clause, they would

---

[7] With respect to the SPK, Plaintiffs must show "that [the Welfenschatz] or any property exchanged for [the Welfenschatz] is owned or operated by [the SPK] and that [the SPK] is engaged in a commercial activity in the United States." *See* 28 U.S.C. § 1605(a)(3).  As the FSIA explains: "A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* § 1603(d).

not need to make any additional showing since Defendants concede that Plaintiffs have satisfied the commercial-activity nexus requirement with respect to the SPK.[8]

The parties point to two D.C. Circuit opinions that seem to suggest different requirements. In *Agudas Chasidei Chabad v. Russian Federation*, 528 F.3d 934 (D.C. Cir. 2008), the D.C. Circuit noted that the two clauses "specify[ ] alternative commercial activity requirements."[9]  *Id.* at 946; *see also id.* at 948 (finding the "second alternative commercial activity requirement" was clearly satisfied).  The use of the word "or" to separate the two clauses in the statute would seem to support this reading.  However, in *Simon*, the D.C. Circuit recognized that "the nexus requirement differs somewhat for claims against the foreign state itself [like Germany] . . . as compared with claims against an agency or instrumentality of a foreign state [like the SPK] . . . ."  *Simon*, 812 F.3d at 146.  As the *Simon* court explained:

> As to the claims against [a foreign state], the question is whether the 'property [in issue] or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state.' As to the claims against [an instrumentality], the question is whether the 'property [in issue] or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.'

---

[8] Plaintiffs' briefing seems to conflate the analysis under the two separate clauses and does not separately analyze the requirements for a foreign state and an instrumentality.  *See* Pls.' Opp'n at 35-39.

[9] In *Chabad*, the D.C. Circuit parsed the language of the expropriation exception as follows:

> [A] rights in property taken in violation of international law are in issue and [B] [1] that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or [2] that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States . . . .

*Chabad*, 528 F.3d at 946-47.

*Id.* (internal citations omitted).  As such, *Simon* suggests that to proceed on claims against a foreign state like Germany, Plaintiffs must meet the requirements of the first clause and to proceed on claims against an instrumentality such as the SPK, Plaintiffs must meet the requirements of the second clause.

The Court is persuaded by the analysis of District Judge Christopher R. Cooper with respect to this issue in *Helmerich & Payne International Drilling Co. v. Bolivarian Republic of Venezuela*, 185 F. Supp. 3d 233, 239-42 (D.D.C. 2016).  In *Helmerich*, Judge Cooper raised several important points: (1) *Simon* did not ignore or distinguish *Chabad*, but instead appeared to apply it; (2) the D.C. Circuit denied the request for a rehearing on this issue in *Simon*; (3) to follow *Chabad* would require deviating from *Simon*'s directive that to proceed against a foreign state, the first commercial-nexus requirement must be met (as is the case here); and (4) this issue was not argued or briefed in *Chabad* or *Simon*.  *Id.* at 241-42.  However, as Judge Cooper noted, while the Court seems bound by the precedent in *Chabad*, "the D.C. Circuit's clear articulation of a contrary rule in *Simon* and its implicit view that the new rule is consistent with—and perhaps even based on—*Chabad* places the Court in somewhat of a quandary."  *Id.* at 242.  Ultimately, Judge Cooper deferred ruling on the issue without further briefing.  At this juncture, the Court deems it appropriate to follow the D.C. Circuit's ruling in *Chabad* and allow the claims against Germany to proceed because it is uncontested that Plaintiffs have sufficiently pled the second requirement of the commercial-activity nexus.[10]  However, the parties are not precluded from raising this issue at a later juncture with more fulsome briefing.

---

[10] Plaintiffs pled that the Welfenschatz is featured in books and guidebooks produced by the SPK that are for sale in the United States, and that Germany engages in painting and exhibition loans with museums in the United States.  *See generally* Compl. ¶ 26.

In sum, the Court finds that it has subject matter jurisdiction over five of Plaintiffs' ten claims pursuant to the expropriation exception of the FSIA. As such, the Court shall deny Defendants' request to dismiss the following claims on that basis: declaratory relief (Count I); replevin (Count II); conversion (Count III); unjust enrichment (Count IV); and bailment (Count IX). Further, the Court finds that it does not have subject matter jurisdiction over the following five claims because these claims do not directly implicate property interests or rights to possession: fraud in the inducement (Count V); breach of fiduciary duty (Count VI); breach of the covenant of good faith and fair dealing (Count VII); civil conspiracy (Count VIII); and tortious interference (Count X). Accordingly, the Court shall dismiss only those five claims as Plaintiffs have not demonstrated that those claims fall within one of the FSIA's exceptions that would give rise to this Court's jurisdiction over a foreign state and its instrumentality.

## B.  Preemption and Non-Justiciability

Defendants next argue that the Court should dismiss Plaintiffs' claims because they are preempted and because they run afoul of international comity. Specifically, Defendants assert that U.S. foreign policy encourages parties to pursue their claims related to Nazi-looted art through dispute resolution mechanisms established under the multinational Washington Conference Principles on Nazi-Confiscated Art. In this instance, Defendants argue that Plaintiffs' claims in this Court are preempted because they already have been adjudicated through Germany's Advisory Commission, which was created to hear such claims under the Washington Principles, and the Commission determined that there was not a compulsory sale of the Welfenschatz due to persecution. Defendants also allege that international comity requires the Court to defer to the decision of the Advisory Commission or, in the alternative, require Plaintiffs to first litigate their

claims in Germany.  The Court shall first address Defendants' preemption arguments and then shall turn to Defendants' arguments concerning international comity.

