# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALAN PHILIPP, *et al.*,

   Plaintiffs,

 v.

STIFTUNG PREUSSISCHER
KULTURBESITZ,

   Defendant.

Civil Action No. 15-00266 (CKK)

## MEMORANDUM OPINION
**(August 25, 2022)**

Plaintiffs Alan Philipp ("Philipp"), Gerald G. Stiebel ("Stiebel"), and Jed R. Leiber ("Leiber") (collectively the "Plaintiffs"), are the legal successors of the estates of individuals who were affiliated with a consortium that was formed in or around 1929 and comprised of three art dealer firms based in Frankfurt, Germany – Z.M. Hackenbroch, I. Rosenbaum, and J.&S. Goldschmidt (collectively, the "Consortium"). Plaintiffs Philipp and Stiebel indicate that their ancestors, Zacharias Max Hackenbroch [owner of Z.M. Hackenbroch] and Isaac Rosenbaum [co-owner of I. Rosenbaum], respectively, were the owners or co-owners of two [of the three] art dealer firms. First Am. Compl. ("FAC"), ECF No. 14, ¶¶ 1, 17-18; Sec. Am. Compl. ("SAC"), ECF No. 62 ¶¶ 1, 17-18. Plaintiff Leiber is the heir of Saemy Rosenberg, who co-owned the I. Rosenbaum art dealer firm. FAC at ¶ 19; SAC at ¶ 19. Furthermore, all three Plaintiffs are "assignees of the claims of Julius Falk Goldschmit . . . and authorized agents for the heirs of Arthur Goldschmidt, who together were the sole owners of the J.&S.

1

Goldschmidt[,]" the third art dealer firm. *Id.* at ¶ 20.[1]

Plaintiffs allege that Defendant Stiftung Preussischer Kulturbesitz ("SPK") is in wrongful possession of a collection of medieval relics known as the Welfenschatz, which was sold by the Consortium – under coercion, as part of the Nazi persecution of the Jewish sellers – on June 14, 1935 to the State of Prussia through the Dresdner Bank. FAC ¶¶ 22, 25; SAC ¶¶ 22, 25 (describing SPK and the Welfenschatz). Plaintiffs' lawsuit was initially filed against both the Federal Republic of Germany ("Germany") and SPK, although Germany has since been dismissed from the case. This case is currently before this Court on Defendant's [63] Motion to Dismiss the [Plaintiffs'] Second Amended Complaint, which is opposed by Plaintiffs.[2] For the reasons set forth herein, Defendant's [63] Motion to Dismiss the Second Amended Complaint is GRANTED. A separate Order accompanies this Memorandum Opinion.

---

[1] The Court cites to the First Amended Complaint, which was the operative complaint when the case was before the Supreme Court of the United States, and to the Second Amended Complaint, which amended the First Amended Complaint [in a limited manner conceded by the parties] to indicate that "Germany is no longer a defendant" and "strik[e] claims that have been dismissed" and further, "to reflect the passage of time since the First Amended Complaint was filed by adding a paragraph" about the return of some other artwork. *See Philipp v. Stiftung Preussischer Kulturbesitz*, Civil Action No. 15-00266 (CKK), 2021 WL 3144956 (D.D.C. July 26, 2021) (denying Plaintiffs' Motion for Leave to File a Second Amended Complaint).

[2] In connection with this Memorandum Opinion and the accompanying Order, the Court considered: Defendant's [63] Motion to Dismiss the Second Amended Complaint ("Def.'s Mot."), Defendant's [63-1] Memorandum in support thereof ("Def.'s Mem."), and the exhibits attached thereto; Plaintiffs' [66] Opposition to Defendant's Motion to Dismiss the Second Amended Complaint (Pls.' Opp'n"); Defendant's [67] Reply Memorandum in support of its Motion to Dismiss the Second Amended Complaint ("Def.'s Reply") and the exhibits attached thereto; Defendant's [68] Notice of Supplemental Authority ("Def.'s Notice"); Plaintiffs' [69] Response to Defendant's Notice of Supplemental Authority ("Pls.' Resp. to Notice"); Plaintiffs' [14] First Amended Complaint ("FAC"); Plaintiffs' [62] Second Amended Complaint ("SAC"); and the entire record in this case. In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

# I. BACKGROUND[3]

## A. Factual Background

The three aforementioned art dealer firms – Z.M. Hackenbroch, I. Rosenbaum, and J. & S. Goldschmidt – formed the Consortium in 1929, and in that same year, the Consortium acquired the Welfenschatz pursuant to a written agreement with the Duke of Brunswick-Lüneberg (the "Duke").  FAC ¶¶ 34-35; SAC ¶¶ 32-33.  The Welfenschatz is comprised of 82 medieval reliquary and devotional objects, dating primarily from the 11th to 15th century, that were originally housed in the Braunschweiger Dom (Brunswick Cathedral) in Germany.  FAC ¶¶ 30, 41; SAC ¶¶ 28, 39.  The October 5, 1929 purchase agreement was signed by the three art dealer firms in their corporate capacities, and it provided the Consortium with sole entitlement to ownership rights of the collection.  FAC ¶¶ 32, 35, Ex. 1 [purchase agreement]; SAC ¶¶ 30, 33, Ex. 1 [purchase agreement].  Pursuant to the agreement, the Consortium was "obligated to attempt to resell the items" and not permitted to retain them, with the Duke entitled to a share of the profits when the items were resold.   Ex. 1 at 10-12.[4]  By 1930, the Consortium had succeeded in selling about half of the collection to museums and individuals around the world.  FAC ¶ 41; SAC ¶ 39.

In early 1933, the Nazi party assumed control over Germany.  FAC ¶¶ 48-51; SAC ¶¶ 46-49.  The Nazis became interested in acquiring the [remaining items in the] Welfenschatz on behalf of the German state, FAC ¶¶ 6, 68; SAC ¶¶ 6, 66, and negotiations began between the Consortium

---

[3] For ease of reference, this Court reiterates much of the procedural background from *Philipp v. Stiftung Preussischer Kulturbesitz*, Civil Action No. 15-00266 (CKK), 2021 WL 3144956 (D.D.C. July 26, 2021).

[4] With regard to documents filed on this Court's electronic filing system (ECF), the page numbers referenced are those located in the top righthand corner of the page.

and the Prussian state (a political subdivision of Germany) with Dresdner Bank acting as an intermediary.[5]  FAC at ¶¶77-78, 81-84, 90-91, 151; SAC ¶¶ 75-76, 79-82, 88-89, 150.  On June 14, 1935, Dresdner Bank entered into an agreement to purchase the Welfenschatz from "1.) the company J. and S. Goldschmidt, Frankfurt/M,  2.) the company Z.M. Hackenbroch, Frankfurt/M, and 3.) Mr. I. Rosenbaum and Mr. S. Rosenberg, Amsterdam, as former owner[s] of the company I. Rosenbaum, Frankfurt/M., hereinafter referred to as the 'Consortium'" and that agreement was signed by Julius Falk Goldschmidt, Zacharias Max Hackenbroch, Isaak Rosenbaum and Saemy Rosenberg.  FAC ¶¶ 151, 153, 154, Ex. 5 [purchase agreement]; SAC ¶¶ 150, 152, 153, Ex. 5 [purchase agreement].