       1.  <u>Preemption</u>

Defendants assert that modern U.S. policy towards recovered art reflects the preference that claims be decided through alternative dispute resolution mechanisms like Germany's Advisory Commission.  The Court shall first provide a brief history of the developments in U.S. foreign policy that Defendants argue support their position that Plaintiffs' claims are preempted by the decision of Germany's Advisory Commission.  The Court shall then address the substance of Defendants' preemption argument.

The United States convened the Washington Conference on Holocaust Era Assets in 1998 to develop an equitable approach to Nazi-looted art given some of the inadequacies that previously existed in the processes for dealing with such claims.  *See* Defs.' Mot. at 32; Compl. ¶ 196.  To that end, the Washington Conference agreed upon a set of non-binding principles to "expeditiously . . . achieve a just and fair solution" to claims of Nazi-confiscated art.  Defs.' Mot. at 32 (quoting *Von Saher v. Norton Simon Museum of Art*, 754 F.3d 712, 721 (9th Cir. 2014)).  "[T]he Principles [also] encouraged nations 'to develop national processes to implement these principles,' including alternative dispute resolution."  *Von Saher*, 754 F.3d at 721.  Defendants also point to the Terezin Declaration issued after the Prague Holocaust Era Assets Conference, in 2009, which was a follow-up to the Washington Conference.  Compl. ¶¶ 201-02.  The Terezin Declaration reaffirmed the Washington Principles and noted "Governments should consider all relevant issues when applying various legal provisions that may impede the restitution of art and cultural property, in order to achieve just and fair solutions, as well as alternative dispute resolution, where appropriate under law."  *Id.* ¶ 202.  Defendants' position is that the Washington Principles and the Terezin

Declaration clearly demonstrate a preference for the resolution of claims related to Nazi-looted art through mediation rather than litigation, and encourage use of alternative dispute resolution mechanisms. Defs.' Mot. at 33, 40. The Court notes that although the proceedings before the Advisory Commission are a form of alternative dispute resolution, they do not constitute a mediation as it is known. Moreover, Defendants argue that the State Department's position is to defer to other nations' alternative dispute resolution proceedings under the Washington Principles. *Id.* at 33-35 (citing an amicus brief filed before the Supreme Court of the United States and a press statement issued by then-Secretary of State Hillary Rodham Clinton).

The parties point to the following summary of U.S. policy on restitution of Nazi-looted art as described by the United States Court of Appeals for the Ninth Circuit:

> (1) a commitment to respect the finality of "appropriate actions" taken by foreign nations to facilitate the internal restitution of plundered art; (2) a pledge to identify Nazi-looted art that has not been restituted and to publicize those artworks in order to facilitate the identification of prewar owners and their heirs; (3) the encouragement of prewar owners and their heirs to come forward and claim art that has not been restituted; (4) concerted efforts to achieve expeditious, just and fair outcomes when heirs claim ownership to looted art; (5) the encouragement of everyone, including public and private institutions, to follow the Washington Principles; and (6) a recommendation that every effort be made to remedy the consequences of forced sales.

*Von Saher*, 754 F.3d at 721. As Plaintiffs correctly point out, this language does not preclude seeking resolution of their claims through litigation, especially where, as here, Plaintiffs sought a remedy through the procedures put in place in Germany in accordance with the Washington Principles.[11]

---

[11] Defendants' preemption challenge centers around U.S. foreign policy as expressed by the Executive Branch to date and, as such, that is the focus the Court's discussion. However, the position of Congress appears consistent with the position of the Executive Branch as to the resolution of claims related to Nazi-looted art. Indeed, the Holocaust Expropriated Art Recovery Act of 2016, H.R. 6130, Pub. L. No. 114-308 ("HEAR Act"), which was signed into law on December 16, 2016, reflected Congress' preference that disputes such as the one at issue here be

In 2003, Germany created the Advisory Commission in light of the Washington Principles and after the German Federal Government, the German Länder, and the German National Associations of Local Authorities issued a Joint Declaration related to tracing and returning Nazi-looted art. Defs.' Mot. at 35-36. In 2012, Plaintiffs submitted their claim regarding the Welfenschatz to the Commission. *Id.* at 36; Compl. ¶ 220. After hearing the evidence including testimony from five experts presented by Plaintiffs, the Commission did not recommend the restitution of the Welfenschatz. Compl. ¶¶ 221, 224. Defendant chose not to present evidence to the contrary. *Id.* ¶ 223. It is undisputed by the parties that the Commission's recommendation is non-binding and Defendants would not have been required to return the Welfenschatz even if that had been the Commission's recommendation. Compl. ¶ 235; Defs.' Mot. at 39 n.16; Defs.' Reply at 15 n.7. Defendants now argue that Plaintiffs' state law claims are preempted because allowing these claims to proceed in this Court would undercut U.S. foreign policy on Nazi-looted art.