The purchase agreement notes that "[t]he company I. Rosenbaum o.H.G. has since been liquidated; it[s] assets now belong to the two business associates I. Rosenbaum and S. Rosenbaum."  Ex. 5 at 11.  In Plaintiffs' Amended Complaints, Plaintiffs assert however that "Saemy Rosenberg's brother, Siegfried Rosenberg, ran operations in Frankfurt as best he could until 1937, when the company was liquidated and closed" and furthermore, "[o]n July 11, 1938, this firm too - - - based in Frankfurt since the mid-19th century - - - was deleted from the commercial register."  FAC ¶ 171, SAC ¶ 170.  By 1935, Rosenberg and Rosenbaum had emigrated from Germany to the Netherlands, and in the years following the sale, the Goldschmidts left Germany, and Hackenbroch died in 1937.  FAC ¶¶ 163, 170, 171; SAC ¶¶ 162,

_____

[5] The Court shall refer to these 42 objects at issue as "the Welfenschatz," even though Plaintiffs' claims do not involve the 40 of the 82 objects in the collection that were sold in the United States and Europe prior to the 1935 transaction.  *See* FAC ¶ 31 (listing the objects at issue); SAC ¶ 29.

169, 170.[6]

Defendant SPK, an instrumentality of Germany, was created for the purpose of succeeding all of Prussia's rights in cultural property and currently is in possession of the Welfenschatz.  FAC ¶ 184; SAC ¶ 183.  The Welfenschatz is located at the SPK-administered Museum of Decorative Arts ("Kunstgewerbemuseum") in Berlin.[7]  FAC ¶ 26 (iv); SAC ¶ 26 (iv).

### B. Procedural Background[8]

<u>First Motion to Dismiss</u>

In February of 2015, Plaintiffs Philipp and Stiebel brought this suit against SPK and Germany, alleging that the 1935 sale of the Welfenschatz by the Consortium was made under duress for less than market value as part of the Nazi persecution of the Jewish sellers of the Welfenschatz.  FAC ¶¶ 2, 4, 12, 139-54; SAC ¶¶ 2, 4, 12, 138-153.  SPK and Germany moved to dismiss on grounds of foreign sovereign immunity, Defs.' [First] Mot. to Dismiss, ECF No. 12, at 10-29, but Plaintiffs invoked the expropriation exception, which abrogates state immunity for claims alleging that property was "taken in violation of international law." 28 U.S.C. § 1605(a)(3).  SPK and Germany asserted that this exception was inapplicable because "[i]nternational law is implicated only when a state expropriates property from foreign nationals" as opposed to taking property from its own nationals.  Defs.' [First] Mot. to Dismiss, ECF No.

---

[6] This Court incorporates by reference the remaining factual background set forth in its [26] Memorandum Opinion, which granted in part and denied in part Defendants' [18] Motion to Dismiss the Plaintiffs' First Amended Complaint.

[7] During World War II, the Welfenschatz was shipped out of Berlin to be saved from destruction and robbery.  It was seized by United States troops and handed over in trust to the State of Hesse.  FAC ¶ 181; SAC ¶ 180.

[8] This Court reiterates much of the procedural background from *Philipp v. Stiftung Preussicher Kulturbesitz*, Civil Action No. 15-00266 (CKK), 2021 WL 3144956 (D.D.C. July 26, 2021).

12, at 17-20. Accordingly, Defendants asserted that this "domestic-takings rule" barred Plaintiffs' claims because the Consortium was a German corporate entity, as were the three art dealer firms and the individuals who owned those firms. *Id.* at 21-23.

First Amended Complaint

The Court did not rule on Defendant's [12] motion to dismiss the complaint because the Plaintiffs filed an amended complaint after obtaining consent from Germany and SPK. *See* Consent to the Filing of an Am. Compl., ECF No. 13; First Am. Compl., ECF No. 14 (adding Plaintiff Lieber and alleging that the heirs of the individual owners of the J. & S. Goldschmidt firm had assigned any rights in the Welfenschatz to the three Plaintiffs). In their First Amended Complaint, Plaintiffs did not add any additional allegations relevant to the nationality of the Consortium, the art dealer firms, or the individual owners of the firms.

Subsequent to the filing of Plaintiffs' First Amended Complaint, the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") issued its opinion in *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016) (*"Simon I"*), whereby the D.C. Circuit ruled that the domestic takings rule had "no application to the unique circumstances of [that] case, in which, unlike most cases involving expropriations in violation of international law, genocide constitutes the pertinent international law violation." *Id.* at 144. Accordingly, *Simon I* presented an alternative theory in expropriation-exception cases; *i.e.*, a plaintiff could argue that a taking violated a body of law, such as the law of genocide, that was not limited by the domestic takings principle.

Second Motion to Dismiss

Shortly thereafter, Defendants filed their [18] Motion to Dismiss the Plaintiffs' First Amended Complaint, in which they argued, *inter alia*, that the expropriations exception does not apply because international law does not prohibit domestic takings. Motion to Dismiss, ECF No.

18, at 28-31 (discussing the Consortium's status as a German legal entity, the German art-dealer firms, and the German nationality of the individual owners of the art-dealer firms). Plaintiffs relied upon the theory propounded in *Simon I* in crafting their opposition to Defendants' motion to dismiss Plaintiffs' First Amended Complaint. Specifically, Plaintiffs argued that the domestic takings rule and the nationality of Plaintiffs' ancestors did not matter because their allegations demonstrated that the sale of the Welfenschatz for less than market value was part of the Nazi Germany genocide against German Jews. *See* Pls. Opp'n to Mot. to Dismiss, ECF No. 19, at 38-43. In their Reply to the Motion to Dismiss, Defendants observed that "Plaintiffs d[id] not deny that this case involves the German government's alleged taking of property of German nationals." Def.'s Reply in Supp. of Mot. to Dismiss, ECF No. 20, at 13.

This Court agreed with Plaintiffs' argument pursuant to *Simon I* and found the domestic takings rule inapplicable because of Plaintiffs' claim that "the taking of the Welfenschatz was part of the genocide of the Jewish people during the Holocaust and, accordingly, [it] violated international law." *Philipp v. Fed. Republic of Germany*, 248 F. Supp. 3d 59, 72 (D.D.C. 2017) (*Philipp I*). Defendants filed a [27] Notice of Appeal to D.C. Circuit, and the case before this Court was stayed while the interlocutory appeal was pending. On appeal, Defendants renewed their argument that the domestic-takings rule barred Plaintiffs' claims, *see* Appellants' Br. at 38-45 (No. 17-7064), while Plaintiffs continued to rely upon *Simon's* genocide theory, *see* Appellees' Br. at 21-32 (No. 17-7064).

The D.C. Circuit noted that the appeal raised a novel question insofar as the court was asked to decide "for the first time whether seizures of art may constitute 'takings of property that are themselves genocide.'" *Philipp v. Fed. Republic of Germany*, 894 F.3d 406, 411 (D.C. Cir. 2018) (*Philipp II*) (quoting *Simon I*, 812 F. 3d at 144). The D.C. Circuit concluded that they could be and affirmed the application of the expropriation exception to sovereign immunity as

well as this Court's exercise of subject matter jurisdiction.[9]  The Circuit Court did however vacate this Court's denial of immunity to Germany and directed that Germany be dismissed. Defendant's request for a rehearing *en banc* was denied.  *Philipp v. Fed. Rep. of Germany*, 925 F.3d 1349 (Mem.) (D.C. Cir. 2019).