Defendants primarily rely on the Supreme Court of the United States' opinion in *American Insurance Association v. Garamendi*, 539 U.S. 396 (2003), and the United States District Court for the Southern District of New York's application of that opinion in *In re Assicurazioni Generali*

---

resolved by alternative dispute resolution processes but did not preclude the possibility of litigating such claims. In relevant part, the HEAR Act includes the following Congressional finding:

> *While litigation may be used to resolve claims to recover Nazi-confiscated art*, it is the sense of Congress that the private resolution of claims by parties involved, on the merits and through the use of alternative dispute resolution such as mediation panels established for this purpose with the aid of experts in provenance research and history, will yield just and fair resolutions in a more efficient and predictable manner.

HEAR Act § 2(8) (emphasis added). It is clear from the text of the HEAR Act that Congress specifically recognized and did not foreclose the use of litigation as a means to resolve claims to recover Nazi-confiscated art. As such, the Court agrees with Plaintiffs that the HEAR Act supports their argument that U.S. policy does not conflict with Plaintiffs' ability to pursue their claims in this Court.

*S.P.A. Holocaust Ins. Litig.*, 340 F. Supp. 2d 494 (S.D.N.Y. 2004), *aff'd*, 592 F.3d 113 (2d Cir. 2010), *cert. denied*, 562 U.S. 952 (2010), in support of their argument. For the reasons described herein, this Court is not persuaded that these cases support Defendants' preemption argument.

In *Garamendi*, the Supreme Court addressed the issue of claims-based on insurance policies issued to Jews before and during World War II, the proceeds of which were either paid to the Third Reich or never paid at all. *Garamendi*, 539 U.S. at 402-03. At issue were two procedures put in place to address such claims, one based on an agreement between the President of the United States and the German Chancellor and one enacted by the state of California. The Court shall briefly address each in turn as such background is relevant in distinguishing the issue in that case from the one in the instant action.

After multiple class-action lawsuits seeking restitution for such insurance claims poured into the United States, negotiations between the German Chancellor and the President of the United States produced an executive agreement through which Germany agreed to enact legislation to create a foundation funded by a voluntary compensation fund contributed to equally by the German Government and German companies. *Id.* at 405. In exchange, the United States agreed to file a notice in all related cases brought in U.S. courts indicating that it was the U.S. Government's position that foreign policy interests support the foundation as the exclusive forum and remedy for resolution of all such claims. *Id.* at 406. Further, the United States agreed to use its "best efforts" to get state and local governments to respect the foundation as the exclusive mechanism for resolving these claims. *Id.* With respect to insurance claims, the countries agreed that the foundation would work with the International Commission on Holocaust Era Insurance Claims (ICHEIC), which negotiated with European insurers to get information on unpaid policies issued to Holocaust victims and worked to settle claims under those identified policies. *Id.* at 406-07.

Germany stipulated that insurance claims within the scope of the handling procedures adopted by the ICHEIC against German companies *shall* be processed based on procedures of the ICHEIC and any additional procedures agreed to by the foundation, the ICHEIC, and the German Insurances Association. *Id.* at 407.

Meanwhile, California enacted a state statute making it an unfair business practice for insurers operating in California to fail to pay any valid claim from a Holocaust survivor and enacted a subsequent statute that allowed California residents to sue in state court on insurance claims based on acts perpetrated during the Holocaust. *Id.* at 409. At issue in *Garamendi* was a portion of the state statute that required all insurers currently doing business in California to disclose the details of insurance policies issued to persons in Europe which were in effect between 1920 and 1945. *Id.* The California legislation specifically acknowledged that while the international Jewish community was in active negotiations to resolve all outstanding claims through the ICHEIC, it still deemed the state legislation necessary to protect the claims of California residents. *Id.* at 410-11. In response to the enactment of the California legislation, Deputy Secretary of the Treasury Stuart Eizenstat wrote both to the insurance commissioner and the governor of California to express concern regarding the California statute, and noting that such actions by the state government threatened to damage the ICHEIC and related diplomatic relations with Germany. *Id.* at 411.

Several American and European insurance companies and a national trade association filed suit against the insurance commissioner of California to challenge the constitutionality of the state statute. *Id.* at 412. The Supreme Court recognized that "at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the

Constitution's allocation of the foreign relations power to the National Government in the first place." *Id.* at 413. The Court also noted that generally there is executive authority to determine the policy of the United States government in foreign affairs. *Id.* at 414. The Supreme Court acknowledged, "At a more specific level, our cases have recognized that the President has authority to make 'executive agreements' with other countries, requiring no ratification by the Senate or approval by Congress, this power having been exercised since the early years of the Republic." *Id.* at 415. While the Supreme Court noted that the text of the executive agreement at issue did not have a preemption clause, the Court nevertheless found that the state statute was in clear conflict with the federal policy and, as such, was preempted. *Id.* at 420-25. The Supreme Court specifically found that with respect to insurance claims, the national opinion as expressed in the executive agreements signed by the President has been to encourage European insurers to work with the ICHEIC to develop claim procedures, a position that was repeatedly supported by high levels of the Executive Branch. *Id.* at 421-22.

In *Assicurazioni Generali,* the U.S. District Court for the Southern District of New York applied *Garamendi* to claims brought against an Italian insurer based on policies in Europe before and during World War II under several state statutes and common law, as well as customary international law. There, the district court dismissed the plaintiffs' claims finding that pursuant to the Supreme Court's holding in *Garamendi*, "[l]itigation of Holocaust-era insurance claims, no matter the particular source of law under which the claims arise, necessarily conflicts with the executive policy favoring voluntary resolution of such claims through ICHEIC." *Assicurazioni Generali*, 340 F. Supp. 2d at 501.