<u>Supreme Court Decision</u>

Shortly thereafter, Defendants filed their [43] Motion to Stay Pending Petition for Writ of Certiorari to the United States Supreme Court, which was granted by this Court's [47] Order. The Supreme Court granted certiorari and issued its unanimous decision in *Federal Republic of Germany v. Philipp*, 141 S. Ct. 703, 715 (2021) (*Philipp III*), holding that "the phrase "rights in property taken in violation of international law," as used in the FSIA's expropriation exception, refers to violations of the international law of expropriation and thereby incorporates the domestic takings rule."   As the Supreme Court explained, the international law of takings governs "confiscation of the property of foreigners, but measures taken by a state with respect to the property of its own nationals are not subject to these principles."  *Philipp III* at 710 (internal quotation marks omitted).  Furthermore, contrary to the D.C. Circuit's decisions in *Simon* and *Philipp*, the FSIA's expropriation exception invoked only the narrow doctrine of "international law governing property rights," rather than broadly incorporating international human-rights

---

[9] Under the FSIA's expropriation exception, 28 U.S.C. § 1605(a)(3), United States courts may exercise jurisdiction over a foreign sovereign in any case:

> in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by a foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605 (a)(3)

norms like the law of genocide.  *Id.* at 711-712.  Accordingly, there was a judicial "consensus that the expropriation exception's reference to 'violation of international law' does not cover expropriations of property belonging to a country's own nationals." *Id.* at 711 (quoting *Republic of Austria v. Altmann*, 541 U.S. 677, 713 (2004) (Breyer, J., concurring) (quotation marks omitted). The D.C. Circuit's judgment was vacated, and the case was remanded for further proceedings.

Defendant notes that "[i]n their brief opposing certiorari, Plaintiffs argued that this case was not an appropriate vehicle for resolving this statutory-interpretation question because '[b]y 1935, the Consortium [members] were long since no longer regarded or treated as Germans,' providing jurisdiction even if the exception were limited to alleged violations of the law of takings." Def.'s Mem., ECF No. 63-1, at 19 (quoting Pls.' Br. in Opp'n to Pet. For Writ of Cert., *Philipp III*, 141 S. Ct. 703 (No. 19-351), 2019 WL 5391187, at *22-24). The Supreme Court explicitly declined to consider the heirs' alternative argument "that the sale of the Welfenschatz is not subject to the domestic takings rule because the consortium members were not German nationals at the time of the transaction," indicating instead that the Court of Appeals should direct the District Court to "consider this argument, including whether it was adequately preserved below." *Philipp III* at 716.

<u>Post-Supreme Court Decision</u>

On March 16, 2021, the D.C. Circuit issued its [53] Mandate and attached Judgment indicating that - consistent with the Supreme Court mandate - this case was remanded to this Court, with instructions to "consider whether the sale of the Welfenschatz is not subject to the domestic takings rule because the Consortium members were not German nationals at the time of the transaction, including whether this argument was adequately preserved in the District Court." *See Philipp v. Fed. Rep. of Germany*, 839 Fed. App'x 574 (Mem.) (D.C. Cir. 2021).

Thereafter, Plaintiffs filed their [56] Motion for Leave to File [a] Second Amended Complaint, which was opposed by Defendant SPK.   This Court denied the Motion for Leave to Amend on grounds that the Supreme Court's mandate did not permit amendment of the complaint.   More specifically this Court noted that "the Supreme Court recognized that Plaintiffs may not have preserved their alternative argument and upon remand to the Court of Appeals, this Court was directed to consider this issue." *Philipp v. Stiftung Preussischer Kulturbesitz*, Civil Action No. 15-00266 (CKK), 2021 WL 3144956, at *5 (D.D.C. July 26, 2021).   Accordingly, "[p]ermitting Plaintiffs to amend their First Amended Complaint now to include additional facts and theories [would be] inconsistent with the instruction that this Court determine whether any alternative argument by the Plaintiffs had been preserved." *Id.* Furthermore, this Court found that amendment of Plaintiffs' First Amended Complaint was not permitted because Defendant had "demonstrated both undue delay and prejudice," which warranted denying relief under Rule 15(a).  *Id.* at *8.   Accordingly, the Court denied Plaintiffs' [56] Motion for Leave to Amend, with the proviso that certain conceded changes could be made. *See* n.1 herein; *see also* Second Am. Compl., ECF No. 62.   Thereafter, Defendant filed the instant Motion to Dismiss the Second Amended Complaint, which is ripe for resolution by this Court.

## II. LEGAL STANDARD

Under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-1611, "a foreign state is presumptively immune from the jurisdiction of United States court," and "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country."  *Id.* (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)

(internal quotation marks omitted).  Because "subject matter jurisdiction in any such action depends on the existence of one of the [FSIA's] specified exceptions. . . [a]t the threshold of every action in a District Court against a foreign state. . . the court must satisfy itself that one of the exceptions applies." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493-494 (1983). "In other words, U.S. courts have no power to hear a case brought against a foreign sovereign *unless* one of the exceptions applies." *Diag Human S.E. v. Czech Republic-Ministry of Health*, 64 F. Supp. 3d 22, 30 (D.D.C. 2014), *rev'd on other grounds*, 824 F.3d 131 (D.C. Cir. 2016).

"Federal courts are courts of limited jurisdiction[.]" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Pursuant to Federal Rule of Civil Procedure 12(b)(1), a party may move for dismissal based on "lack of subject matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  To survive a Rule 12(b)(1) motion to dismiss, the plaintiff generally "bears the burden of invoking the court's subject matter jurisdiction." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

In resolving a motion to dismiss pursuant to Rule 12(b)(1), the court can, and often must, go beyond the allegations in the complaint.  "Where a motion to dismiss a complaint 'present[s] a dispute over the factual basis of the court's subject matter jurisdiction . . . the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant.'" *Feldman v. Fed. Deposition Ins. Corp.*, 879 F.3d 347, 351 (D.C. Cir. 2018) (quoting *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).  Instead of merely relying on the truth of the facts alleged in the complaint, "the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Id.* (quoting *Phoenix Consulting*., 216 F.3d

at 40).  In such situation, the "court may properly consider allegations in the complaint and evidentiary material in the record," affording the plaintiff "the benefit of all reasonable inferences." *Feldman*, 879 F.3d at 351; *see also Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) ("In considering a  motion to dismiss for lack of subject matter jurisdiction, . . . we may consider materials outside the pleadings . . . ")  (quotation and internal quotation marks omitted).

Defendant SPK notes that this motion to dismiss is confined to "the question the Supreme Court directed this Court to answer first."  Def.'s Mem., ECF No. 63-1, at 22.  *See Philipp v. Stiftung Preussischer Kulturbesitz*, Civil Action No. 15-00266, 2021 WL 3144958, at *5 (D.D.C. July 26, 2021) ("[T]he mandate here makes clear that the only issue possibly remaining in this case is whether the [domestic] takings rule applies or not, including a necessary inquiry into whether Plaintiffs preserved this argument at all.")

## III. ANALYSIS

This Court has been tasked with determining: (1) whether the sale of the Welfenschatz would not be subject to the domestic takings rule because the Consortium members were not German nationals at the time of the transaction and (2) whether this argument was adequately preserved in the District Court.  As a preliminary matter, Defendant argues that this Court should consider first whether or not Plaintiffs preserved their theory of jurisdiction because if they did not, "then those theories' merits are irrelevant."  Def.'s Reply, ECF No. 67, at 6.  More specifically, Defendant states that the question is "not whether Plaintiffs' complaints *could have* supported their new arguments that the Consortium members were not German nationals in 1935" but rather whether "they *actually made* those arguments in the record in this case[.]"  *Id.* at 7 (internal quotation marks omitted).  Because the mandate asked that this Court to consider

whether the Consortium members were not German nationals at the time of the transaction and whether this argument was adequately preserved below, and these two prongs were not contingent, the Court considers them in tandem.  More specifically, this Court will consider whether Plaintiffs included allegations in their Complaint and/or made any arguments relevant to the domestic takings rule, and, if so, whether these allegations/arguments support their assertion that the Consortium members were not German nationals at the time of the sale.  The Court begins its analysis with a review of whether and how the domestic takings rule was addressed by the parties throughout this litigation.