The Court finds the reasoning in *Garamendi* to be inapplicable to the facts of the instant action for a number of reasons. First, *Garamendi* dealt with the applicability of a state statute

26

setting forth a process for addressing claims that already were covered by a process set forth in an executive agreement signed by the President of the United States. Defendants appear to assert that this action brings claims akin to actions brought under a state statute because Plaintiffs advance claims rooted in common law even though those claims are brought in federal court under an exception to the FSIA. While the issue of preemption was not directly addressed, the Court notes that in *Simon*, the D.C. Circuit permitted common law property-based claims, like the ones here, to proceed against a foreign state pursuant to the FSIA's expropriation exception.

Second, there does not appear to be a direct conflict between the property-based common law claims raised by Plaintiffs and foreign policy as expressed by the President. Indeed, in *Garamendi*, the executive agreement at issue clearly contemplated the U.S. Government taking active steps to declare its view that U.S. foreign policy interests supported the notion that the ICHEIC should be the exclusive mechanism for resolution of these types of insurance-related claims. Specifically, the U.S. Government agreed to submit a statement in cases in which a German company was sued on a Holocaust-era claim in an American court. Second, recognizing that the filing of such statements may not provide an American court with an independent basis for dismissal, the U.S. Government agreed to tell courts that U.S. policy grounds favor dismissal on any valid legal ground. Further, the U.S. Government "promised to use its 'best efforts, in a manner it considers appropriate,' to get state and local governments to respect the foundation as the exclusive mechanism." *Garamendi*, 539 U.S. at 406.

The U.S. Government made no such assurances that it would submit statements expressing its view that U.S. foreign policy supports all claims related to Nazi-looted art being resolved through alternative dispute mechanisms when such claims are pursued in American courts. Further, Defendants do not point to any statements made by the Executive Branch that such

alternative dispute mechanisms set up in accordance with the Washington Principles should be the *exclusive* mechanism for resolving such claims.  Rather, the statements of U.S. foreign policy related to such claims demonstrate only that this is the *preferred* mechanism for addressing such claims.  The United States acknowledged this point in an amicus brief filed in the Supreme Court and cited by the Defendants in their briefing.  Brief for the United States as Amicus Curiae, *Von Saher v. Norton Simon Museum of Art*, No. 09-1254 (U.S. May 27, 2011), 2011 WL 2134984, at *15, *cert. denied*, 564 U.S. 1037 ("Unlike in *Garamendi*, the United States has not entered into Executive Agreements with foreign governments to resolve contemporary claims for Holocaust art, and it has supported the just and equitable resolution of claims from that era.").

This is a logical distinction.  The *Garamendi* Court tackled an executive agreement that established the formation of the ICHEIC, procedures for identifying and processing claims through same, and a system for funding the recovery of such claims.  This is not the type of comprehensive scheme contemplated by the Washington Principles and the Terezin Declaration.  Rather, the Washington Principles were agreed-upon, non-binding principles entered into by 13 nongovernmental organizations and 44 governments that encouraged nations to develop national processes, including alternative dispute resolution processes, to implement these principles.  As such, the executive agreement itself did not establish such processes but only provided guidance for doing so to the stakeholders.[12]

---

[12] The Court notes that while Defendants in the instant action have not pointed to a direct statement made by the President, it may be sufficient that such statements were made by high-level executive officials.  Indeed, the majority in *Garamendi* noted:

> The dissent would also dismiss the other Executive Branch expressions of the Government's policy, insisting on nothing short of a formal statement by the President himself. But there is no suggestion that these high-level executive officials were not faithfully representing the President's chosen policy, and there is

Third, Plaintiffs rely on an amicus brief filed by the United States in a case before the Supreme Court in which the Supreme Court ultimately denied certiorari. *See generally* Brief for the United States as Amicus Curiae, *Von Saher*, No. 09-1254 (U.S. May 27, 2011), 2011 WL 2134984. In that case, the United States advanced its view that:

> [I]t is United States policy to support both the just and fair resolution of claims to Nazi-confiscated art on the merits and the return of such art to its rightful owner. But that policy does not support relitigation of all art claims in U.S. courts. Neither the Washington Principles nor the Terezin Declaration takes an explicit position in favor of or against the litigation of claims to Nazi-confiscated art. Rather, they encourage resort to alternative dispute resolution, so that such claims may be resolved as justly, fairly, and expeditiously as possible.

*Id.* at *18. The United States went on to explain: "When a foreign nation . . . has conducted bona fide post-war internal restitution proceedings following the return of Nazi-confiscated art to that nation under the external restitution policy, the United States has a substantial interest in respecting the outcome of that nation's proceedings." *Id.* at *19. As such, the United States' own statement of its foreign policy undercuts Defendants' request for dismissal. Indeed, the United States notes that neither the Washington Principles nor the Terezin Declaration explicitly take a position regarding the litigation of Nazi-confiscated art claims. Further, the United States does acknowledge a "substantial interest" in respecting the outcome of a nation's "bona fide post-war internal restitution proceedings." However, here, Plaintiffs have sufficiently pled that the Advisory Commission proceedings were not bona fide proceedings but rather specifically allege that it was a "sham process" that was conducted inconsistently with "internationally accepted principles and precedents (among others)," Compl. ¶ 221, and resulting in a "politically-motivated

---

no apparent reason for adopting the dissent's "nondelegation" rule to apply within the Executive Branch.