A. The Domestic Takings Rule

Plaintiffs begin by proffering that the "Prussian Foundation . . . clearly had notice enough to raise the question" regarding a domestic taking in its "very first Motion to Dismiss." Pls.' Opp'n, ECF No. 66, at 36 n.11.[10]  Furthermore, Plaintiffs argue that the "court expressly acknowledged the existence of the domestic takings rule, but explicitly declined to reach it because of the controlling law provided by *Simon [I]*."  *Id.* (citation omitted).  The Court notes however that these assertions by Plaintiffs turn the burden of proof on its head.  Furthermore, Defendant explains that it is "not the Court's job to scrutinize a plaintiff's factual allegations

---

[10] Plaintiffs assert that the question of preservation asks whether an issue was brought to the court's attention.  Pls.' Opp'n, ECF No. 66, at 35 (citing *Holguin-Hernandez v. United States*, 140 S. Ct. 762, 766 (2020)); *see Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 754 F.3d 1031, 1040 (D.C. Cir. 2014) ("A party is not required to invoke magic words in order to adequately raise an argument[.]") (citation and internal quotation marks omitted); *see also Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1290 (D.C. Cir. 2004) (The proponent of an argument must however provide "a fair opportunity to entertain it[.]") (citation and internal quotation marks omitted).  Defendant notes however that "Plaintiffs' 'fair opportunity' standard comes from cases addressing what a party must do during administrative rulemaking to preserve a challenge to an agency rule, *see id.* at 1290-1291, rather than "what a plaintiff must do to raise an alternative legal theory against a motion to dismiss."  Def.'s Reply, ECF No. 67, at 9.

and *sua sponte* raise legal theories found nowhere in the briefs."  Def.'s Reply, ECF No. 67, at 9.  In the instant case, there is no dispute that Defendants raised the domestic takings argument, but Plaintiffs never responded to it, instead electing to rely on *Simon I* and a theory involving a claim of genocide.  Subsequently, Plaintiffs amended their complaint, but, as noted earlier herein, the amendment did not add any allegations relevant to rebutting the domestic takings rule because Plaintiffs were focused solely on their claim of genocide.  Even as Defendants raised a domestic takings argument again – this time, in their motion to dismiss Plaintiffs First Amended Complaint – Plaintiffs failed to respond to that argument, electing to rely again on *Simon I* and a claim of genocide.

Defendant notes succinctly the major flaw in this case insofar as "[b]ut what Plaintiffs never did before the case reached the Supreme Court was argue in the alternative that even if the expropriation exception looked solely to the law of takings (as SPK contended), this was not a domestic taking."  Def.'s Mem., ECF No. 63-1, at 28.  More specifically, while Plaintiffs disputed whether the Consortium was a German legal entity, *see* Pls.' Opp'n. to Defs.' Mot. to Dismiss First Am. Compl., ECF No. 19, at 66 n.8, they neither challenged Defendants' argument that the art dealership firms were German corporate entities nor did they assert that any of the individual owners were foreign nationals or stateless.  Furthermore, in both its reply to the Motion to Dismiss Plaintiffs' First Amended Complaint and in its briefing before the D.C. Circuit, Defendant SPK pointed out Plaintiffs' failure to address the domestic takings rule.  Moreover, SPK asserts that, even now, Plaintiffs "never identify where in their prior briefs they 'mention[ed] [these] possible argument[s] in the most skeletal way,' let along 'put flesh on [their] bones.'"  Def.'s Reply, ECF No. 67, at 7 (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)); *accord  GSS Grp. Ltd. v. Nat'l Port Auth.*, Civil Action No. 09-1332

(PLF), 2011 WL 13121428, at *3-5 (D.D.C. Aug. 10, 2011).

Defendant concludes therefore that because Plaintiffs never contested its argument that the Consortium, the firms comprising it, and the individual owners of the firms were German nationals in 1935, "Plaintiffs long ago conceded these points." Def.'s Reply, ECF No. 67, at 8; *see, e.g., Johnson v. District of Columbia*, 49 F. Supp. 3d 115, 121-122 (D.D.C. 2014) (explaining that in this circuit "a court may treat those arguments [raised in a dispositive motion] that the plaintiff failed to address as conceded"); *see also NetworkIP v. F.C.C.*, 548 F.3d 116, 120 (D.C. Cir. 2008) (recognizing that "arguments in favor of subject matter jurisdiction can be waived by inattention or deliberate choice"); *GSS Grp. Ltd.*, 2011 WL 13121428, at *3-5 (holding that an alternative jurisdictional theory plaintiff failed to raise in opposition to a motion to dismiss was forfeited).[11]  Accordingly, the challenges Plaintiffs now attempt to raise were not preserved because Plaintiffs never raised such challenges in opposition to Defendants' motions to dismiss.  Furthermore, in the course of attempting to amend their complaint <u>after</u> the Supreme Court's ruling, Plaintiffs acknowledged that, based on *Simon I*, they thought they "had no reason to allege particular facts concerning the nationality of Goering's victims," although they contend that they did so. Memorandum in Support of Plaintiffs' Motion For Leave to Amend, ECF No. 56-1, at 12.

Plaintiffs assert here that, [previously], they did not need to argue in the alternative

---

[11] In their [66] Opposition, at 43-44, Plaintiffs attempt to distinguish *GSS Group*, on grounds that plaintiffs sought to reverse a dismissal in that case "despite no change in the governing law." *But see* this Court's reiteration of its previous ruling that there was no change of law, addressed on pages 16-17 herein.  Plaintiffs attempt also to distinguish *Johnson*, on grounds that the plaintiff there "did not address the District's statute-of-limitations argument in an opposition brief" whereas they allege that, in the instant case, "Plaintiffs noted the existence of the domestic takings rule and explained why . . . it was irrelevant." Pls.' Opp'n, ECF No. 66, at 43.  Plaintiffs provide no record reference corresponding to this alleged "explanation."

because this Court and the D.C. Circuit applied other law, and a prevailing litigant does not "waive" an alternative argument. Pls.' Opp'n, ECF No. 66, at 41-46; *see Dandridge v. Williams*, 397 U.S. 471, 475 n.6 (1970) ("The prevailing party may, of course, assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court."). While it is accurate that "a court of appeals can affirm a district court judgment on any basis supported by the record, even if different from the grounds the district court cited," *Parsi v. Daioleslam*. 778 F.3d 116, 126 (D.C. Cir. 2015), that rule is limited to grounds that were "decided or raised below." *Warren v. District of Columbia*, 353 F.3d 36, 38-39 (D.C. Cir. 2004) (refusing to affirm a judgment on a ground that was not presented to the district court). In this case, the Court has been tasked with deciding whether the domestic takings argument was preserved by Plaintiffs, and while Defendants explain how and when they raised this issue on several occasions, Plaintiffs neither raised nor rebutted it.

Plaintiffs rely instead on their argument that "surely [a party's] failure to raise an argument anticipating the Supreme Court's decision to change the law does not waive an argument relying on that change." Pls.' Opp'n, ECF No. 66, at 42 (quoting *United States v. Abu Khatallah*, 316 F. Supp. 3d 207, 211-12 (D.D.C. 2018)) (finding no waiver where defendant did not object to a jury instruction that was constitutional under Circuit court precedent at the time and "before the Supreme Court . . . called that ruling into question"). The Court notes however that Plaintiffs' "change of law" argument has been rejected previously by this Court. More specifically, after the Supreme Court issued its mandate, Plaintiffs moved to amend their complaint, and in that motion, Plaintiffs argued that the Supreme Court's decision was a change of law, but this Court "reject[ed] Plaintiffs' argument that there was a change in law . . . , as the applicability of the domestic takings rule pre-date[d] the Supreme Court's decision, and the

Supreme Court's unanimous rejection of Plaintiffs' arguments in this case d[id] not constitute new law." *Philipp v. Stiftung Preussischer Kulturbesitz*, Civil Action No. 15-00266 (CKK) 2021 WL 3144958, at *6 (D.D.C. July 26, 2021).