*Garamendi*, 539 U.S. at 424 n.13 (internal citations omitted).

decision," *id.* ¶ 222, that failed to address Plaintiffs' uncontested expert testimony, *id.* ¶ 227-28. At the motion to dismiss stage, the Court finds such allegations sufficient to allow the claims to proceed as U.S. foreign policy supports the just and fair resolution of claims to Nazi-confiscated art.

### 2.   Non-justiciability

Defendants also contend that Plaintiffs' claims are non-justiciable due to international comity and, as such, should be dismissed.   Here, Defendants argue that international comity requires that the Court defer to the Advisory Commission or, in the alternative, requires that Plaintiffs exhaust their remedies in Germany.   The Court shall first address Defendants' argument that international comity requires this Court to defer to the decision of the Advisory Commission. The Court shall then address Defendants' argument that international comity requires Plaintiffs to exhaust their remedies in Germany before proceeding in this Court.

The term "'[c]omity' summarizes in a brief word a complex and elusive concept—the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum."   *de Csepel v. Republic of Hung.* (*de Csepel II*), 714 F.3d 591, 606 (D.C. Cir. 2013) (quoting *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984)).   The D.C. Circuit explained that "'the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh' based 'upon the mere assertion of the party that the judgment was erroneous in law or in fact," *id.*, provided:

> there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect . . . .

*Id.* (quoting *Hilton v. Guyot*, 159 U.S. 113, 202-03 (1895)).

Defendants first assert that international comity requires the Court to defer to the decision of the Advisory Commission.  In essence, Defendants' argument appears to be either that the Advisory Commission's decision is unreviewable or that Plaintiffs have failed to sufficiently plead a basis for reviewing the Commission's decision.  Defendants have pointed to no authority that would preclude judicial review of a decision made by a commission set up in accordance with the non-binding, agreed upon Washington Principles, particularly in light of Plaintiffs' uncontested assertion that the parties are not bound by the Commission's decision even if it recommends the return of the property at issue.  Here, Plaintiffs allege that the Commission's decision was not supported by the uncontested evidence presented by Plaintiffs and that the proceeding itself was a "sham."  Compl. ¶¶ 3, 224-25.  Indeed, Plaintiffs claim that:

> [T]he Advisory Commission heard from five experts who established the context surrounding the sale at issue by showing (i) the actual market value of the collection in 1935; 11.6 Million RM; (ii) the law applicable to the sale; (iii) the historical background which supports the claim that the sale in issue was coercive and made under duress—and certainly cannot be characterized as one governed by free will and free choice in an open market; and (iv) the art dealers were the sole owners of the collection.

*Id.* ¶ 224.  Further, Plaintiffs contend that the Commission did not incorporate these uncontested findings into their recommendation and argue that "[i]gnoring the experts entirely in an otherwise detailed opinion undermines the credibility of the report by the Advisory Commission."  *Id.* ¶¶ 227-28.  The Court finds that these allegations along with the other allegations in the complaint are sufficient to provide a plausible basis for review.  In reaching this holding, the Court simply finds that Plaintiffs' allegations as set forth in the complaint are sufficient to survive a motion to dismiss on this issue.  However, the Court expresses no other opinion regarding the validity or prudence of the Commission's decision related the Welfenschatz.

Defendants next assert that Plaintiffs are required to exhaust their remedies in Germany before bringing an action in this Court. The issue of whether international comity requires a plaintiff to exhaust remedies in a foreign state prior to bringing an action under an exception to the FSIA has not been squarely addressed by the D.C. Circuit. However, the United States Court of Appeals for the Seventh Circuit ("Seventh Circuit") expressly tackled the issue in *Fischer v. Magyar Allamvasutak Zrt*, 777 F.3d 847 (7th Cir. 2015), *cert. denied*, -- U.S. --, 135 S. Ct. 2817 (2015). In *Fischer*, the Seventh Circuit recognized that the text of the FSIA's expropriation exception does not include an exhaustion requirement. *Id.* at 859. However, the Seventh Circuit held that the defendants could invoke "the well-established rule that exhaustion of domestic remedies is preferred in international law as a matter of comity." *Id.* As such, the *Fischer* court required plaintiffs "to show either that they exhausted any available . . . remedies [in the foreign state] or that there was a legally compelling reason to excuse such an effort." *Id.* In reaching this holding, the *Fischer* court relied primarily on an earlier Seventh Circuit opinion in *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661 (7th Cir. 2012), and §§ 712 and 713 of the Restatement (Third) of the Foreign Relations Law of the United States.

Given that the Seventh Circuit did not rely on any binding precedent in this jurisdiction, the Court next turns to precedent from the D.C. Circuit. In *Chabad*, the D.C. Circuit addressed a district court's holding that a plaintiff was not required to exhaust remedies in Russia before litigating the case in the United States. *Chabad*, 528 F.3d at 948. The D.C. Circuit opined this result was "likely correct," but found that the issue need not be reached on appeal because Russia identified plainly inadequate remedies. *Id.* Specifically, the D.C. Circuit noted that a different section of the FSIA previously contained a local exhaustion requirement that required foreign states to be provided the opportunity to arbitrate certain claims, but that provision was repealed by

Congress in 2008.  *Id.*   The D.C. Circuit noted that although the exhaustion requirement was

repealed, its original inclusion supported the inference that "Congress's inclusion of a provision

in one section strengthens the inference that its omission from a closely related section [here, the

expropriation exception] must have been intentional."  *Id.* at 948.  The D.C. Circuit in *Chabad*,

like the Seventh Circuit in *Fischer*, also addressed the language of the Restatement (Third) of the

Foreign Relations Law of the United States, which provides:

> *Exhaustion of remedies.*  Under international law, ordinarily a state is not required
> to consider a claim by another state for an injury to its national until that person has
> exhausted domestic remedies, unless such remedies are clearly sham or inadequate,
> or their application is unreasonably prolonged.