Defendant argues and the Court agrees that "[i]f Plaintiffs wanted to preserve an alternative theory that the purchase of the Welfenschatz was not a "domestic" taking at all because the Consortium and its members were not German nationals in 1935, then it was their obligation to 'spell out [those] arguments squarely and distinctly, or else forever hold [their] peace." Def.'s Reply, ECF No. 67, at 12 (quoting *Schneider*, 412 F.3d at 200 n.1). In the instant case, Plaintiffs proffer several alleged justifications for why it was unnecessary for them to argue this alternative theory, and consistent with that approach, they point to no place in the record before this Court where they made such argument. Accordingly, this Court finds that Plaintiffs did not preserve an argument regarding any exception to the application of the domestic takings rule.

B. Exception to the Domestic Takings Rule

Even assuming *arguendo* that Plaintiffs did preserve a domestic takings rule argument below, Plaintiffs would need to establish an exception to that rule. To survive a motion to dismiss in this context, the plaintiffs' complaint must plead facts establishing that the alleged taking was an actual violation of international law. *Bolivarian Republic of Venezuela v. Helmerich & Payne International Drilling Co.*, 137 S. Ct. 1312, 1318-22 (2017) (*Helmerich I*); *see Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 743 Fed. App'x 442, 448-53 (D.C. Cir. 2018) (*Hemerich II*) (because a plaintiff is required to allege facts establishing an actual (not merely possible) violation of international law, a plaintiff has the burden of showing that their supposed rule was clearly established in international law).

Accordingly, Defendant asserts that because "the domestic-takings rule is a well-established principle of the law of takings, *Philippe III*, 141 S. Ct. at 709-11, Plaintiffs must allege facts establishing that this was not a domestic taking."  Def.'s Mem., ECF No. 63-1, at 32.  Plaintiff must also demonstrate that the "claimed exception is clearly established customary international law."  *Id.* at 32-33.

### 1. Who are the Consortium members?

In this case, Defendant asserts that the 1935 sale of the Welfenschatz, which is the claimed taking, occurred when "the Consortium was solely entitled to ownership rights of the collection . . ."  Def's Mem., ECF No. 63-1, at 33 (quoting First Am. Compl, ¶ 34, Sec. Am. Compl. ¶ 32).[12] Under international law, "a corporation has the nationality of the state under the laws of which the corporation is organized." *Helmerich II*,  743 Fed. App'x at 447 (quotation and quotation marks omitted).  Pursuant to the domestic takings rule, claims that a state has taken the property of its own corporations are barred.  *See, e.g., Helmerich II*, 743 Fed. App'x, at 447-448 (holding that domestic-takings rule applied to Venezuela's taking of a Venezuelan corporation's property);[13] *Ivanenko v. Yanukovich*, 995 F. 3d 232, 237 (D.C. Cir. 2021) (same for Ukraine's taking of Ukrainian company property).  Defendant argues that "[b]ecause Plaintiffs allege that Germany took property belonging to the Consortium or the art dealership firms — German corporate entities — the domestic-takings rule makes SPK immune from suit."  Def.'s Mem, ECF No. 63-1, at 33 (relying on the allegations in the complaint as well as the expert opinion of

---

[12] Plaintiffs cite legal principles relating to the factors underlying a "taking,"  Pls.' Opp'n, ECF No. 66, at 17-20, but this issue is not contested by the Defendant.  Rather, the contested issue is whether or not the domestic takings rule applies, based on German nationality of the Consortium members.

[13] Plaintiffs assert that "Rosenberg and Rosenbaum are just like the American investors whose claims survived in *Helmerich*, not the Venezuelan domestic corporations whose claims did not."  Pls.' Opp'n, ECF No. 66, at 33-34.

Professor Dr. Christian Armbruster [attached at ECF 63-2] as to the characterization of a "consortium," which has the legal capacity to own property). "Since the complaint alleges that the Consortium's only members were three Frankfurt-based firms, and the Consortium's business activities were centered in Germany, it must be treated as [a] German corporate entity."  Def.'s Mem., ECF No. 63-1, at 34 (citing Prof. Armbruster Op. ¶¶ 22-26).[14]  Accordingly, Defendant concludes that the German's government's alleged "taking of an art collection belonging to this German legal entity thus falls squarely within the domestic-takings rule."  Def.'s Mem., ECF No. 63-1, at 34; *see Helmerich II*, 743 Fed. App'x at 447-448.

Defendant turns next to the three art dealership firms that made up the Consortium – Z.M. Hackenbroch, I. Rosenbaum and J.& S. Goldschmidt – and asserts that because "the complaint's own allegations and exhibits establish that they were based in Frankfurt," accordingly, "they too were German corporate nationals."  Def.'s Mem., ECF No. 63-1, at 35 (citations omitted). Plaintiffs do not specifically address the domestic takings argument at the "Consortium" or "art dealership firm" level, but instead look to the individual owners of the art dealership firms. Defendant asserts however that this focus on whether "the individual owners of the art dealership firms – Hackenbroch, Rosenbaum and Rosenberg, or one of the two Goldschmidts – were *foreign* nationals" bypasses "clearly established international law [and] would ignore the nationality of the Consortium and the art dealership firms and look instead to the nationality of the individuals who owned those firms."  Def.'s Mem., ECF No. 63-1, at 36; *see Helmerich II*, 743 Fed. App'x.

---

[14] Plaintiffs challenge Dr. Armbruster's opinion that the Consortium here would have had "its own legal person status."  Pls.' Opp'n, ECF No. 66, at 33 (referencing the expert opinion of Dr. Stephan Meder, which was attached as Exhibit 1 [ECF No. 19-2] to a Declaration by Nicholas M. O'Donnell in Plaintiffs' Opposition to Defendant's Motion to Dismiss the First Amended Complaint).  This Court need not decide this issue because the remand refers to "Consortium members" rather than the Consortium itself.

at 447-453 (noting that entities are legally distinct from their owners and shareholders and rejecting claims that a state violates international law by taking the property of a domestic corporation owned by foreign nationals).

Defendant asserts therefore that the nationality of the individuals at issue in this case is irrelevant because the property was owned by the Consortium or the art dealership firms.  Def.'s Mem., ECF No. 63-1, at 37. In this case, however, the Supreme Court's remand specifically asks about the "Consortium members" and whether they were German nationals, as opposed to discussing the Consortium itself.  The Supreme Court opinion references a "consortium of three art firms owned by Jewish residents of Frankfurt."  *Philipp III*, 141 S. Ct. at 708. While the term "Consortium members" could be interpreted as the art dealership firms comprising the Consortium or the individuals who owned the art dealership firms, the parties' arguments focus on the latter and this Court interprets it as such.

    2. <u>Nationality</u>

The Supreme Court's remand in this case and the Court of Appeals mandate direct that this Court consider whether "the sale of the Welfenschatz is not subject to the domestic takings rule because the consortium members were <u>not German nationals</u> at the time of the transaction,"  Pls.' Opp'n, ECF No. 66, at 29 (citing *Philipp III*, 141 S. Ct. at 715 (emphasis added)).  Relying on that exact language, Plaintiffs argue that the "question on remand is whether they were *not* German nationals, not whether they were nationals of some other country."  *Id.* at 29-30 (citing *Philipp III*, 141 S. Ct. at 711) (noting that "the expropriation exception's reference to 'violation of international law' does not cover expropriations of property belonging to a country's *own nationals*") (emphasis added by Plaintiffs).  Plaintiffs submit that "[t]he Supreme Court could easily have held that a taking violates international law *only* when the property [of someone] who

possess[es] the affirmative nationality of another state is targeted - but it did not."  Pls.' Opp'n, ECF No. 66, at 29.