Restatement § 713, cmt. f.  The D.C. Circuit distinguished this provision from the facts of that

case, noting that the Restatement addressed claims of one state against another, or nation v. nation

litigation.  *Chabad*, 528 F.3d at 949.  However, the FSIA's expropriation exception involves the

claims of an individual of one state against another state and, as such, "there is no apparent reason

for systematically preferring the courts of the defendant state."[13]  *Id.*

In *Simon*, the D.C. Circuit again touched on the issue.  Specifically, the D.C. Circuit noted

that the Seventh Circuit in *Fischer* found persuasive the prudential exhaustion argument that "the

court . . . should decline to exercise jurisdiction as a matter of international comity unless the

plaintiffs first exhaust domestic remedies (or demonstrate that they need not do so)."  *Simon*, 812

F.3d at 149.  However, the D.C. Circuit declined to address the issue because it was not before that

---

[13] The D.C. Circuit also addressed Justice Stephen G. Breyer's concurrence in *Republic of Austria v. Altmann,* 541 U.S. 677 (2004).  The D.C. Circuit characterized Justice Breyer's argument regarding exhaustion as follows, "there simply is no unlawful taking if a state's courts provide adequate postdeprivation remedies."  *Chabad*, 528 F.3d at 949.  However, the D.C. Circuit suggested that this substantive theory advanced by Justice Breyer would appear "to moot the argument from the language of the FSIA and is independent of Restatement § 713."  *Id.*

Court on appeal.  *Id.*  Rather, the D.C. Circuit noted that the district court on remand should consider the issue if it is raised by the defendants.  *Id.*

In *de Csepel*, another district judge in this jurisdiction, Judge Ellen Segal Huvelle, addressed the issue of whether the court should decline to exercise jurisdiction as a matter of international comity unless plaintiffs first exhausted their remedies in Hungary or demonstrated that such efforts would be futile.  *de Csepel III*, 169 F. Supp. 3d at 169.  After tracing the language of the Restatement and the D.C. Circuit's discussion in *Chabad*, the *de Csepel* court noted that "both international and domestic courts (including the D.C. Circuit) have reasonably construed the prudential theory of exhaustion to be inapplicable to causes of action brought by *individuals* and not states."  *Id.* at 169 (emphasis added).  In light of that finding, the court respectfully declined to apply the Seventh Circuit's holding in *Fischer* and rejected the defendants' exhaustion argument based on international comity.  *Id.*  However, the *de Csepel* court stated in a footnote that even if the court agreed with the Seventh Circuit's application of the exhaustion requirement based on international comity, the court still found that the plaintiffs had adequately shown that efforts to seek a remedy in Hungary would have been futile.  *Id.* at 169 n.15.

Here, absent binding precedent from the D.C. Circuit, the Court is persuaded by Judge Huvelle's analysis in *de Csepel* and is inclined to agree that the prudential exhaustion requirement based on international comity is not applicable to cases, such as this one, which are brought by individuals against the a foreign state.  The Court further notes that even if it were inclined to apply the prudential exhaustion requirement, it would decline to do so based on this record without first affording the parties an opportunity to provide further, targeted briefing on the adequacy of available remedies in Germany.

### C.  Doctrine of Forum Non Conveniens

Finally, Defendants argue that the Court should dismiss Plaintiffs' claims based on the doctrine of forum non conveniens.  Forum non conveniens is a discretionary doctrine that permits a federal court to dismiss an action in favor of its resolution in a court of foreign state.  *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007).  "The forum non conveniens analysis calls for the court to consider '(1) whether an adequate alternative forum for the dispute is available and, if so, (2) whether a balancing of private and public interest factors strongly favors dismissal.'"  *de Csepel II*, 714 F.3d at 605 (quoting *Chabad*, 528 F.3d at 950).  Specifically, an action may be dismissed when there is an alternative forum available and "'trial in the chosen forum would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience, or . . . the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.'"  *Sinochem*, 549 U.S. at 429 (quoting *American Dredging Co. v. Miller*, 510 U.S. 443, 447-48 (1994)).  "Dismissal for *forum non conveniens* reflects a court's assessment of a 'range of considerations, most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality.'"  *Id.* (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996)).  Moreover, a defendant invoking the doctrine bears a heavy burden in challenging a plaintiff's chosen forum.  *Id.* at 430.  However, "[w]hen the plaintiff's choice is not its home forum, . . . the presumption in the plaintiff's favor 'applies with less force,' for the assumption that the chosen forum is appropriate is in such cases 'less reasonable.'"  *Id.* (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981)).  For the reasons described herein, the Court shall not exercise its discretion to dismiss Plaintiffs' claims based on the doctrine of forum non conveniens.