Defendant explains however that "the reason the Supreme Court did not itself reject Plaintiffs' alternative theory is that Plaintiffs simply "noted" it in the Supreme Court without fully arguing it."  Def.'s Reply, ECF No. 67, at 22 (citing *Philipp III*, 141 S. Ct. at 715), *accord Simon v. Republic of Hungary*, Civil Action No. 10-1770 (BAH), -- F. Supp. 3d --, 2021 WL 6196995, at *18 (D.D.C. December 30, 2021) ("*Simon II*") (discussing *Philipp* and recognizing that Plaintiffs only "obliquely" raised this theory and noting that "the clearest statement of what is meant by this residual argument on remand was whether the German governmental treatment of German Jews in the 1930s would transgress [the] nationality line, . . . a question plaintiff's counsel acknowledged would be a case-specific question of fact that may require the submission of historical expertise[.]")  (internal citations and quotation marks omitted).

As a preliminary matter, this Court notes that with the exception of Rosenberg and Rosenbaum, who are alleged by Plaintiffs to be Dutch nationals at the time of the sale, Plaintiffs' argument that the other individual art dealers lost their German nationality would leave those individuals stateless.  Defendant asserts that Plaintiffs' argument fails because "[a] state's taking of a stateless person's property does not violate the customary international law of takings [a]nd, even if it did, Plaintiffs have not alleged facts establishing that any of the individual owners were stateless in 1935."  Def.'s Mem., ECF No. 63-1, at 39.  The issue of whether a state violates the customary international law of takings when it takes property from an allegedly stateless person is an issue that has not been decided in this Circuit.[15]  The Court of Appeals for the Eleventh Circuit

---

[15] Plaintiffs cite no legal authority in support of their proffer that the law of takings is implicated by stateless persons.  In contrast, *see* Restatement (Third) of the Foreign Relations Law of the United States § 712 (A state violates the law of takings when it takes the "property of the national

is the only court that appears to have addressed this issue.  *See Mezerhane v. Republica Bolivariana*

*De Venezuela*, 785 F.3d 545, 551 (11th Cir. 2015) (after limited analysis, the court dismissed a

claim by a plaintiff who was alleged to be "d*e facto* stateless" because the claim did not "implicate

multiple states" as required by the law of takings). "*Mezerhane* distinguished this holding from

Holocaust-related cases on the grounds that the expropriation at issue in the latter cases were part

of a genocidal plan, *id.* at 551, a distinction that *Philipp* later rejected with respect to the

applicability of the expropriation exception."  *Simon II*, 2021 WL 6196995 at *19 n. 20.

The Court notes that, in *Simon II*, *id.* at *18, Chief Judge Howell concluded that it is

"unnecessary [for the Court to make] fact-specific determinations of which instances of abhorrent

historical conduct are *de facto* denationalizing and which are not."  This is because:

> *Philipp* provided sufficiently clear breadcrumbs of a path to conclude that  expropriations
> conducted as an integral part of a broad genocidal program [Holocaust] . . . simply cannot
> trigger the expropriation exception with regard to takings from individuals regarded as
> citizens of the expropriating state during or just prior to the genocidal events.  Put another
> way, if a loss of nationality is part and parcel of a set of genocidal acts that happen to
> include expropriation, then the expropriation exception becomes the very type of "all-
> purpose jurisdictional hook for adjudicating human rights violations" rejected in *Philipp*,
> 141 S. Ct. at 713. . . The logical result of plaintiffs' argument, then, is that any program of
> genocidal conduct of which expropriations are a part – because it inherently entails a loss
> of nationality – falls outside the domestic takings rule and can be prosecuted using the
> expropriation exception.  That is precisely what *Philipp* forecloses, only without
> articulating the intermediate "loss of nationality" step.  As the defendant in *Philipp*
> articulates in a renewed motion to dismiss on remand, "claim[ing] some de facto
> statelessness exception to the domestic-takings rule . . . do[es] little more than ask[ ] this
> Court to reinstate the unanimously overruled *Simon [I]* decision in new words."

*Simon II, id.,* at *18.  Accordingly, "genocidal expropriations, including those directly associated

---

of another state."); *id.*, cmt. a (explaining that the customary international law of takings is
concerned with "economic injury to foreign nationals"); *id.* § 713, cmt. d (discussing stateless
persons and noting that the principles in sections 711 and 712 "provide no protection for persons
who have no nationality; and the responsibility of the offending state to the state of nationality
ceases if the alien has voluntarily given up that nationality or has lost or been deprived of it under
the law of that state") (cited by Defendant in its Memorandum, ECF No. 63-1, at 42-43).

with the result of denaturalization, cannot under *Philipp* trigger the expropriations exception with respect to plaintiffs that would have been nationals of the offending state but for the genocidal conduct."  *Id.* at \*19; *see also Heller v. Republic of Hungary*, No. 21-cv-1739-BAH, 2022 WL 2802351, at \* 1 (D.D.C. July 18, 2022) (declining to find jurisdiction over claims brought by certain heirs of Hungarian Jews who sought compensation for "property unlawfully seized by Hungary in the course of the many atrocities surrounding Hungary's treatment of its Jewish residents before and during World War II").[16]  This Court need not weigh in on whether a state violates the customary international law of takings when it takes property from an allegedly stateless person unless the Court finds that Plaintiffs have demonstrated that any of the Consortium members were anything other than German nationals at the time of the sale. Accordingly, this Court turns now to its analysis of whether Plaintiffs demonstrate that members of the Consortium were <u>not</u> German nationals at the time of the sale.

    a. "<u>Defining</u>" Nationality

    As a preliminary matter, both parties acknowledge that, in 1930, Germany, among other states, entered into a multilateral convention agreeing that "[i]t is for each State to determine under its own law who are its nationals" and further, "[a]ny question as to whether a person possesses the nationality of a particular State shall be determined in accordance with the law of the State." Convention on Certain Questions Relating to the Conflict of Nationality Law arts. I & II, Apr. 12, 1930, 179 L.N.T.S. 89.  Furthermore, international law leaves to the states' domestic laws the question of "certain criteria for acquisition and loss of nationality[.]"  *See* Oliver Dorr, *Nationality*,

---

[16] Plaintiffs in the instant case note that, in contrast to this case, in *Heller*, "[n]o party contest[ed] that the Heller Family members were all Hungarian nationals at least up until the time they all fled Hungary in 1939."  Pls.' Resp. to Notice, ECF No. 69, at 2 (citing *Heller*, 2022 WL 2802351, at \*6).

Max Planck Encyclopedias of International Law at ¶ 4 (2019) (International law "neither contains nor proscribes certain criteria for acquisition and loss of nationality," leaving those questions to states' domestic laws.); *see also Comparelli v. Republica Bolivariana de Venezuela*, 891 F.3d 1311, 1321-22 (11th Cir. 2018) ( International law's basic rule on nationality is "that it is generally up to each state (i.e. country) to determine who are its nationals.")

Defendant notes the distinction between nationality and citizenship, and explains that it is "nationality, not citizenship, that matters to the domestic-takings rule." Def.'s Mem., ECF No. 63-1, at 38 n.15; *see e.g.*, *Abelesz v. Maygar Nemzeti Bank*, 692 F.3d 661, 676 n.6 (7th Cir. 2012) (explaining this point and rejecting argument that deprivation of citizenship brought a case outside the domestic-takings rule).[17] Defendant contends therefore that "[w]hether the art dealers were German nationals or instead were "stateless" thus depends on the status German law gave them in 1935." Def.'s Reply, ECF No. 67, at 24-25; *see Camparelli*, 891 F. 3d at 1321 (finding that whether plaintiffs were Venezuelan nationals at the time of the alleged taking was "determined by the laws of Venezuela").