1.   <u>Alternative Forum</u>

Defendants contend that Germany is an available and adequate forum for Plaintiffs to pursue their claims.  *See generally* Defs.' Mot. at 53-55.  Plaintiffs argue that Germany is not an adequate forum "because of the inability of [P]laintiffs even to bring the claims, Germany's lack of coherent policy generally toward victims of Nazi-looted art, and the unfair treatment that Plaintiffs specifically have already suffered as a result of the Advisory Commission's recommendation."  Pls.' Opp'n at 57.

The parties submitted competing opinions from experts on the German legal system regarding the sufficiency of German courts as a forum to adjudicate Plaintiffs' claims in support of their respective positions.  *See generally* Defs.' Mot., Ex. A (Declaration of Prof. Dr. Christian Armbrüster); *Id.*, Ex. B (Declaration of Prof. Dr. Jan Thiessen); Pls.' Opp'n, Ex. 1 (Declaration of Prof. Dr. Stephan Meder); Defs.' Reply, Ex. A (Supp. Declaration of Prof. Dr. Jan Thiessen); *Id.*, Ex. B (Supp. Declaration of Prof. Dr. Christian Armbrüster).  Specifically, these expert opinions differ as to whether Plaintiffs would be able to pursue their claims in German courts.  *See, e.g.*, Theissen Decl. at 15 ("German courts would have jurisdiction over this lawsuit. There are various legal provisions on which a plaintiff could base a claim. Thus, the plaintiffs would not be excluded from the outset with their claims as alleged in the First Amended Complaint."); Meder Decl. at 33 ("From my point of view, and in consideration of the legal framework, the literature and the legal precedent [sic], the matter of asserting and enforcing these claims in Germany before German courts must be at best affirmed theoretically (in contrast to the assertion by Thiessen), but is de facto excluded from a practical point of view."); *Id.* at 38 ("The plaintiffs Alan Philipp, Gerald Stiebel, and Jed Leiber cannot pursue the claims asserted before the District of Columbia in Washington D.C. before German courts.").

In the Court's analysis under the forum non conveniens doctrine, the first step is to consider whether there is an available forum before moving to the next steps of the analysis. The Court has considered the competing information regarding the availability of causes of action for Plaintiffs if their claims were pursued in Germany. However, regardless of the adequacy of Germany as a forum to adjudicate the claims at issue, which is disputed by the parties, the Court finds that it would not exercise its discretion to dismiss the claims under the forum non conveniens doctrine based on the balance of the private and public interests at play. As such, the Court shall not reach a decision on this issue. The Court deems this course to be appropriate particularly because Defendants carry the burden of demonstrating this requirement in support of dismissal. *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996). In light of this decision, the Court shall not address the parties' arguments regarding the application of the statute of limitations to Plaintiffs' claims should they be raised in a German court and, relatedly, Defendants' concession that it would not raise a statute of limitations defense if this Court required Plaintiffs to first pursue their claims in a German court.

### 2.   Private Interests

The Supreme Court provided the following guidance when considering private interests in the forum non conveniens analysis:

> Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforceability of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial.

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947), *superseded on other grounds as recognized in Quackenbush*, 517 U.S. at 722.

Defendants set forth three main arguments to support their contention that private interest factors strongly favor dismissal: (1) Plaintiffs' claims center on German-language documents located in German historical archives, many of which have not been digitized and would require translation; (2) German law is likely applicable because the relevant events occurred in Germany and involved the German Government, German nationals, and German legal entities; and (3) this Court's judgement is potentially unenforceable in Germany without a separate action from a German court. *See generally* Defs.' Mot. at 55-61.  In response, Plaintiffs contend that the factors identified by Defendants do not balance strongly in favor of dismissal.  Plaintiffs also point to the fact that the District of Columbia is a convenient forum for their witness Plaintiff Leiber's mother, who Plaintiffs assert has personal knowledge of the allegations in their Complaint, is of advanced age, and lives in the United States.[14]  Pls.' Opp'n at 65-66.  Moreover, Plaintiffs point out that two of the three Plaintiffs in this case reside in the United States.  Plaintiffs also argue that the District of Columbia is convenient for Defendant Germany because of the presence of German diplomatic representatives in the city and the proximity of the Embassy of the Federal Republic of Germany. *Id.* at 66.

Here, the Court agrees that proceeding in this Court rather than in Germany will place some additional burdens on the parties, namely requiring the translation of certain German language documents.  However, as Plaintiffs point out, these documents would likely need to be digitized regardless of the forum.  Further, while this matter may require the Court to consider issues of

---

[14] In their reply, Defendants argue that Plaintiff Leiber's mother would only have been seven or eight years old at the time that the Consortium sold the Welfenschatz. Defs.' Reply at 29.  Plaintiffs have not been specific as to the nature of this witness' potential testimony.  However, the witness may be available to offer testimony not specifically regarding the discussions leading to the transaction but rather about the effects of the transaction on their lives including the access to funds.

foreign law, this Court is capable of considering such issues even though this factor weighs in favor of having the case heard in Germany.  Finally, to the extent that Defendants who are the German Government and its instrumentality that currently has possession of the objects at issue raises the issue of the enforceability of this Court's judgment, the Court shall not consider this as a factor that weighing in favor of dismissal.  *TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 303 (D.C. Cir. 2005).  To do so would allow a defendant to overcome a plaintiff's choice of forum based on a defendant's own assertion that it may not adhere to a judgment entered in that forum even if that forum otherwise has jurisdiction (as here, under the FSIA).  Further, to the extent that further steps are required to enforce a judgment of this Court, Plaintiffs, who chose to file suit in this Court, are the party that would be required to take those additional steps.  As such, the Court finds the balance of these private interest factors weigh slightly, but not heavily, in favor of Defendants' request.