Plaintiffs assert that nationality "is determined by one's social ties to the country of one's nationality, and when established, gives rise to rights and duties on the party of the state, as well as on the part of the citizen/national." Pls.' Opp'n, ECF No. 66, at 21 (citing Alice Edwards & Laura Van Waas, *Nationality and Statelessness Under International Law* at 12 (Cambridge University Press, Kindle Ed. 2014)); *see also* Restatement (Second) of the Foreign Relations Law of the United States § 26 (1965) ("An individual has the nationality of a state that confers it upon him provided there exists a genuine link between the state and individual.") According to

---

[17] Plaintiffs acknowledge that "[c]itizenship as conferred by the state and nationality under international law can diverge." Pls.' Opp'n, ECF No. 66, at 22.

Plaintiffs, "nationality is a 'legal bond having as its basis a social fact of attachment, a genuine connection of existence, interests, and sentiments, together with the existence of reciprocal rights and duties." Pls.' Opp'n, ECF No 66, at 20 (quoting *Nottebohm (Liech v. Guat.) Judgment*, 49 AM J INTER'L L. 396 (1955) ("*Nottebohm*")).

Defendant contests Plaintiffs' reliance on the International Court of Justice decision insofar as *Nottebohm*, 1955 I.C.J. 4 (Apr. 6), involved "a German citizen and long-time resident of Guatemala, who, at the outset of World War II, briefly visited Liechtenstein and became a national of that country through a sham process." Def.'s Reply, ECF No. 67, at 25; *see Nottebohm* at 13-16. Upon his return to Guatemala, authorities there tried to seize his assets at the behest of the United States as part of the war effort against Germany. *Id.*; *Nottebohm* at 17-20. The ICJ found that Liechtenstein lacked standing to espouse a claim against Guatemala on Nottebohm's behalf because there was no "genuine connection" between Nottebohm and Liechtenstein (such as acquiring nationality by birth, owning property, or living there) that supported his acquisition of that country's nationality. *Id.;* see *Nottebohm* at 20-24. Defendant notes that *Nottebohm* is "not generally accepted and therefore not part of customary international law." Def.'s Reply, ECF No. 67, at 25-26; *see* Oliver Dorr, *Nationality,* ¶ 4; *see also* Restatement (Third) of the Foreign Relations of the United States § 211 reporter's note 1 ("Nothing in [*Nottebohm*] suggests that a state may refuse to give effect to a nationality acquired at birth, regardless of how few other links the individual had at birth or maintained later.") Reviewing the authorities relevant to defining nationality that were cited by the parties, this Court looks to German law for guidance regarding the art dealers' nationality at the time of the sale.

3. Plaintiffs' Allegations in their Amended Complaints

In the instant case, Plaintiffs indicate that their Second Amended Complaint contains

"numerous examples" of "relevant international law" that demonstrate that Jews in Nazi Germany were not German nationals by the time of the sale, as "be[ing] a German national always required *not* being a Jew."  Pls.' Opp'n, ECF No. 66, at 25.  Plaintiffs reference three paragraphs from the Complaint, which presumably support this general contention.  They are reiterated below, as follows.

> *Mein Kampf* [ ] left no doubt as to Hitler's worldview, and his views on where Jews fit into it, *i.e.*, they did not.  For anyone who was seeking to rise within the NSDAP, or later the government that it took over, it left no secret about how to please Hitler.

> The Enabling Act of 1933 (*Gessetz zur Behebung der Not von Volk und Reich*, or the Law for the Remedy of the Emergency of the People and the Reich) amended the Weimar Constitution further, giving the Chancellor — *i.e.*, Hitler — the power to enact laws without the legislature.

> These laws and regulations, while draconian, barely approach the repression that was unleashed on Germany's Jews.  Through the collective humiliation, deprivation of rights, robbery, and murder of the Jews as a population, they were officially no longer considered German.

Pls.' Opp'n, ECF No. 66, at 25 (citing SAC ¶¶ 43, 53, 55).

Furthermore, Plaintiffs state that their "second Amended Complaint references by name indisputable historical documents that confirm," Pls.' Opp'n, ECF No. 66, at 26, that the Nazi movement's "motivating principle was the exclusion of Jews from the very ability to be German." *Id.* at 25.  While Plaintiffs rely on language from the Nazi Party Platform that "no Jew may be a member of the [German] nation," *id.* at 26, that language was not included in their Complaint. Moreover, while they allege that the Nazi Party Platform was "identified specifically in Paragraph 48 of the Second Amended Complaint,"  Pls.' Opp'n, ECF No. 66, at 26, the Court's review of Paragraph 48 indicates that this allegation is somewhat misleading.  The assertions in Paragraph 48 are – like the majority of Plaintiffs' assertions – general in nature, and they are tangential at best in providing information about the Consortium members' alleged loss of German nationality by the time of the sale.  *See* SAC ¶ 48 ("On January 30, 1933, Adolf Hitler was appointed

26

Chancellor by aging Reich President Paul von Hindenberg.  What was initially perceived as a stabilizing nod to conservatism, quickly descended into an onslaught of repression.  All the designs of the Nazi Party program of 1920, the failed 'putsch' of 1923, and *Mein Kampf* had now assumed the authority of the state.")

Defendant asserts and this Court agrees that, under *Helmerich*, Plaintiffs fail to meet their burden of demonstrating an exception to the domestic takings rule by "pointing to 'the judgments and opinions of national and international judicial bodies, scholarly writings, and unchallenged governmental pronouncements that undertake to state a rule of international law.'"  Def.'s Reply, ECF No. 67, at 23 (citing *Helmerich II*, 743 Fed. App'x at 449 (internal quotation marks omitted)); *see also Exxon Mobil Corp.v. Corporación Cimex S.A.*, 534 F. Supp. 3d 1, at 27-28 (D.D.C. 2021) (dismissing claim because plaintiff failed to "marshal[ ] enough evidence from reputable sources of customary international law" to support its position in a case involving expropriation of assets located in Cuba and owned and operated by Exxon's subsidiary).

Defendant's discussion of German law pertaining to nationality relies in part on the Expert Opinion of Professor Jan Thiessen, *see* Def.'s Motion, Ex. B, ECF No. 63-3, at 5 (noting that "[b]efore September 1935, there was no legal distinction between nationality and citizenship under German law" and nationality was governed by the "Nationality Law of 1913" which "also applied to Jewish Germans"), at 5 (German nationality was "generally obtained by being born to German parents or by the naturalization of foreigners"), at 6 (recognizing that the Nazis discriminated against Jewish people in many ways but this "discrimination did not initially relate to questions of nationality or citizenship in general"), at 7-8 (during the relevant time period, finding no denaturalization of Jewish Germans in accordance with the 1933 Law for the Repeal of Naturalization and Revocation of German Nationality), at 9-10 (discussing laws regarding

nationality and citizenship after the 1935 sale).   While Plaintiffs criticize Dr. Thiessen's

qualifications, they proffer no contrary expert opinion, and accordingly, the Court accepts Dr.

Thiessen's opinions as uncontroverted.

> Defendant concludes that:

> Rather than addressing actual German law, Plaintiffs contend this Court can ignore
> it and treat the art dealers as de facto stateless persons due to the Nazis' discrimination
> against and persecution of Jewish Germans in 1933-35. They cite at length the statements
> of various Nazi officials regarding Nazi ideology, under which German Jews were not seen
> as true German citizens or nationals.  But nationality is controlled by a state's actual law,
> not by the ideology of its ruling party or the statements of its leaders.  And while Nazi
> Germany's grave mistreatment of its own Jewish nationals in the early years of the Nazi
> era is reprehensible, Plaintiffs cite no authority establishing as a rule of international law
> that a state's mistreatment of its own nationals falls outside the domestic-takings rule.