### 3. Public Interests

The D.C. Circuit has identified three factors for a court to weigh when conducting a public interests analysis:

> first, that courts may validly protect their dockets from cases which arise within their jurisdiction, but which lack significant connection to it; second, that courts may legitimately encourage trial of controversies in the localities in which they arise; and third, that a court may validly consider its familiarity with governing law when deciding whether or not to retain jurisdiction over a case.

*Pain v. United Technologies Corp.*, 637 F.2d 775, 791-792 (D.C. Cir. 1980), *cert. denied*, 454 U.S. 1128 (1981).

Defendants assert this suit lacks significant connections to the District of Columbia and Germany has an interest in litigating this case in its courts because the claims arose there.  Defs.' Mot. at 62-63.  Further, Defendants argue that Germany has a particular interest in this case

because it has "powerful interest[s] in remedying the crimes of the Nazi government[,] . . . in providing compensation and restitution of Nazi-looted art to victims of Nazi persecution," *id.* at 63, and in having a German court resolve the issue of the ownership of the Welfenschatz which currently is displayed in a German museum and any damages related thereto, *id.* at 65. Finally, Defendants assert that choice-of-law issues favor litigation in Germany because this action may require the Court to apply areas of German law which are open and/or unfamiliar to the Court and which present a language barrier to this Court.

Plaintiffs counter these arguments by asserting that "federal courts in the United States have expressed a strong interest in providing a forum for the resolution of Holocaust-era claims." Pls.' Opp'n at 67. Moreover, Plaintiffs note that the District of Columbia has been designated by Congress as the proper venue for claims brought against foreign states under the FSIA. *See* 28 U.S.C. § 1391(f)(4). Further, Plaintiffs point out that this Court is regularly called upon to address issues of foreign legal concepts in cases. Plaintiffs also note that the majority of German law at issue in this case is historical law which would require the use of historical legal experts regardless of the forum. Pls.' Opp'n at 67-68.

Here, the Court finds the balance of the public interests are in equipoise. The Court recognizes Germany's interest in adjudicating claims like the ones in the instant action. However, "'there is a public interest in resolving issues of significant impact in a more central forum, such as this one.'" *de Csepel v. Republic of Hung.* (*de Csepel I*), 808 F. Supp. 2d 113, 139 (D.D.C. 2011) (quoting *Agudas Chasidei Chabad v. Russian Fed'n*, 466 F. Supp. 2d 6, 29-30 (D.D.C. 2006)).

4.   Balance of Interests

The parties dispute the degree of deference that the Court should afford Plaintiffs' choice

of forum.  While Defendants acknowledge that Plaintiffs' choice to proceed in this Court enjoys

some deference, Defendants argue that the Court should grant Plaintiffs little deference because

the lack of significant contacts between the events and this forum "suggests that [P]laintiffs' choice

of forum was motivated by tactical considerations, such as a desire to avoid Germany's fee-shifting

rules or to force the defendants to litigate the case in a much more costly forum."  Defs.' Mot. at

67.  Plaintiffs argue that their choice of forum is entitled to strong deference because two of the

three Plaintiffs are U.S. citizens who currently reside in the United States, and note that the analysis

should be unaffected by the fact that Plaintiffs do not live in the District of Columbia because any

federal court in this country may be considered their "home forum."  Pls.' Opp'n at 60-61.

Plaintiffs further assert that they are not engaged in forum shopping and instead selected this Court

because Defendant SPK is engaged in commercial activity in the District pursuant to 28 U.S.C. §

1391(f)(3) and because this District is the proper forum to bring claims against Defendant

Germany pursuant to § 1391(f)(4).  The Court agrees with Plaintiffs that their selection of this

forum to adjudicate their claims is entitled to deference.  Indeed, the Court finds no support for

Defendants' claim that Plaintiffs engaged in forum shopping when they brought their claims in the

home forum of two of the three Plaintiffs and, as such, the Court shall not diminish the degree of

deference that it applies to Plaintiffs' choice of forum based on this argument.  Here, the Court

finds that the balance of public and private interests does not overcome that presumption in favor

of Plaintiffs' choice of forum.  As such, the Court shall decline to exercise its discretion to dismiss

Plaintiffs' claims under the doctrine of forum non conveniens.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' request that the Court dismiss five non-property based claims because Defendants are entitled to sovereign immunity on the following claims: fraud in the inducement (Count V); breach of fiduciary duty (Count VI); breach of the covenant of good faith and fair dealing (Count VII); civil conspiracy (Count VIII); and tortious interference (Count X).   The Court DENIES Defendants' request for dismissal on the remaining five claims: declaratory relief (Count I); replevin (Count II); conversion (Count III); unjust enrichment (Count IV); and bailment (Count IX).   Specifically, the Court finds that Plaintiffs have sufficiently pled these five claims under the expropriation exception to the FSIA pursuant to 28 U.S.C. § 1605(a)(3).   The Court further finds that these five claims are not preempted or non-justiciable, nor should they be dismissed under the doctrine of forum non conveniens.

An appropriate Order accompanies this Memorandum Opinion.

     /s/
_____
COLLEEN KOLLAR-KOTELLY
United States District Judge