Defs.' Reply, ECF No. 67, at 27-28 (internal citation omitted).  In the instant case, Plaintiffs

identify no source suggesting that the law of takings is violated when a state takes a stateless

person's property, contrary to the standard set forth in cases addressing an expropriation exception,

*see Helmerich II*, 743 Fed. App'x at 449 (requiring expropriation-exception plaintiffs to show the

existence of an exception to the domestic-takings rule through evidence of customary international

law's content); *see also Simon II*, 2021 WL 6196995, at *19 (noting that "in order to prevail on a

motion to dismiss, a plaintiff must show that he or she was not a Hungarian national immediately

prior to defendants' expropriation of their property or the commencement of other genocidal

conduct")[18]; *Heller v. Republic of Hungary*, 2022 WL 2802351, at *6-9 (rejecting plaintiffs

contention that Hungary's "gradual stripping away of all indicia of citizenship from its Jewish

residents" made them de facto stateless, on grounds that this argument would "nulliffy any practical

---

[18] In *Simon II*, *id.* at *19-21, the court concluded that four plaintiffs did not show a lack of
Hungarian nationality prior to Hungary's wartime conduct, while nine plaintiffs did.  *Id.* at *29-
32.

effect of *Philipp's* holding" and would be inconsistent with interpretation and application of Supreme Court precedent); *Philipp III*, 141 S. Ct. at 711-14 (explaining that the expropriation exception does not exist to address foreign states' human-rights abuses).

Defendant contends that the facts provided in the Second Amended Complaint do not indicate that any of the individuals were nationals of another state in 1935, but rather, they validate that "[a]ll were long-time German residents operating German firms in Frankfurt." Def.'s Mem., ECF No. 63-1, at 37-38 (referencing the SAC ¶¶ 1, 17-20, 32; SAC Ex. 1 at 5). More specifically, Defendant states that:

> Hackenbroch died there, and his family left the country three years after the Welfenschatz was sold. SAC ¶¶ 162, 167. Plaintiffs allege that on their departure, one of his relatives was stripped of German citizenship, *id.* ¶ 168, showing she retained it until then. Similarly, the Goldschmidts continued to operate their business in Germany after the sale, leaving Germany a few years later. *Id.* ¶ 169. And while the complaint vaguely alleges that Rosenberg and Rosenbaum had "emigrated by 1935 from Germany," it does not allege they had become nationals of the Netherlands or any other state. *Id.* ¶ 170. To the contrary, they continued to operate their business in Germany for several more years. *Id.* ¶¶ 170-71. And the complaint explicitly alleges that Rosenberg was stripped of German citizenship in 1941 – nearly six years after the sale – seemingly establishing that he remained a German national (and citizen) until then. *Id.* ¶ 172. The complaint's allegations thus show that all the art dealers were German nationals in June 1935.

Def.'s Mem., ECF No. 63-1, at 38-39. Furthermore, this Court notes plaintiffs' concession that "[t]here is no dispute, because Plaintiffs allege it specifically, that the Nazi regime did not undertake the public shaming of identifying individual Consortium members for citizenship-stripping until after 1935." Pls.' Opp'n, ECF No. 66, at 27.[19] Plaintiffs acknowledge also that the Nuremberg laws, which were enacted after the sale, "did not deprive Jews of citizenship (or nationality)." Pls.' Opp'n, ECF No. 66, at 28. Accordingly, this Court finds that Plaintiffs'

---

[19] Plaintiffs assert however that these "ceremonial acts of ridicule made no difference from one day to the next with respect to the individual's relationship to the state." *Id.*

allegations in their Amended Complaints regarding the individual art dealers and Nazi regime policies in effect during the applicable time period do not suffice to demonstrate that the Consortium members were not German nationals at the time of the sale.

    4. Rosenbaum and Rosenberg

In support of their claim that two of the art dealers acquired Dutch nationality by the time of the sale, *see* Pls.' Opp'n, ECF No. 66, at 22, Plaintiffs rely heavily on a single allegation in their Complaint stating that Rosenberg and Rosenbaum had emigrated by 1935 from Germany to the Netherlands.  FAC ¶ 171, SAC ¶ 170.  Plaintiffs argue that emigration implies that "the individual has renounced" a former nationality.  Pls' Opp'n, ECF No. 66, at 23, citing Restatement (Second) of the Foreign Relations Law of the United States § 26, but that section does not support that proposition.  Plaintiffs indicate that Rosenbaum "died in Amsterdam in 1936," while Rosenberg "escaped to England."  Pls.' Opp'n, ECF No. 66, at 23.  Plaintiffs proffer that Rosenberg and Rosenbaum certainly had no attachment or connection with Germany, nor any existence of reciprocal rights after they left Germany because of the "Nazi policy about nationality,"  Pls.' Opp'n, ECF No. 66, at 24, but this generalization seems to the Court to be similar to the type of "de facto statelessness" claim that was discussed and dismissed in *Simon II*.

    Defendant argues that with regard to Rosenbaum and Rosenberg, Plaintiffs asserted only that they had "emigrated" from Germany in 1935, but Plaintiffs "never plead (or argue) that either one had *lost* German nationality by operation of Germany's nationality laws."  Def.'s Reply, ECF No. 67, at 26; *see* Professor Thiessen's Supplemental Expert Opinion,  attached as Ex. B to Def.'s Reply, ECF No. 67-2, at 3 (indicating that the "legislation in force in Germany in June/July 1935 identified several specific conditions that would result in a loss of German nationality), at 4 (discussing the Nationality Law and conditions under which nationality was lost and finding that

"permanently leaving Germany, even with the intention not to return, is not one of the conditions that result[ed] in an automatic loss of nationality"), at 6 (opining that the claim that Rosenbaum and Rosenberg "emigrated" from German between 1933 and 1935 is "insufficient to establish that either of those art dealers would have ceased to be German nationals by June/July 1935"); *see also* SAC ¶ 172 (alleging that Rosenberg was stripped of German citizenship in 1941).   Defendant concludes and this Court agrees that Plaintiffs fail to meet "their burden of pleading facts establishing that either [Rosenbaum or Rosenberg] was no longer a German national in 1935." Def.'s Reply, ECF No. 67, at 26; *see Simon II*, 2021 WL 6196995, at *19 (dismissing claims of four plaintiffs for whom "nothing in the record suggest[ed] a lack of Hungarian nationality at the relevant time").

## IV. CONCLUSION

For the reasons explained herein, this Court has determined that Plaintiffs failed to preserve their argument that the sale of the Welfenschatz is not subject to the domestic takings rule because the Consortium members were not German nationals at the time of the sale.   Even assuming *arguendo* that such argument was preserved, this Court finds that Plaintiffs failed to provide adequate information in support of their contention that the art dealers were not German nationals at the time of the sale.  Plaintiffs direct this Court to general allegations in the Amended Complaints regarding the treatment of Jews during the relevant period and a statement that two of the art dealers emigrated to the Netherlands by 1935 and left their business in Germany to be run by the brother of one of them.  To survive a motion to dismiss, a plaintiff must plead facts "mak[ing] out a legally valid claim that a certain kind of right is at issue (property rights) and that the relevant property was taken in a certain way (in violation of international law)."  *See Helmerich I*, 137 S. Ct. at 1316.  On the record before this Court, the Court finds that Plaintiffs fail to meet their burden

of pleading facts establishing that the Consortium members were not German nationals at the time

of the sale.  Accordingly, because this transaction falls within the domestic takings rule and is not

within the scope of the FSIA's expropriation exception, Defendant's [63] Motion to Dismiss the

Second Amended Complaint shall be granted.  A separate Order accompanies this Memorandum

Opinion.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE